**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Princeton Pike Corporate Center
997 Lenox Drive, Bldg. 3
Lawrenceville, NJ  08648
(609) 896-3600; (609) 896-1469 (fax)
Hal L. Baume, Esquire (HB 6668)
Teresa M. Dorr, Esquire (TD 3845)
hbaume@foxrothschild.com
tdorr@foxrothschild.com
Proposed Counsel for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br>Oskar Huber Fine Furniture Incorporated,<br><br>                              Debtor. | Chapter 11<br>Case No. 08-28136<br>(Joint Administration Requested) |
| In re:<br>Oskar Huber, Inc., f/t/a Oskar Huber Furniture and Design,<br><br>                              Debtor. | Chapter 11<br>Case No. 08-28138<br>(Joint Administration Requested) |
| In re:<br>DD-OH Family Partners, LLC, t/a DD Huber Furniture & Design, and Oskar Huber Furniture & Design,<br><br>                              Debtor. | Chapter 11<br>Case No. 08-28140<br>(Joint Administration Requested) |
| In re:<br>JD Garber Furniture, LP, f/t/a D&D Home Furnishings,<br><br>                              Debtor. | Chapter 11<br>Case No. 08-28143<br>(Joint Administration Requested) |
| In re:<br>JDG of DE, LP,<br><br>                              Debtor. | Chapter 11<br>Case No. 08-28144<br>(Joint Administration Requested) |
| In re:<br>JDG of PA, LP,<br><br>                              Debtor. | Chapter 11<br>Case No. 08-28145<br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR AN INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105,
361, 362, AND 363 AND BANKRUPTCY RULE 4001 (I) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL (II) GRANTING LIENS AND ADEQUATE
PROTECTION, AND (III) SCHEDULING A FURTHER HEARING**

Oskar Huber Fine Furniture, Inc. ("OHFF") Oskar Huber, Inc. ("OH"), DD-OH Family Partners, LLC, t/a DD Huber Furniture & Design and Oskar Huber Furniture & Design ("DD-OH"), JD Garber Furniture, LP ("Garber"), JDG of DE, LP, and JDG of PA, LP (and together with DD-OH, OHFF, OH, Garber and JDG of DE, LP, the "Debtors"), Debtors and Debtors-in-Possession, by and through their undersigned proposed counsel, hereby requests the entry of an Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Bankruptcy Rule 4001 (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Liens and Adequate Protection, and (iii) Scheduling a Further Hearing (the "Motion").   In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.    Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105, 361, 362 and 363 and Federal Rule of Bankruptcy Procedure 4001.

## BACKGROUND

4.    On or about September 22, 2008 (the "Petition Date"), each of the Debtors filed a petition (the "Petitions") for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

5.    Contemporaneously with the filing of this Motion (and other "First Day Motions"), the Debtors have filed a Motion for Substantive Consolidation of their Cases; however, pending the

2

entry of an order granting that motion, the Debtors have also requested joint administration of the Petitions (jointly, the "Chapter 11 Case").

6.   The Debtors continue to operate their businesses and operate their properties as debtors-in-possession in accordance with Bankruptcy Code §§ 1107 and 1108.   No trustee, examiner or creditors' committee has been appointed in this Chapter 11 case.

**The Debtors' Businesses**

7.   The Debtors are furniture retailers and provide premier home furnishings and design centers in the greater Philadelphia and South Jersey area.   As of the Petition Date, the Debtors operated eight retail stores under various trade names in New Jersey and Pennsylvania and one outlet store in Allentown, Pennsylvania, offering a wide variety of furniture and household goods from such manufactures as Sealy Mattress Company, Hooker Furniture, and Rowe Furniture.     The Debtors have distinguished themselves in the market by offering furniture to customers seeking quality furniture at a reasonable price.    The Debtors offer numerous custom order options for customers not offered by other major furniture retailers in the area.  The Debtors also provide design services that include home visits to assist customers in furnishing their homes.

*The Oskar Huber Entities*

8.   OH is a New Jersey corporation incorporated in 1927 as a family-owned and operated business that has remained family-owned and has prospered for over three generations in Pennsylvania.   OH built its reputation by offering the highest quality furniture at an exceptional value and by completing the experience by providing its own delivery teams and trucks.  In 2000, OHFF (and together with OH, the "Huber Companies") was formed as a New Jersey corporation when the Huber Companies opened a store in Cherry Hill, New Jersey.    OHFF offered the same quality products to a new customer base.

