**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Hal L. Baume (HB 6668)
Joseph R. Zapata, Jr.  (JZ 0671)
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311
(609) 896-3600
hbaume@foxrothschild.com
jzapata@foxrothschild.com
Proposed Counsel for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br>Oskar Huber Fine Furniture Incorporated,<br><br>                    Debtor. | Chapter 11<br>Case No. 08-28136<br>(Joint Administration Requested) |
| In re:<br>Oskar Huber, Inc., f/t/a Oskar Huber Furniture and Design,<br><br>                    Debtor. | Chapter 11<br>Case No. 08-28138<br>(Joint Administration Requested) |
| In re:<br>DD-OH Family Partners, LLC, t/a DD Huber Furniture & Design, and Oskar Huber Furniture & Design,<br><br>                    Debtor. | Chapter 11<br>Case No. 08-28140<br>(Joint Administration Requested) |
| In re:<br>JD Garber Furniture, LP, f/t/a D&D Home Furnishings,<br><br>                    Debtor. | Chapter 11<br>Case No. 08-28143<br>(Joint Administration Requested) |
| In re:<br>JDG of DE, LP,<br><br>                    Debtor. | Chapter 11<br>Case No. 08-28144<br>(Joint Administration Requested) |
| In re:<br>JDG of PA, LP,<br><br>                    Debtor. | Chapter 11<br>Case No. 08-28145<br>(Joint Administration Requested) |

**MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING DEBTORS TO ASSUME PRE-PETITION EXECUTORY CONTRACT (B) AUTHORIZING THE DEBTORS TO CONDUCT A GOING-OUT-OF-BUSINESS SALE, (C) APPROVING LEASE REJECTION PROCEDURES AND (D) GRANTING OTHER RELIEF**

Oskar Huber Fine Furniture, Inc. ("OHFF") Oskar Huber, Inc. ("OH"), DD-OH Family Partners, LLC, t/a DD Huber Furniture & Design, and Oskar Huber Furniture & Design ("DD-OH"), JD Garber Furniture, LP ("Garber"), JDG of DE, LP, and JDG of PA, LP (and together with DD-OH, OHFF, OH, Garber and JDG of DE, LP, the "Debtors"), Debtors and Debtors-in-Possession, by and through their undersigned proposed counsel, respectfully request the entry of an Order pursuant to 11 U.S.C. §§ 105, 363 and 365: (a) authorizing the Debtors to assume the September 19, 2008 Sale Promotion Consulting Agreement, (b) authorizing Planned Furniture Promotions, Inc. to act as Debtors' exclusive agent for conducting a going-out-of-business, bankruptcy liquidation, store closing and similar themed sales (collectively, the "Sale"), (c) approving procedures for the rejection of truck leases and non-residential real property leases and (d) granting other relief (the "Motion"), and in support thereof, respectfully state as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b).

2.     This proceeding is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2).

3.     Venue in this District is properly laid by virtue of, and in accordance with 28 U.S.C. § 1409.

## BACKGROUND

4.     On or about September 22, 2008 (the "Petition Date"), each of the Debtors filed a petition (the "Petitions") for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

5.     Contemporaneously with the filing of this Motion (and other "First Day Motions"), the Debtors have filed a Motion for Substantive Consolidation of their Cases; however, pending the entry of an order granting that motion, the Debtors have also requested joint administration of the Petitions (jointly, the "Chapter 11 Case").

6.     The Debtors continue to operate their businesses and operate their properties as debtors-in-possession in accordance with Bankruptcy Code §§ 1107 and 1108.   No trustee, examiner or creditors' committee has been appointed in this Chapter 11 case.

**The Debtors' Businesses[1]**

7.     The Debtors are furniture retailers and provide premier home furnishings and design centers in the greater Philadelphia and South Jersey area.   As of the Petition Date, the Debtors operated eight retail stores under various trade names in New Jersey and Pennsylvania and one outlet store in Allentown, Pennsylvania, offering a wide variety of furniture and household goods from such manufactures as Sealy Mattress Company, Hooker Furniture, and Rowe Furniture.   The Debtors have distinguished themselves in the market by offering furniture to customers seeking quality furniture at a reasonable price.    The Debtors offer numerous custom order options for customers not offered by other major furniture retailers in the area.  The Debtors also provide design services that include home visits to assist customers in furnishing their homes.