LV1 988658v1 09/22/08

9.  The Huber Companies have offices located at 618 Second Street Pike, Southampton, Pennsylvania and prior to March 2008 have operated at least six (6) retail furniture stores at the Lawrence Shopping Center, 2495  U.S. Route 1, Lawrenceville, New Jersey, the Valley Fair Shopping Center, 254 West Swedesford Road, Berwyn, Pennsylvania, 2005 Marlton Pike East, Cherry Hill, New Jersey, 200 Tilton Road, Northfield, New Jersey, 101 8th Street, Ship Bottom, New Jersey and in Southampton, Pennsylvania which the Huber Companies lease from various entities.

10. The Huber Companies had annual sales of approximately $23 million in 2006.  In 2007, OH opened two new stores and had annualized sales of over $26 million.

*The JD Garber Entities*

11. Garber is a Pennsylvania Limited Partnership formed in 1997 as a family-owned and operated retail furniture business.  Garber offered similar quality products to its customer base as the Huber Companies, but also appealed to customers seeking quality furniture at a slightly lower price.

12. Garber's offices were previously located in Whitehall PA and since the merger are also located at 618 Second Street Pike, Southampton, Pennsylvania. Prior to March 2008, Garber operated two retail furniture stores at 2028 McArthur Road, Whitehall, Pennsylvania and 1522 Bethlehem Pike, Hatfield, Pennsylvania and a furniture outlet at 1856 Catasauqua Road, Allentown, Pennsylvania.

13. JDG of DE, LP, a Delaware limited partnership, and JDG of PA, LP, a Pennsylvania limited partnership (and together with Garber, collectively, the "Garber Companies") were formed in 2004 in order to own and operate four Lane Home Furnishings brand stores[1].

---

[1] A more complete description of the Garber Companies' relationship with Lane Home Furnishings is set forth below.

LV1 988658v1 09/22/08

14. In 2003, Garber, who was already selling Lane Furniture in its stores, was approached by Lane Home Furnishings ("Lane") with an offer to become part of Lane's expansion into the furniture retail market with free-standing stores specific to their brand.

15. Over the course of the next four years, Garber invested in an expansion to accommodate eight stores to be opened under the Lane name in Pennsylvania, New Jersey and Delaware.  Garber expanded its warehouse facilities, invested in state-of-art computer systems and formed the JDG entities all with an expectation of achieving higher profits and market share.

16. Of the eight stores, four were owned and operated by the JDG entities and four were owned by Lane but operated by the JDG entities.  By the time the final store opened in December 2007, it was apparent that the hoped for benefits of increased sales and profits, market share and exposure to a larger customer base were not realized by the Garber Companies.

17. Garber historically had annual sales of $7 to 11 million prior to its relationship with Lane and the opening of the eight Lane stores.   Following the opening of some of the Lane stores, the Garber Companies' sales increased, but not in an amount sufficient to offset the expenses related to the new stores or to even recoup the expansion costs incurred by Garber.  In fact, the Garber Companies had a net decrease in income during the time it was involved with Lane.

18. In early 2008 after having spent a significant amount of money to accommodate the Lane relationship, Lane and the Garber Companies could not agree on a means of continuing with the business relationship. They therefore agreed to terminate same.  There was a transition period during which the parties worked together and reached a financial resolution.

*Merger Discussions between and among the Huber and Garber Companies*

19. After the Garber Companies' relationship with Lane ended, Garber was left with several hard assets, including delivery trucks, other equipment and a sophisticated inventory control

5

computer system that was much larger than necessary for the three Garber locations. The Garber Companies had also put together a highly trained and nationally recognized IT, computer and sales management staff but not enough stores to benefit from having a significant amount of such assets. Garber also no longer had a warehouse to store its inventory.

20. Over the course of 6 months in the middle to end of 2007, the Garber and Huber Companies engaged in discussions regarding the benefits of working together. The Garber Companies brought the "front-end" hard assets and strong merchandising talent and the Huber Companies brought six locations, the warehousing, inventory control, accounting operations and 80 years of experience in the furniture retail business. Both the Huber and Garber families believed merger was in the best interest of their respective business and customers.