8.     DD-OH, a Pennsylvania limited liability company, was formed in March 2008 and is the result of a merger (the "Merger") between and among OH, OHFF, Garber and JDG of

---

[1] A more complete description of the Debtors' businesses, their history, their secured creditors and the events leading to bankruptcy is contained in the certain Motion for the entry of an Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Bankruptcy Rule 4001 (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Liens and Adequate Protection, and (iii) Scheduling a Further Hearing (the "Cash Collateral Motion") filed contemporaneously with this Motion and other First Day Motions.

DE, LP and JDG of PA, LP (collectively, the "Merged Companies").  DD-OH's offices are located at 618 Second Street Pike, Southampton, Pennsylvania.

9.      OH is a New Jersey corporation incorporated in 1927 as a family-owned and operated business that has remained family-owned and has prospered for over three generations in Pennsylvania.  OH built its reputation by offering the highest quality furniture at an exceptional value and by completing the experience by providing its own delivery teams and trucks.  In 2000, OHFF (and together with OH, the "Huber Companies") was formed as a New Jersey corporation when the Huber Companies opened a store in Cherry Hill, New Jersey. OHFF offered the same quality products to a new customer base.

10.      The Huber Companies' offices are also located in Southampton and prior to March 2008 the Huber Companies operated at least six (6) retail furniture stores at the Lawrence Shopping Center, 2495  U.S. Route 1, Lawrenceville, New Jersey, the Valley Fair Shopping Center, 254 West Swedesford Road, Berwyn, Pennsylvania, 2005 Marlton Pike East, Cherry Hill, New Jersey, 200 Tilton Road, Northfield, New Jersey, 101 8th Street, Ship Bottom, New Jersey and the main store in Southampton, Pennsylvania which the Huber Companies lease from various entities.

11.      Garber is a Pennsylvania Limited Partnership formed in 1997 as a family-owned and operated retail furniture business.  Garber offered similar quality products to its customer base as the Huber Companies, but also appealed to customers seeking quality furniture at a slightly lower price.

12.      Garber's offices were previously located in Whitehall PA and since the merger are also located at 618 Second Street Pike, Southampton, Pennsylvania. Prior to March 2008, Garber operated two retail furniture stores at 2028 McArthur Road, Whitehall, Pennsylvania and

1522 Bethlehem Pike, Hatfield, Pennsylvania and a furniture outlet at 1856 Catasauqua Road, Allentown, Pennsylvania.

13.      JDG of DE, LP, a Delaware limited partnership, and JDG of PA, LP, a Pennsylvania limited partnership (and together with Garber the "Garber Companies") were formed in 2004 in order to own and operate four Lane Home Furnishings brand stores.

14.      In the Merger, the Garber Companies brought the "front-end" hard assets and strong merchandising talent and the Huber Companies brought the warehousing, inventory control, accounting operations and 80 years of  experience in the furniture retail business.   Both the Huber and Garber families believed the Merger was in the best interest of their respective business and customers.

15.      The Garber and the Huber Companies came to realize that to be profitable in the retail furniture business, they had to have the benefit of economies of scale in advertising, purchasing, delivery and warehousing.

16.      DD-OH maintains its offices at the Southampton location occupied by the Huber and Garber Companies and now operates each of the nine locations previously operated separately by the Garber and Huber Companies.

**Events Leading To Bankruptcy**

17.      In the 18 months prior to the Petition Date, the Huber Companies and Garber both opened new stores anticipating that sales would remain constant and that more locations would increase their respective market shares and exposure.  With the Merger, the Huber and Garber Companies expected reduced expense and increased profits based upon the economies of scale.

18.      Just following the Merger, as the newly formed DD-OH was looking forward to increased profits and decreased expenses, the credit crisis hit and the United States economy as a

whole took a downturn.  As a result, sales declined immediately and DD-OH had difficulty finding qualified sales people.

19.    Within a few months of the Merger, sales had declined forty to fifty percent (40%-50%) from pre-Merger levels.  At the same time, the costs of inventory skyrocketed, affected by the sharp increase in the cost of manufacturing and shipping finished goods. Delivery costs also increased for the Merged Companies as the price of fuel made the home delivery the Merged Companies were known for far more expensive.   Freight costs have increased on the average of once each month, further reducing the Merged Companies' profit margins.

20.    With the reduction in income, DD-OH experienced difficulties in obtaining inventory financing.  Their primary factor reduced the terms by which they would finance the Debtors' inventory and would no longer finance further inventory expansions dollar for dollar. DD-OH was told that they were in "a high risk industry."   Several other attempts to find financing also failed.