21. The Garber and Huber Companies came to realize that to be profitable in the retail furniture business, they had to have the benefit of economies of scale in advertising, purchasing, corporate overhead and delivery and warehousing. Therefore, on or about March 1, 2008 (the "Merger"), the Garber and Huber Companies merged, forming DD-OH.

22. DD-OH (and together with the Huber Companies and the Garber Companies, the "Merged Companies"), a Pennsylvania limited liability corporation, maintains its offices at the Southampton location occupied by the Huber and Garber Companies and now operates each of the nine locations previously operated separately by the Garber and Huber Companies.

23. The Garber and Huber Companies combined all of their assets, subject to all their liabilities, into DD-OH, with their sole assets being their respective ownership stakes in DD-OH. Pursuant to the merger, DD-OH is owned 50% by OH and 50% by Garber.

24. Prior to the Merger, the Garber and Huber Companies employed over 260 employees. Following the Merger, DD-OH currently employs approximately 220 employees, including 80 to 90

full- and part-time sales people in the nine locations.  The remaining employees compromise (i) the combined "back office" staff at the Southampton location, (ii) IT and professional design staff, (iii) warehouse staff, and (iv) office staff at the nine retail locations.

25. The Merger held the promise of reduced costs in personnel, advertising, delivery and warehousing.   Unfortunately, the Merged Companies never realized the benefits of the reduced overhead cost as sales began to fall markedly immediately following the Merger.

**The Debtor's Secured Creditors[2]**

*The Huber Companies' Relationship with Harleysville National Bank and other Security Interests*

26. On or about March 4, 2005, Harleysville National Bank ("Harleysville") extended credit to OH for working capital in the amount of $1,000,000 (the "OH Commercial Loan").  To evidence its obligations to Harleysville under the OH Commercial Loan, OH executed certain notes, agreements, and other documents, including without limitation, a security agreement granting the Bank a security interest in, *inter alia*, all of OH's inventory, equipment, accounts, chattel paper, instruments, letter-of-credit rights, letters of credit, documents, deposit accounts, and general intangibles (the "OH Collateral") and executed various documents in connection with the OH Commercial Loan and renewal of same as requested by Harleysville.

27. As of the Petition Date, the balance due under the OH Commercial Loan was approximately $1.0 million, including a letter of credit.

28. On or about August 8, 2006, Debtor OH entered into a Business Loan Agreement and Promissory Note for $750,000 with Harleysville.  The Loan was a term note with a balloon payment

---

[2] The Debtors make no representations or admissions as to the extent and validity of the liens asserted against them by various creditors described herein or those that later assert secured liens against the Debtors.   The Debtors hereby reserve all rights to challenge said liens and preserve all defenses, set off rights and counterclaims they may have against the creditors.

due on August 22, 2008 (the "OH Term Note").   The OH Term Note is secured by the OH

Collateral.

29. As of the Petition Date, the balance due on the OH Term Note was approximately

$500,000.  Therefore, as of the Petition Date, the combined balance of the OH Commercial Loan and

the OH Term Note is approximately $1.5 million.

30.  Certain of the Huber Companies' creditors have also filed UCC statements against one

or more of the Huber Companies, including Bernhardt Furniture Company ("Bernhardt"), Stanley

Furniture  Corporation  ("Stanley"),  HDM  Furniture  Industries,  Inc.("HDM")  and  La-Z-Boy

Incorporated ("La-Z-Boy," and together with Bernhardt, Stanley and HDM, sometimes hereinafter

referred to as the "Vendor Creditors").   The Debtors believe that liens of the Vendor Creditors are

limited to the inventory sold by these vendors.