21.    Because of the sudden and drastic drop in sales and the unlikely prospect of a revitalized economy within the next few months, over the last several months, the Debtors considered several options, including refinancing, new capital contributions, sale of some or all of their assets and/or liquidation of certain of their stores and assets.  The Debtors met with bankers, sought out new investors, other potential merger targets and discussed refinancing with Harleysville National Bank, the Huber Companies' lender.   The Debtors also considered closing under-performing stores and retrenching with financially leaner operations.   None of these efforts were successful.

22.     In addition to attempts to obtain financing and/or sell their businesses, the Debtors requested proposals from different liquidation companies.   After discussions with such liquidation companies, the Debtors determined that the proposal from Planned Furniture Promotions, Inc. ("PFP") was the highest and best proposal and will result in the greatest return to the Debtors' estates and their creditors, both secured and unsecured.

23.     As a result of extensive negotiations, the Debtors and PFP entered into the September 19, 2008 Sale Promotion Consulting Agreement (the "Agreement") for the liquidation of the Debtors' inventory (the "Company Inventory" and the "Other Inventory") as part of the Sale.  A true and correct copy of the Agreement is annexed hereto as <u>Exhibit A</u>.

## <u>REQUESTED RELIEF AND REASONS THEREFOR</u>

24.     The Debtors respectfully submit that the assumption of the Agreement with PFP, the establishment of rejection procedures and the proposed Sale, are in the best interests of the estate and that cause exists to assume the Agreement and conduct a going out of business sale of the Company Inventory.

### I.     <u>Assumption of the Agreement</u>

25.     Bankruptcy Code § 365(a) provides that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract."  11 U.S.C. § 365(a).

26.     The assumption of an agreement under Bankruptcy Code § 365 requires a showing that the debtor demonstrate a sound business justification for doing so.  <u>See</u>, <u>In re Market Square Inn, Inc.</u>, 978 F.2d 116, 121 (3d Cir. 1992) (recognizing that "resolution of this issue of assumption or rejection will be a matter of business judgment by the bankruptcy court"); <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him a good

business reason to grant such an application."); In re First Merchants Acceptance Corp., Nos. 97-1500 & 97-1892(JJF), 1997 Bankr. LEXIS 1492, at *10 (D. Del. Sept. 11, 1997) (applying sound business judgment standard to section 363(b) sale of assets).

27.     Generally, in making this determination, the courts give the debtor's business judgment much deference as the decision to assume an executory contract is an administrative not a judicial matter. Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 849 (Bankr.W.D.Pa. 1987).

28.     Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985).

29.     Unless it can be established that the debtor's decision "was one taken in bad faith or in gross abuse of its retained business judgment," the court should approve the debtor's assumption or rejection determination.  See, e.g. In re Trans World Airlines, Inc., 261 B.R. 103 (Bankr.D.Del. 2001); Wheeling-Pittsburgh, 72 B.R. at 849.

30.     As set forth supra, the Debtors have expended significant time and effort to obtain either financing to maintain the ongoing operations of the businesses or locate purchasers for the business and/or inventory as well speaking with different GOB liquidators.  As a result of such efforts, the Debtors negotiated and entered into the Agreement with PFP.

31.     Pursuant to the Agreement, PFP will serve as the Debtors' exclusive agent for the purpose of conducting a going out of business sale at all of the Debtors' sale locations (the "Sale Locations").  As set forth in the Agreement, PFP will:

(a) provide a team of experienced furniture personnel including a manager and additional sales personnel for the conduct of the Sale. PFP will also arrange for administrative, clerical and warehouse personnel, as necessary;

(b) provide assistance and direction with Sale-related operations including merchandising, display, pricing, tagging, advertising, administrative, sales, delivery, service and other aspects regarding the conduct of the Sale;

(c) make available the benefit of its buying power to provide Additional Inventory[2] for the Sale;

(d) assume responsibility for Sale Expenses … pursuant to the terms and conditions of the Agreement; and

(e) arrange for the advance of funds for Sale Expenses, in PFP's discretion, which advances shall be reimbursed from the proceeds of the Sale.