31. Based upon the Debtors' books and records, as of the Petition Date,

> (i) the amount owed to Bernhardt was approximately $85,600 and the
> value of the inventory (the "Bernhardt Collateral") sold by Bernhardt
> was approximately $153,000;
>
> (ii) the amount owed to Stanley was approximately $190,000 and the
> value of the inventory (the "Stanley Collateral") sold by Stanley was
> approximately $221,000;
>
> (iii) the amount owed to HDM was approximately $3,300 and the
> value of the inventory (the "HDM Collateral") sold by HDM was
> approximately $44,000; and
>
> (iv) the amount owed to La-Z-Boy was approximately $175,000 and
> the value of the inventory (the "La-Z-Boy Collateral," and together
> with the Bernhardt, Stanley and HDM Collateral, sometimes
> hereinafter referred to as the "Vendors' Collateral') sold by La-Z-Boy
> was approximately $144,500.

The Debtors believe that the total aggregate amount due these creditors combined does not exceed

approximately $454,000.

LV1 988658v1 09/22/08

*The Garber Companies' Secured Creditors*

32. The Garber Companies do not have a secured line of credit, term loans or other secured obligations. However, the Garber Companies have, in the past, factored their inventory and granted liens to the factor on its assets.

*The DD-OH Alleged Secured Creditor*

33. As of the Petition Date, GE Commercial Distribution Finance Company ("GECDFC," and together with Harleysville, Bernhardt, Stanley, HDM, and La-Z-Boy, sometimes hereinafter referred to individually as a "Secured Creditor" and collectively, as the "Secured Creditors") asserts a claim in the approximate amount of $91,000 secured by DD-OH's accounts, inventory, equipment, general intangibles, chattel paper, negotiable instruments and computer equipment, including proceeds thereof (the "DD-OH Collateral") DD-OH disputes this lien and is in the process of reviewing GECDFC's claims.

*The Debtors' Equipment and Personal Property Liens*

34. The Debtors also have various equipment leases (the "Equipment Leases") which are secured, *inter alia,* by specific pieces of equipment and/or fixtures. The Debtors believe that each of these Equipment Leases are "true leases" however, several parties to whom the Debtors are obligated under these Equipment Leases have filed UCC statements asserting a security interest in the various pieces of equipment. These UCC statements are filed against certain of the Garber and Huber Companies but none are filed against DD-OH.

35. Finally, certain of the Garber and Huber Companies are obligated on several purchase agreements for vehicles utilized by the officers, directors and management personnel.

**Events Leading To Bankruptcy**

36. In the 18 months prior to the Petition Date, the Huber Companies and Garber both opened new stores anticipating that sales would remain constant and that more locations would increase their respective market shares and exposure.  With the Merger, the Huber and Garber Companies expected decreased costs and increased profits based upon the economies of scale.

37. Just following the Merger, the credit crisis hit and the United States economy as a whole took a downturn.  As a result, sales declined immediately and DD-OH had difficulty finding qualified sales people.  In addition to the credit effect on the housing market (which has a strong correlation to the home furnishings market), consumers were feeling the effects of higher gas and food prices as well as uncertainty over the political future of the country. As a result, sales continued to decline and DD-OH had even further difficulty finding and keeping qualified sales people.

38. Within a few months of the Merger, sales had declined forty to fifty percent (40%-50%) from the pre-Merger levels.  At the same time, the costs of inventory increased, affected by the sharp increase in the cost of manufacturing and shipping finished goods.   Delivery costs also increased for the Merged Companies as the price of fuel made the home delivery the Merged Companies were known for far more expensive.   Freight costs have increased on the average of once each month, further reducing the Merged Companies' profit margins.

39. With the reduction in income, concerns in general from potential lenders about furniture being "a high risk industry" as well as historical losses, DD-OH experienced difficulties in obtaining inventory financing.  Their primary factor reduced their terms and would no longer finance further inventory expansions dollar for dollar.  Several other attempts to find financing also failed.

**Debtors' Pre-Petition Efforts To Reorganize**

40. Because of the sudden and drastic drop in sales and the unlikely prospect of a revitalized economy, within the last several months, the Debtors considered numerous options, including

refinancing, new capital contributions, sale of some or all of their assets and/or liquidation of certain of their stores and assets.  The Debtors met with bankers, sought out new investors, other potential merger targets and discussed refinancing with Harleysville.   The Debtors also considered closing under-performing stores and retrenching with financially leaner operations.  None of these efforts were successful.