32.    In addition to these aforementioned services, PFP shall assist the Debtors in satisfying customer orders for which a deposit was made prior to the start of the Sale (the "Pre-Sale Orders") and shall receive a commission of five percent (5%) of the gross sales amount (excluding sales taxes) for completing Pre-Sale Orders.[3]

33.    Pursuant to the Agreement, PFP will be granted a first priority security interest in certain of the Debtors' assets, including the Company Inventory Other Inventory and proceeds thereof.  PFP shall be further entitled to retain all proceeds of the Sale (excluding Pre-Sale Orders) free and clear of liens.

34.    In exchange for entering into the Agreement, the Debtors shall receive the following amounts:  (i) eighty-five percent (85%) of the Company Inventory Cost Value (the

---

[2] The descriptions of the pertinent terms of the Agreement are for ease of reference and the attached Agreement sets forth all terms and conditions.  In the event of any inconsistency between the description set forth in this Motion and the terms of the Agreement, the Agreement shall control.  Capitalized terms set forth in the description not otherwise defined shall have the meanings as set forth in the Agreement.
[3] Simultaneously herewith, the Debtors have filed a First Day Motion seeking authorization to honor certain pre-petition customer deposits by fulfilling their orders.

"Company Inventory Guaranteed Amount"; (ii) thirty percent (30%) of the Other Inventory Cost Value (the "Other Inventory Guaranteed Amount"); (iii) one hundred percent (100%) of the Accepted On-Order Merchandise Cost Value and thirty percent (30%) of the Accepted On-Order Merchandise Cost Value if the merchandise is odd, mismatched, damaged or distressed (the "Accepted On-Order Merchandise Guaranteed Amount" and together with the Company Inventory Guaranteed Amount and the Other Inventory Guaranteed Amount collectively, the "Guaranteed Amount"); and (iv) a $500,000 augment fee.  On the first business day following the entry an Order approving the Agreement and Sale, PFP shall make an Initial Guaranty Payment of 50% of the sum of the Company Inventory Guaranteed Amount and the Other Inventory Guaranteed Amount.  The remaining unpaid portion of the Company Inventory Guaranteed Amount and the Other Inventory Guaranteed Amount  will be paid within one (1) business day following the verification and reconciliation by PFP and the Debtors of the Company Inventory Cost Value and the Other Inventory Cost Value and the issuance of a Final Inventory Report.  The Accepted On-Order Merchandise Guaranteed Amount will be paid within two (2) business days after the issuance of the Final Inventory Report with respect to the Accepted On-Order Merchandise.

35.    As set forth supra, the Debtors have evaluated several options for maximizing the assets of its estate, including conducting its own liquidation sale.  None of the options that the Debtors explored would result in a return to the estate greater and as quickly as the return provided for in the Agreement.

36.    The Debtors do not have a bank line or sufficient cash to continue operations. The payment of the Guaranteed Amount and payment of the Sale Expenses by PFP provides the Debtors with cash during this liquidation process which maximizes the value of the assets for the

benefit of the Debtors, their estates and creditors.  If the Debtors do not immediately assume the Agreement, the value of the return to the estates will be greatly reduced.  In addition, the Debtors do not have sufficient cash or a bank line to continue their operations.

37.    The Debtors respectfully submit that the assumption of the Agreement is in the best interests of the Debtors, their estates, all creditors and parties in interest.  The proceeds of the Guaranteed Amount will be sufficient to satisfy all of the Debtors' secured creditors. On addition, the Debtors anticipate that after satisfaction of the secured claims, the remaining portion of the Guaranteed Amount, combined with other assets of the Debtors which were not subject to the Agreement, will pay administrative expense and unsecured claims in full and also provide for a distribution to general unsecured creditors.

38.    As such, the Debtor submits that cause exists for the assumption of the Agreement.

## II.    Rejection of Leases

39.    The Debtors further seek approval of an orderly process for the rejection of executory contracts, personal property leases and non-residential real property leases.

40.    PFP will be occupying the Sale Locations and will also be using certain trucks leased by the Debtors for the Sale.  As such, and pursuant to the Agreement, PFP will be responsible for the Sale Expenses for the Sale Locations and each of the trucks (e.g. gas, routine maintenance, mileage charges, tolls and inspection costs, if due) during the period of the Sale.

41.    At some point during the Sale, Sale Locations and trucks will no longer be necessary and/or further utilized by PFP.