41. In addition to attempts to obtain financing and/or sell the business, the Debtors requested proposals from different liquidation companies.  After discussions with such liquidation companies, the Debtors determined that a proposal from Planned Furniture Promotions, Inc. ("PFP") was the highest and best proposal and will result in the greatest return to the Debtors' estates and their creditors, both secured and unsecured.

*The Sale Promotion Consulting Agreement with Planned Furniture Promotions, Inc.*

42. As a result of extensive negotiations, the Debtors and PFP entered into the September 18, 2008 Sale Promotion Consulting Agreement (the "PFP Agreement") for the liquidation of the Debtors' inventory (the "Company Inventory" and the "Other Inventory") as part of  a "Going Out of Business Sale" ("GOB Sale")[3].

43. Under the terms of the PFP Agreement[4], PFP will serve as the Debtors' agent for the purpose of conducting GOB Sales at all of the Debtors' sale locations (the "Sale Locations").  As set forth in the PFP Agreement, PFP will;

> (a) provide a team of experienced furniture personnel including a manager and additional sales personnel for the conduct of the Sale. PFP will also arrange for administrative, clerical and warehouse personnel, as necessary;

---

[3] A more complete description of the PFP Agreement and the conduct of the GOB Sale is contained in that certain Motion for the entry of an order pursuant to 11 U.S.C. §§ 105, 363 and 365: (a) authorizing the Debtors to assume pre-petition executory contract, (b) authorizing the Debtors' to conduct a going-out-of-business sale, (c) approving lease rejection procedures and (d) granting other relief (the "GOB Sale Motion"), filed contemporaneously with this Motion and other First Day Motions.
[4] Capitalized terms not defined herein shall have the meanings ascribed them in the GOB Sale Motion.

LV1 988658v1 09/22/08

(b) provide assistance and direction with Sale-related operations including merchandising, display, pricing, tagging, advertising, administrative, sales, delivery, service and other aspects regarding the conduct of the Sale;

(c) make available the benefit of its buying power to provide Additional Inventory for the Sale…

(d) assume responsibility for Sale Expenses … pursuant to the terms and conditions of th[e] Agreement; and

(e) arrange for the advance of funds for Sale Expenses, in PFP's discretion, which advances shall be reimbursed from the proceeds of the Sale.

44. In addition to these aforementioned services, PFP shall assist the Debtors in satisfying customer orders for which a deposit was made prior to the start of the Sale (the "Pre-Sale Orders") and shall receive a commission of five percent (5%) of the gross sales amount (excluding sales taxes) for completing Pre-Sale Orders[5].

45. Under the PFP Agreement, PFP shall pay the Debtors the following amounts: (i) eighty-five percent (85%) of the Company Inventory Cost Value which is estimated to be approximately $4,800,000 (the "Company Inventory Guaranteed Amount"); (ii) thirty percent (30%) of the Other Inventory Cost Value which is estimated to be $1,800,000 (the "Other Inventory Guaranteed Amount"); (iii) one hundred percent (100%) of the Accepted On-Order Merchandise Cost Value and thirty percent (30%) of the Accepted On-Order Merchandise Cost Value if the merchandise is odd, mismatched, damaged or distressed[6] (the "Accepted On-Order Merchandise Guaranteed Amount")(the Accepted On-Order Merchandise Guaranteed Amount, the Company Inventory Guaranteed Amount and the Other Inventory Guaranteed Amount are collectively referred to as the

---

[5] The Debtors have also filed a Motion to Honor Customer Deposits by allowing the Debtors and PFP to fulfill the Pre-Sale Orders.
[6] The approximate value of the Accepted On-Order Merchandise Cost Value has not yet been determined.

LV1 988658v1 09/22/08

"Guaranteed Amount")and (v) a $500,000 augment fee.  Based on the foregoing, the Guaranteed
Amount is estimated to be in excess of $4,600,000.

46. On the first business day following the entry an Order approving the Agreement and Sale,
PFP shall make an Initial Guaranty Payment of 50% of the Guaranteed Amount.  The remaining
unpaid portion of the Guaranteed Amount will be paid within one (1) business day following the
verification and reconciliation by PFP and the Debtors of the Company Inventory Cost Value and
the Other Inventory Cost Value and the issuance of a Final Inventory Report.  The Accepted On-
Order Merchandise Guaranteed Amount will be paid within two (2) business days after the issuance
of the Final Inventory Report with respect to the Accepted On-Order Merchandise.  The parties
believe that the issuance of the Final Inventory Report should take place approximately eight days
after court approval of the PFP Agreement.