42.    In order to avoid unnecessary administrative costs to the estate, the Debtors request that the Court approve the following rejection procedure:

(a)     PFP will serve the Debtors with written notice seven (7) days prior to the termination of the use of the truck(s) or Sale Location(s) (the "Seven Day Notice Period") of their intent to no longer occupy and/or use the same.  PFP will be responsible to pay the Sale Expenses for the Truck(s) and Sale Location(s) as agreed in the Agreement until the expiration of the Seven Day Notice Period;

(b)     On or before four (4) days prior to the expiration of the Seven Day Notice Period, the Debtors shall serve the landlord(s)/lessor(s) with a notice of rejection (the "Rejection Notice") of the lease(s).; and

(c)     The affected lease(s) shall be deemed rejected upon the expiration of the Seven Day Notice Period.

43.     The above rejection procedures will minimize administrative costs to the estate in paying rent and lease payments for Sale Locations and Trucks that are no longer being utilized by the Debtors or PFP during the Sale.  In addition, the Debtors respectfully submit that the proposed rejection procedures will afford the landlords and lessors with a greater opportunity to mitigate their damages.

**III.     Approval of the Sale**

44.     Bankruptcy Code § 363(b) authorizes a debtor-in-possession, subject to Court approval and after notice and a hearing, to use, sell or lease property of the estate, outside the ordinary course of business.  *See In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by § 363(b)).  To obtain court approval to use property under § 363(b) of the Bankruptcy Code for the purpose of a sale such as ours,  the debtor need only show a legitimate business justification for the proposed action.  *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 993 F.2d 513, 515 (7th Cir. 1991)); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (7th Cir. 1983) (same).

45.      In interpreting Bankruptcy Code § 363(b), courts have approved sales of assets, including those of substantially all of the debtor's assets, prior to confirmation.  See, e.g., Stephens Industries, Inc. v. McClung, 789 F.2d 386, 389 (6th Cir. 1986); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-150 (3d Cir. 1986); In re After Six Inc., 154 B.R. 876 (Bankr. E.D. Pa. 1993); In re Weatherly Frozen Food Group, Inc., 149 B.R. 480 (Bankr. N.D. Ohio, 1992).  A showing of an emergency is no longer required; Courts in the Third Circuit only require that the debtor demonstrate a sound business reason for the sale.  See, e.g., In re Industrial Valley Refrig. & Air Cond. Supp., 77 B.R. 15, 20 (Bankr. E.D.Pa. 1987), and In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.Del.  1991).

46.      At this juncture the Debtors are unable to continue to operate their business on a going forward basis as the expenses continue to substantially exceed profits.  Absent the Sale, any profits to be received will solely go to the payment of such expenses and negate any potential recovery by unsecured creditors.  As such, the Debtors respectfully submit that they believe that in their sound business judgment they must conduct the Sale.  Based upon the current market conditions and the present status of the furniture business in general, the Debtors believe that the liquidation of its inventory is in the best interests of creditors and provides the most efficient mechanism to maximize their value.

47.      Prior to approving a sale of assets pursuant to Bankruptcy Code § 363(b), the court must find "good faith" on the part of the proposed purchaser.  As noted by the Third Circuit in Abbotts Dairies,

> [T]he requirement that a purchaser act in good faith...speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

Abbotts Dairies, 788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also After Six, Inc., 154 B.R. at 881; Weatherly Frozen Food Group, Inc., 149 B.R. at 483.

48.    In addition to "good faith," the proposed purchaser must purchase the assets for "value[.]"    Abbotts Dairies, 788 F.2d at 147.    See also After Six, Inc., 154 B.R. at 881; Weatherly Frozen Food Group, Inc., 149 B.R. at 483.

49.    In the present case, PFP is clearly a good faith purchaser for value.  As set forth supra, the entry into the Agreement was a result of extensive arms length negotiations and only entered into after the Debtors had performed an exhaustive review of other financing or liquidation options.  A guaranteed return is being paid by PFP to the Debtors, and PFP is assuming all Sale-related expenses.  To the extent funds are not immediately available to pay such expenses as they are due, PFP will fund such expenses directly.

50.    In addition to the Guaranty Amount, PFP is also paying the Debtors a $500,000 augment fee.

### a.    Approval of the Going Out of Business Sale

51.    Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors.  See, Ames, 136 B.R. at 359 (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring a Debtor to maximize estate assets").  Bankruptcy courts have approved similar store closing sales.  See, e.g., In re London Fog, Inc., No. 99-3446 (PM) (Bank. D. Del. Oct. 7, 1999); In re Starter Corp., No. 99-906 (PJW) (Bankr. D. Del. July 2, 1999); WSR Corporation, et al., No. 98-1241 (MFW) (Bankr. D. Del. October 28, 1998); HomePlace Stores, Inc., et al., No. 98-8 (PJW) (Bankr. D. Del. June 15, 1998); In re Montgomery Ward Holding Corp., No. 97-1409 (PJW) (Bankr. D. Del. Nov. 7, 1997)

(authorizing debtor to conduct store closing sales and granting related relief); In re Edison

Brothers Stores, Inc., No. 95-1353 (PJW) (Bankr. D. Del. June 25, 1997) (same).