47. Through the PFP Agreement, PFP will also pay substantially all of the costs of
conducting the GOB Sales themselves.  Accordingly, a substantial portion of the Debtors' operating
costs during the GOB Sale will be paid for by PFP, relieving the Debtors of substantial
administrative expenses.

48. The Debtors anticipate that the proceeds of the sale will substantially exceed the
aggregate amount of the asserted liens of record set forth hereinabove (some of which, as stated, are
disputed) and therefore will be more than sufficient to satisfy all of its secured creditors holding
valid and allowed secured liens.

49. Based on the foregoing, the Initial Guaranteed Amount to be paid one day after Court
approval of the GOB Sale will exceed $2,300,000 which is higher than the amount of the asserted
liens of Harleysville and the other Secured Creditors discussed herein.  If the Court grants the GOB
Sale Motion on the date requested for hearing on same (10/2/08), then all the foregoing liens will

either be paid, or funds in the amounts asserted with respect to disputed liens will be escrowed pending allowance, as early as October 3, 2008. Even if such amount should not be sufficient, the balance of the Guaranteed Amount (estimated at $2,300,000) will be paid within a short time thereafter.

50. Debtors anticipate that after satisfaction of the secured claims, the remaining sale proceeds, combined with other assets of the Debtors which are not subject to the GOB Sale, will be available for distribution to creditors in accordance with the priorities set forth in the bankruptcy code. The GOB Sale of the Debtors' assets will provide an orderly liquidation of the inventory at the highest price and will result in significantly greater proceeds than if the same assets were sold at auction or other form of quick sale.

51. As set forth herein, despite the Debtors' admirable intentions when it merged the Huber and Garber Companies and the resulting economies of scale experienced by the Merger, the reductions were more than offset by the declining sales, tighter credit options, increased fuel costs and the sagging economy. This left the Debtors with few options, and the ultimate decision was to pursue the GOB Sale and file for relief under chapter 11.

52. Debtors are also considering and analyzing the viability of continuing in business with some of their stores after completion of the GOB Sale. Should that occur, the Debtors will be in a position to file a Plan of Reorganization and emerge from Bankruptcy as a reorganized Debtor. If the Debtors determine otherwise, then the Debtors will file a Plan of Liquidation as soon as possible and practicable after the completion of the GOB Sale.

**Debtor's Require Use of Cash Collateral**

53. The Debtors anticipate that during the course of administration of this Chapter 11 Case, pending Court approval of and consummation and closing on the proposed GOB Sale, referenced

14

herein, they will be able to meet all of their post petition obligations. However, the Debtors require authority to use the funds generated in order to meet their ongoing obligations both while the GOB Sale Motion is pending and while the GOB Sales are underway.

## **RELIEF REQUESTED**

54. Through this Motion, the Debtors respectfully seek an order, pursuant to Bankruptcy Code §§ 105, 361 and 363 and Bankruptcy Rules 2002, 4001 and 9014:

    a. Approving on an interim basis, the terms and conditions pursuant to which the Debtors shall be entitled to use cash collateral and other relief as described in the Interim Order and budget attached thereto (the "Budget") through the date of the Final Hearing (which Debtors will request be set for a date after the hearing on the GOB Sale Motion), a true and correct copy of which is attached hereto as Exhibit "A**;"**

    b. Approving the form and manner of service of notice of this Motion;

    c. Scheduling: (i) an interim hearing (the "Interim Hearing") on this Motion at the earliest possible date; and (ii) a final hearing to consider entry of the Final Order granting the relief sought herein on a permanent basis (the "Final Hearing") no sooner than fifteen (15) days after the hearing on this Motion;

    d. Approving the form and manner of providing notice of the Final Hearing; and

    e. Granting such other and further relief as the Court deems just or proper.