52.    As such, the Debtors request the Court authorize the Sale as set forth herein.

**b.    The Court Should Waive Compliance with any State and Local Laws, Statutes, Rules and Ordinances Restricting Going Out of Business Sales**

53.    The Debtors also seek authority to conduct the Sale without complying with any

local laws, including, without limitation, local laws related to bulk sale laws, advertising,

licensing requirements and procedures, waiting periods or time limits, inventory augmentation

and transferring merchandise between Sale Locations; provided, however, that the Debtors

(and/or their agents) continue to be bound by and comply with public safety and health laws, to

the extent applicable.

54.    Many state and local laws, statutes, rules and ordinances require special and

cumbersome licenses, waiting periods, time limits, and other procedures for "going-out-of-

business" store closing, liquidation, or similar sales conducted outside of bankruptcy.  In

addition, some states and localities have statutes or regulations requiring creditor notification

before a company conducts a bulk sale.  However, in the context of bankruptcy cases such as

these, when creditors receive notice of the proposed sale, as well as opportunity to be heard in

this Court, enforcement of such statutes and regulations is redundant and unnecessary.

55.    As a general matter, under 28 U.S.C. § 959(b), "a debtor-in-possession must

manage and operate the property . . . according to the requirements of the valid laws of the state

in which such property is situated. . . ."  Courts, however, have held that a debtor-in-possession

that is liquidating estate assets does not "manage and operate" the property for the purposes of

§ 959(b).  See Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining

Co., Inc.), 963 F.2d 1449, 1460-61 (11th Cir. 1992) (holding that § 959(b) does not apply when

debtor-in-possession is liquidating property and not operating business); Missouri v. United States Bankruptcy Court, 647 F.2d 768, 778 n. 18 (18th Cir. 1981) (same), cert. denied, 454 U.S. 1162 (1982); Missouri Dept. of Natural Res. v. Valley Steel Products Co., Inc. (In re Valley Steel Products Co., Inc.), 157 B.R. 442, 447-48 (Bankr. E.D. Mo. 1993) (same); In re Corona Plastics, Inc., 99 B.R. 231, 235-36 (Bankr. D.N.J. 1989) (same); Matter of Bourne Chemical Co., 54 B.R. 126, 135 (Bankr. D.N.J. 1984) (holding that "(s)ection 959(b) is applicable only where the property is being managed or operated for the purpose of continuing operations"). Because the Debtors seek to liquidate the Debtors' inventory, § 959(b) does not require compliance with these state and local licensing procedures and other regulations, especially when the Debtors will conduct the Sale with the knowledge and oversight of the creditors and this Court.

56.     Moreover, federal bankruptcy law preempts state and local laws that conflict with the underlying policies of the Bankruptcy Code. See Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995), aff'd, 112 F.3d 633 (3d Cir. 1997) ("[T]rustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . [A] state statute [] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."). While preemption of state law is not always appropriate, preemption is appropriate when, as here, the only state laws involved concern economic regulation rather than the protection of public health and safety. See Baker & Drake, Inc. v. Public Serv. Comm'n of Ne (In re Baker & Drake, Inc.), 35 F.3d 1348, 1353 (9th Cir. 1994) (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); see also In re Scott Housing Sys., Inc., 91 B.R. at 196-97 (holding that the automatic stay under Bankruptcy Code § 362 is broad and preempts state law except for those laws designated to

protect public health and safety).

57.     Here, state and local licensing requirements, time limits or bulk sale restrictions on liquidation sales would undermine the fundamental purpose of Bankruptcy Code § 363(b) by placing constraints on the Debtor's ability to marshal and maximize estate assets for the benefit of creditors.