55. Approval of the Debtors' authority to use cash collateral on an interim basis pending the Final Hearing is necessary to provide the Debtors' immediate use of funds, which will allow the Debtors to pay essential operating costs. The Debtors' immediate cash needs, for which it seeks authorization, arise by virtue of its need to pay post petition obligations critical to the continued operation of Debtors' business, such as the salaries of the Debtors' employees, post-petition trade

15

vendors, and other similar vital needs pending approval of the GOB Sale Motion.  Absent the authority to use cash collateral, the Debtors will be unable to pay for the services that are essential to the maintenance of their operations until receipt of the Guaranteed Amount and the successful GOB Sale.   In contrast, the authority to use cash collateral will provide the Debtors with liquidity to manage their businesses.  Accordingly, use of cash collateral is crucial.

56. A hearing on the GOB Sale Motion has been requested for October 2, 2008. If the GOB Sale Motion is granted, the Guaranteed Payment Amount will be funded on October 3, 2008, providing the Debtor with sufficient cash to (i) satisfy the obligations due Harleysville, (ii) and satisfy the valid allowed claims of the other Secured Creditors who have asserted liens or escrow funds sufficient to pay such asserted liens until their validity and amount has been determined  and (iii) fund continuing administrative costs..

57. The Debtors, subject to the approval of this Court, will be authorized to use cash collateral in accordance with the terms of the Budget.

## ARGUMENT

58. Pursuant to Bankruptcy Code § 363(c)(2), "The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless- (A) each entity that has an interest in such cash collateral consent; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease...."  11 U.S.C. §363.  Thus, the use of a secured creditor's cash collateral is conditioned upon either the consent of the secured creditor and/or the provision of adequate protection to the secured creditor by the Debtor.

59. Pursuant to Bankruptcy Code § 361, adequate protection may take the form of periodic cash payments, additional or replacement liens to the extent of diminution in the value of such

16

entity's interest in property, or by such other means "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361(1) - (3).

60. The purpose of providing adequate protection is to protect the value of the creditor's interest in collateral from diminution during the course of the proceedings while the Debtor is using the secured creditor's collateral.  *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr.D.Colo. 1995).  *See, also, In re Cann & Saul Steel Co.*, 76 B.R. 479 (Bankr.E.D.Pa. 1987); and *In re Dunes Casino Hotel,* 69 B.R. 784, 793 (Bankr.D.N.J. 1986) ("Adequate Protection is designed to preserve the secured creditor's position at the time of the bankruptcy.")  Regardless of the form of adequate protection given, "the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case." *Id*

61. The creditor is only entitled to protection of the value of the collateral supporting its secured claim; it is not entitled to adequate protection for lost opportunity costs. *Gallegos,* 193 B.R. at 584-85, *citing, United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988).

62. Debtors believe that Harleysville is fully secured, as the value of the Debtors' assets is substantially higher than the amount of its claim.  And, the price to be paid for Debtor's assets to be sold pursuant to the GOB Sale are also greater than Harleysville's claim.  In fact, Harleysville is over-secured.  Therefore, Harleysville is adequately protected.

63. Further, pursuant to the GOB Sale and the PFP Agreement, on the first business day following the entry of an Order by the Bankruptcy Court approving the GOB Sale, PFP shall fund fifty (50%) percent of the Guaranteed Amount of approximately $4,600,000, (*See,* Section 3.3 of the

Sale Agreement attached to the Motion to Approve GOB Sale).  Fifty percent of that sum ($2,300,000) is by itself more than sufficient to satisfy the amounts due to Harleysville.

64. Finally, pursuant to the PFP Agreement, sums have been set aside for all other liens and encumbrances which shall attach to the Guaranteed Amount; thus, the liens of the Debtors' other Secured Creditors, to the extent they are valid are also adequately protected.

65. The Debtors requested a hearing on the GOB Sale Motion for October 2, 2008.  In the event that the GOB Sale is not approved by the Bankruptcy Court, the Debtors will, at the Final Hearing, present the Court and interested parties with a revised budget in support the Debtors' operations post-petition which will, *inter alia*, provide for adequate protection of the Secured Creditors during the period of such operations.   Debtors will therefore request that the Final Hearing be scheduled for a date after the hearing on the GOB Motion.