58.     Accordingly, the Debtors respectfully request that the Court authorize them to conduct the Sale and related transactions without the necessity of, and the delay associated with, obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and the like.  In addition, the Debtors request that the Court waive any bulk sales laws, to the extent applicable, since creditors are protected by the notice provided by the Motion and the jurisdiction of the Court.  Finally, the Debtors request that the Court enjoin any action by any federal, state or local agency, department or governmental authority or any other entity to prevent, interfere with, or otherwise hinder consummation of the Sale or advertisement of such sale.

59.     The requested waiver is narrowly tailored to facilitate the successful consummation of the Sale pursuant to the terms of the Agreement. The Debtors do not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales.  The Debtors fully intend to be bound by and comply with state and local health and safety laws.

60.     Bankruptcy Courts have granted similar relief in numerous cases.  See e.g., George Kerr, Inc., Case No. 08-23066; Reliable Furniture, Inc., No. 08-19068; Klavohn's New Leaf, Inc., Case No. 08-80401; Mastercraft Interiors Ltd., No. 06-12769; Levitz Furniture, Inc., No. 97-1842; London Fog, Inc., No. 99-3446 (authorizing closing of stores and granting relief

from state and local regulatory statutes and ordinances and lease provisions regulating going-out-of-business sale); <u>WSR Corporation, et al.</u>, 98-1241; <u>In re Montgomery Ward Holding Corp.</u>, No. 97-1409; <u>In re Edison Bros. Stores, Inc.</u>, No. 95-1354.

61.    In connection with the foregoing, the Debtors request that the Court enter an order that includes restraining provisions that would enable the Debtors to conduct the Sale in an orderly manner so that any action that might be taken to impede such sales can be avoided. As described above, any delay in conducting the Sale would be extremely damaging.  As such, authorization to conduct such sales without compliance with local ordinances or regulations is absolutely essential.

**c.**    <u>**Leasehold Restrictions on Going Out of Business Sales are Unenforceable**</u>

62.    Certain of the leases governing the Debtors' stores may contain provisions purporting to restrict or prohibit the Debtors from "going dark" and/or conducting going-out-of-business sales, store closing, liquidation or similar sales at the Sales Locations.  Such provisions are unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to maximize the value of its assets under Bankruptcy Code § 363.  <u>See</u>, <u>e.g.</u>, <u>In re R.H. Macy & Co., Inc.</u>, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding restrictive lease provisions unenforceable in chapter 11 case when debtor sought to conduct going-out-of-business sale); <u>Ames</u>, 136 B.R. at 359 ("[T]o enforce the anti-GOB sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress").

63.    Accordingly, no clause in any of the leases for the Sale Locations should act as an impediment to the Sale or any activities in connection therewith.  To the extent that any such restrictions exist in the leases, the Debtors request that the Court grant to the Debtors and PFP

authority to conduct the Sale without complying with such restrictive lease provisions and enjoin the lessors from (1) interfering with or otherwise restricting the Debtors and PFP from conducting the Sale and, (2) seeking to recover damages for breach of the restrictive provisions.

64.     It is respectfully submitted that provisions have been specifically placed in both the Agreement and the proposed Order seeking to protect and properly maintain the Sales Location during the Sale.  In addition, PFP shall be responsible for, and the landlords shall be paid, per diem rent for the use of the respective Store Locations during the Sale and any rent required to be paid under 11 U.S.C. § 365 that is not paid by PFP will be paid by the Debtors. As such, any concerns that any of the landlords should have with such Sale should be allayed by same.

### d.     **Augmenting of Inventory**

65.     In addition to seeking authority to sell the Company Inventory and the Other Inventory, the Debtors also seek authority to permit PFP to augment the Debtors' inventory. The purpose of augmenting inventory is to, among other things, allow the Sale to benefit from the best available selection of merchandise and to allow customers who paid deposits prior to the Petition Date to receive their merchandise.

66.     In similar cases in other districts involving furniture inventory liquidations at retail stores, bankruptcy courts have approved agency agreements with similar augmentation provisions. See, e.g., In re Mastercraft Interiors Ltd., No. 06-12769 (PM) (Bankr. D. MD. 2006); In re George Kerr, Inc., Case No. 08-23066 (JKF) (Bankr. W.D. PA June 4, 2008); In re Klavohn's New Leaf, Inc., Case No. 08-80401 (Bankr. Cent. D. Il. April 11, 2008); In re Breuners Home Furnishings Corp., Case No. 04-12030 (Bankr. D. Del. July 30, 2004); In re Levitz Furniture Inc., Case No. 97-1842 (Bankr. D. Del. Sept. 19, 2001); In re Heilig-Meyers

Co., Case No. 00- 34533 (Bankr. E.D. Va. Apr. 24, 2001); In re HomeLife Corp., Case No. 01-

2412 (Bankr. D. Del. Aug. 1, 2001); In re Mondi of Am., Inc., Case No. 99-3986 (Bankr. D. Del.