66. As additional adequate protection, the Debtors propose to grant the Secured Creditors replacement liens on post petition property of the Debtor with the same validity, priority and subject to the same defenses and claims as the pre petition liens of the Secured Creditors to the extent of any diminution in value of the Secured Creditors' collateral during the chapter 11.  Courts have held that such replacement liens are appropriate in these circumstances to provide secured creditors adequate protection for use of cash collateral for operating expenses. *See, e.g.*, *In re Dynaco Corp.,* 158 B.R. 552 (Bankr.D.N.H. 1993).

67. Thus, to the extent that the Debtors utilize the cash collateral of Harleysville, Harleysville is adequately protected by (i) the actual value of the Debtor's property on which it asserts liens (in which there is a substantial equity cushion), (ii) approval of the GOB Sale which will result in receipt by the Debtors of the Initial Guaranteed Amount one day after such approval which, under the Agreement, must be used to fully satisfy all valid liens (which will attach to such proceeds),

18

which provides sufficient funds to immediately satisfy such liens and (iii) the granting of replacement liens on the Debtors' post petition property with the same extent, validity, perfection and priority and subject to the same defenses as its pre petition liens,.

68. The Debtors other Secured Creditors, who the Debtors believe hold liens solely on the inventory each creditor sold to one or more of the Debtors, are adequately protected by (i) the actual value of the Vendor's Collateral on which it asserts liens, (ii) approval of the GOB Sale which will result in receipt by the Debtors of the Initial Guaranteed Amount one day after such approval which, under the Agreement, must be used to fully satisfy all valid liens (which will attach to such proceeds) and provides sufficient funds to satisfy such liens, and (iii) the granting of replacement liens on the Debtors' post petition property with the same extent, validity, perfection and priority and subject to the same defenses as its pre petition liens.   The Debtors hereby reserve the right to seek a determination of the value of the "Vendor Collateral" as of the Petition Date (the "Petition Date Value") and provide for adequate protection to be provided to the Vendor Creditors as a result determination

69. To the extent the Petition Date Value is less than the amount owed to the Vendor Creditor, the Debtors further reserve the rights to either (i) return the Vendor's Collateral to the Vendor Creditor in full satisfaction and discharge of its lien or (ii) provide for the payment to the Vendor Creditor in an amount equal to the Petition Date Value of the Vendor's  Collateral in full satisfaction  and discharge of its lien.

## **NOTICE IS SUFFICIENT UNDER THE CIRCUMSTANCES**

70. The Debtors submit that given the exigencies of the situation, the timing of the filing, and the Debtors' immediate need for funds, expedited notice as contemplated by Bankruptcy Rule 4001 is sufficient to permit this Court to enter an interim order authorizing Debtors' use of cash collateral.

19

The Debtors will provide notice of the Interim Hearing to: (i) the Office of the United States Trustee, (ii) the Debtors' consolidated thirty (30) largest unsecured creditors, (iii) Harleysville National Bank, (iv) GE Commercial Distribution Finance Company (v) the Debtors' other Secured Creditors, and (vi) all other persons and entities that have requested notice pursuant to Fed. R. Bankr. P. 2002.

71.   The Debtors submit that no other or further notice is necessary.

## NOTICE WITH RESPECT TO FINAL ORDER

72. Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request that they be authorized to provide notice of the Final Hearing on this Motion by serving a copy of the Motion (to the extent not previously served), together with the Interim Order, in accordance with the terms provided in the Interim Order.

73. The cost of mailing a notice to the Debtors' unsecured creditors would be exceedingly expensive, and would not, in the Debtors' view, confer any substantial benefit on the Debtors, their estate or their creditors.  Accordingly, and in light of the urgency of the relief requested, the Debtors respectfully request that any further notice of the Final Hearing, and of the relief requested, other than as provided for in this Motion, be dispensed with and waived.

## NO PREVIOUS RELIEF REQUESTED

74. The Debtor has not previously sought the relief requested herein from this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) GRANT the Motion, (ii) enter the Interim Order, substantially in the form attached hereto, granting the relief requested; (iii) set the Final Hearing; and (iv) grant such other and further relief as is just and proper.

20

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

(Formed in the Commonwealth of Pennsylvania)

*Proposed Counsel to the Debtors and Debtors-in-Possession*

By:  /s/ Teresa M. Dorr

Teresa M. Dorr, Esquire

Dated: September 22, 2008

LV1 988658v1 09/22/08