Nov. 12, 1999).

      **e.**      **Sale of the Property Free and Clear of Liens**

      67.      The Debtors respectfully submit that the Sale, which involves the sale of both

Company Inventory and Other Inventory, must be made free and clear of liens.

      68.      Pursuant to Bankruptcy Code § 363(f), the sale of the property of the estate may

be made free and clear of liens in such property to the extent:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater that the aggregate value of the liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

      69.      As Bankruptcy Code § 363(f) is written in the disjunctive, the Sale is permissible

if any one of the five conditions are met. In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988).

      70.      The Debtors respectfully submit that the amount to be received by the Debtors

from the Sale is greater than the aggregate value of the liens on the Company Inventory and

Other Inventory to be sold under the Agreement.

      71.      Certain claims and/or liens against the Debtors may be in dispute.

72.    To the extent that liens of secured creditors against the Company Inventory are not in dispute, paragraph 3.3 (b)(1) of Agreement provides that such secured creditors will be paid and their claims will be satisfied first and foremost as part of the Guaranty Amount to be paid by PFP to the Debtors.

73.    In addition, any valid liens not paid at that time will attach to the Guaranty Amount.

74.    As such, the Debtors submit that the approve of the Sale free and clear of liens is not only appropriate, but warranted under the facts of this case.

    **f.**    **Request for Relief Under Rule 6004 of the Federal Rules of Bankruptcy Procedure**

75.    Rule 6004(h) of the Federal Rules of Bankruptcy Procedure provides that an order authorizing the sale of a debtor's property or assumption/rejection of a lease is stayed for a period of ten (10) days after entry of the order unless the court orders otherwise.

76.    The Debtors' need to effectuate the Sale without waiting the ten (10) day period provided for under Bankruptcy Rule 6004(h) is acute.  The failure to expeditiously consummate the transactions under the Agreement will have a significantly adverse impact upon the value to be realized upon the disposition of the Debtors' assets.  The transaction is extremely time sensitive, as the dates reflected in the Agreement make clear.  In addition, the Debtors' liquidity concerns also compel the Debtors to effectuate the Sale as expeditiously as possible.

77.    As such, the Debtors request that any Order approving the relief requested herein be effective immediately and that the ten (10) day stay period under Rule 6004 is deemed inapplicable and/or waived.

## Notice

78.    Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) Harleysville National Bank or its counsel; (iii) PFP; (iv) state Attorneys General for the states in which there is a Sale Location, i.e., the Attorneys General of New Jersey and Pennsylvania;(v) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis or their counsel.

79.    As this Motion is seeking "first day" relief, upon entry of an Order setting a hearing of "first day" motions (the "Order"), the Debtors shall also serve the Motion and Order on (i) Debtors' other secured creditors or their counsel; (ii) Debtors' landlords; (iii) the Attorneys General for the States of New Jersey and Pennsylvania; (iii) the city and county consumer protection agency (or if none, the local District Attorney(s)) for each city and county in which there is a Sale Location; (v) the division of consumer protection, if any, for each municipality in which there is a Sale Location; (vi) federal, state and local taxing authorities; and (vii) all parties requesting notice in these proceedings pursuant to Fed.R.Bankr.P.2002.

80.    The Debtors represent that the facts and circumstances set forth herein do not present novel questions of law, and, as such, respectfully requests that this Bankruptcy Court waive the requirement of the filing of a memorandum of law in accordance with D.N.J. LBR 9013-1(b).

81.    No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully requests entry of an Order (a) authorizing the Debtors to assume the September 19, 2008 Sale Promotion Consulting Agreement; (b) authorizing Planned Furniture Promotions, Inc. to act as Debtors' exclusive agent for conducting a going out of business, bankruptcy liquidation, store closing and similarly themed sale; (c) approving procedures for the rejection of  truck leases and non-residential real property leases; and (d) granting such other and further relief as is just.

Respectfully Submitted,

**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
*Proposed Counsel to the Debtors*


By: ___/s/ Joseph R. Zapata, Jr._____
        Joseph R. Zapata, Jr., Esquire

Dated: September 22, 2008