**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Princeton Pike Corporate Center
997 Lenox Drive, Bldg. 3
Lawrenceville, NJ  08648
(609) 896-3600
(609) 896-1469 (fax)
Hal L. Baume, Esquire (HB 6668)
hbaume@foxrothschild.com
Proposed Counsel for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br>Oskar Huber Fine Furniture Incorporated,<br><br>Debtor. | Chapter 11<br>Case No. 08-28136<br>(Joint Administration Requested) |
| In re:<br>Oskar Huber, Inc., f/t/a Oskar Huber Furniture and Design,<br><br>Debtor. | Chapter 11<br>Case No. 08-28138<br>(Joint Administration Requested) |
| In re:<br>DD-OH Family Partners, LLC, t/a DD Huber Furniture & Design, and Oskar Huber Furniture & Design,<br><br>Debtor. | Chapter 11<br>Case No. 08-28140<br>(Joint Administration Requested) |
| In re:<br>JD Garber Furniture, LP, f/t/a D&D Home Furnishings,<br><br>Debtor. | Chapter 11<br>Case No. 08-28143<br>(Joint Administration Requested) |
| In re:<br>JDG of DE, LP,<br><br>Debtor. | Chapter 11<br>Case No. 08-28144<br>(Joint Administration Requested) |
| In re:<br>JDG of PA, LP,<br><br>Debtor. | Chapter 11<br>Case No. 08-28145<br>(Joint Administration Requested) |

**CERTIFICATION OF J. DAVID GARBER IN SUPPORT
OF FIRST DAY MOTIONS AND ORDERS**

LV1 988798v1 09/23/08

**COMMONWEALTH OF PENNSYLVANIA**       :
                                       :   SS
**COUNTY OF BUCKS**                    :

   J. David Garber, being duly sworn, deposes and says:

1. I am the Chief Operating Officer of DD-OH Family Partners, LLC, t/a DD Huber Furniture & Design and Oskar Huber Furniture & Design, one of the Debtors in the above captioned cases and I have knowledge of these matters.

2. I submit this certification in support of the following Motions (collectively, the "First Day Motions"):

    a) Motion for the entry of an Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Bankruptcy Rule 4001 (i) Authorizing the Debtors to Use Cash Collateral, (ii) Granting Liens and Adequate Protection, and (iii) Scheduling a Further Hearing (the "Cash Collateral Motion");

    b) Motion for the entry of an order pursuant to 11 U.S.C. §§ 105, 363 and 365: (a) authorizing the Debtors to assume the September 19, 2008 Sale Promotion Consulting Agreement, (b) authorizing Planned Furniture Promotions, Inc. to act as Debtors' exclusive agent for conducting a going out of business sale, and (c) granting other relief (the "GOB Sale Motion");

    c) Motion to Substantively Consolidate the Debtors' Chapter 11 Cases (the "Substantive Consolidation Motion");

    d) Motion for the entry of an order authorizing (i) the payment of prepetition date wages, salaries, commissions vacation pay and employee benefits, and (ii) reimbursement of employee business expenses pursuant to 11 U.S.C. §§ 105, 363, 507(a)(4) and 507(a)(5) (the "Wages Motion");

    e) Motion for entry of an Order for (A) Interim Relief Pursuant to 11 U.S.C. § 366(b) and (B) Setting Method of Service of Opportunity for Hearing Objections to Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Post-Petition Utility Services (the "Utilities Motion");

    f) Motion for the entry of an Order, pursuant to 11 U.S.C. §105(a) Authorizing the Debtors to Honor Certain Pre-Petition Customer Deposits by Fulfilling their Orders (the "Customer Deposits Motion");

    g) Motion for the entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 1107 and 1108 (A) Authorizing Maintenance of Existing Bank Accounts, Cash Management System, (B) Continued Use of Existing Business Forms and (C) Waiving Deposit Guidelines under 11 U.S.C. §345 (the "Bank Accounts Motion");

2

  h) Motion Seeking Joint Administration of Multiple Debtor Bankruptcy Cases (the "Joint Administration Motion"); and

  i) Motion for Order Authorizing the Debtors an Extension of Time Within Which to File Statements and Schedules (the "Extension of Time Motion").

**General Background And Debtors' Business History**

  3. The Debtors are furniture retailers and provide premier home furnishings and design centers in the greater Philadelphia and South Jersey area. As of the Petition Date, the Debtors operated eight retail stores under various trade names in New Jersey and Pennsylvania and one outlet store in Allentown, Pennsylvania, offering a wide variety of furniture and household goods from such manufactures as Sealy Mattress Company, Hooker Furniture, and Rowe Furniture. The Debtors have distinguished themselves in the market by offering furniture to a customers seeking quality furniture at a reasonable price. The Debtors offer numerous custom order options for customers not offered by other major furniture retailers in the area. The Debtors also provide design services that include home visits to assist customers in furnishing their homes.

  4. OH is a New Jersey corporation incorporated in 1927 as a family-owned and operated business that has remained family-owned and has prospered for over three generations in Pennsylvania. OH built its reputation by offering the highest quality furniture at an exceptional value and by completing the experience by providing its own delivery teams and trucks. In 2000, OHFF (and together with OH, the "Huber Companies") was formed as a New Jersey corporation when the Huber Companies opened a store in Cherry Hill, New Jersey. OHFF offered the same quality products to a new customer base.

  5. The Huber Companies' offices are located at 618 Second Street Pike, Southampton, Pennsylvania and prior to March 2008 the Huber Companies operated at least six (6) retail furniture stores at the Lawrence Shopping Center, 2495 U.S. Route 1, Lawrenceville, New Jersey, the Valley Fair

3

Shopping Center, 254 West Swedesford Road, Berwyn, Pennsylvania, 2005 Marlton Pike East, Cherry Hill, New Jersey, 200 Tilton Road, Northfield, New Jersey, 101 8th Street, Ship Bottom, New Jersey and the main store in Southampton, Pennsylvania which the Huber Companies lease from various entities.

6. Garber is a Pennsylvania Limited Partnership formed in 1997 as a family-owned and operated retail furniture business. Garber offered similar quality products to its customer base as the Huber Companies, but also appealed to customers seeking quality furniture at a slightly lower price.

7. Garber's offices were previously located in Whitehall PA and since the Merger are also located at 618 Second Street Pike, Southampton, Pennsylvania. Prior to March 2008, Garber operated two retail furniture stores at 2028 McArthur Road, Whitehall, Pennsylvania and 1522 Bethlehem Pike, Hatfield, Pennsylvania and a furniture outlet at 1856 Catasauqua Road, Allentown, Pennsylvania.

8. JDG of DE, LP, a Delaware limited partnership, and JDG of PA, LP, a Pennsylvania limited partnership (and together with Garber, collectively, the "Garber Companies") were formed in 2004 in order to own and operate four Lane Home Furnishings brand stores.

9. DD-OH was formed in March 2008 and is the result of a merger (the "Merger") between and among OH, OHFF, Garber and JDG of DE, LP and JDG of PA, LP (collectively, the "Merged Companies"). DD-OH's offices are located at 618 Second Street Pike, Southampton, Pennsylvania.

**Events Leading To Bankruptcy**

10. In the 18 months prior to the Petition Date, the Huber Companies and Garber both opened new stores anticipating that sales would remain constant and that more locations would increase their respective market shares and exposure. With the Merger the Huber and Garber Companies expected decreased costs and increased profits based upon the economies of scale.

4

11. Just following the Merger the credit crisis hit and the United States economy as a whole took a downturn. As a result, sales declined immediately and DD-OH had difficulty finding qualified sales people. In addition to the credit effect on the housing market (which has a strong correlation to the home furnishings market), consumers were feeling the effects of higher gas and food prices as well as uncertainty over the political future of the country. As a result, sales declined immediately. DD-OH had difficulty finding and keeping qualified sales people because of the downturn in sales.

12. Within a few months of the Merger, sales had declined forty to fifty percent (40%-50%) from the pre-Merger levels. At the same time, the costs of inventory increased, affected by the sharp increase in the cost of manufacturing and shipping finished goods. Delivery costs also increased for the Merged Companies as the price of fuel made the home delivery the Merged Companies were known for far more expensive. Freight costs have increased on the average of once each month, further reducing the Merged Companies' profit margins.

13. With the reduction in income, concerns in general from potential lenders about furniture being "a high risk industry" as well as historical losses, DD-OH experienced difficulties in obtaining inventory financing. Their primary factor reduced their terms and would no longer finance further inventory expansions dollar for dollar. Several other attempts to find financing also failed.

**Debtors' Pre-Petition Efforts To Reorganize**

14. Because of the sudden and drastic drop in sales and the unlikely prospect of a revitalized economy within the next few months, within the last several months, the Debtors considered several options, including refinancing, new capital contributions, sale of some or all of their assets and/or liquidation of certain of their stores and assets. The Debtors met with bankers, sought out new investors, other potential merger targets and discussed refinancing with Harleysville. The Debtors also considered

5

closing under-performing stores and retrenching with financially leaner operations. None of these efforts were successful.

15. In addition to attempts to obtain financing and/or sell the business, the Debtors requested proposals from different liquidation companies. After discussions with such liquidation companies, the Debtors determined that a proposal from Planned Furniture Promotions, Inc. ("PFP") was the highest and best proposal and will result in the greatest return to the Debtors' estates and their creditors, both secured and unsecured.

16. Despite the Debtors' admirable intentions when it merged the Huber and Garber Companies and the resulting economies of scale experienced by the Merger, the reductions were more than offset by the declining sales, tighter credit options, increased fuel costs and the sagging economy. This left the Debtors with few options, and the ultimate decision was to pursue the GOB Sale and file for relief under chapter 11.

17. As part of their filing for relief under the Bankruptcy Code, the Debtor have directed Fox Rothschild LLP, their proposed bankruptcy counsel, to file the First Day Motions described herein.

**A. Cash Collateral Motion**

*The Huber Companies' Relationship with Harleysville National Bank*

18. On or about March 4, 2005, Harleysville National Bank ("Harleysville") extended credit to OH for working capital in the amount of $1,000,000 (the "OH Commercial Loan"). To evidence its obligations to Harleysville under the OH Commercial Loan, OH executed certain notes, agreements, and other documents, including without limitation, a security agreement granting the Bank a security interest in, *inter alia*, all of OH's inventory, equipment, accounts, chattel paper, instruments, letter-of-credit rights, letters of credit, documents, deposit accounts, and general intangibles (the "OH

6

Collateral") and executed various documents in connection with the OH Commercial Loan and renewal of same as requested by Harleysville.

19. .As of the Petition Date, the balance due under the OH Commercial Loan was approximately $1,000,000, including a Letter of Credit.

20. On or about August 8, 2006, Debtor OH entered into a Business Loan Agreement and Promissory Note for $750,000 with Harleysville. The Loan was a term note with a balloon payment due on August 22, 2008 (the "OH Term Note"). The OH Term Note is secured by the OH Collateral.

21. As of the Petition Date, the balance due on the OH Term Note was approximately $500,000. Therefore, as of the Petition Date, the combined balance of the OH Commercial Loan and the OH Term Note is approximately $1,500,000.

22. Certain of the Huber Companies' creditors have also filed UCC statements against one or more of the Huber Companies, including Bernhardt Furniture Company ("Bernhardt"), Stanley Furniture Corporation ("Stanley"), HDM Furniture Industries, Inc.("HDM") and La-Z-Boy Incorporated ("La-Z-Boy"). The Debtors believe that liens of theses companies are limited to the inventory sold by these vendors (and the proceeds from same). Further, both Bernhardt and La-Z-Boy have recently filed new UCC statements listing DD-OH as the responsible party. The Debtors believe that the total aggregate amount due these creditors combined does not exceed approximately $453,000.

*The Garber Companies' Secured Creditors*

23. The Garber Companies do not have a secured line of credit, term loans or other secured obligations. However, the Garber Companies have, in the past, factored their inventory and granted liens to the factor on its assets.

*The DD-OH Alleged Secured Creditor*

24. As of the Petition Date, GE Commercial Distribution Finance Company ("GECDFC," and together with Harleysville, Bernhardt, Stanley, HDM, and La-Z-Boy, sometimes hereinafter referred to individually as a "Secured Creditor" and collectively, as the "Secured Creditors") asserts a claim in the approximate amount of $91,000 secured by DD-OH's accounts, inventory, equipment, general intangibles, chattel paper, negotiable instruments and computer equipment, including proceeds thereof (the "DD-OH Collateral")  DD-OH disputes this lien and is in the process of reviewing GECDFC's claims.

*The Debtors' Equipment and Personal Property Liens*

25. The Debtors also have various equipment leases (the "Equipment Leases") which are secured, *inter alia,* by specific pieces of equipment and/or fixtures.  The Debtors believe that each of these Equipment Leases are "true leases;" however, several parties to whom the Debtors are obligated under these Equipment Leases have filed UCC statements asserting a security interest in the various pieces of equipment.  These UCC statements are filed against certain of the Garber and Huber Companies but none are filed against DD-OH.

26. Finally, certain of the Garber and Huber Companies are obligated on several purchase agreements for vehicles utilized by the officers, directors and management personnel.

27. The Debtors anticipate that during the course of administration of this Chapter 11 Case, pending Court approval of and consummation and closing on the proposed GOB Sale, referenced herein, they will be able to meet all of their post petition obligations.  However, the Debtors require authority to use the funds generated in order to meet their ongoing obligations both while the motion to approve the GOB Sale is pending and while the GOB Sales are underway.

8

28. Through the Cash Collateral Motion, the Debtors seek an order, pursuant to Bankruptcy Code §§ 105, 361 and 363 and Bankruptcy Rules 2002, 4001 and 9014 approving on an interim basis, the terms and conditions pursuant to which the Debtors shall be entitled to use cash collateral and other relief as described in the Interim Order and budget attached thereto (the "Budget") through the Final Hearing (which Debtors will request be set for a date after the hearing on the GOB Sale Motion).

29. Approval of the Debtors' authority to use cash collateral on an interim basis pending the Final Hearing is necessary to provide the Debtors' immediate use of funds, which will allow the Debtors to pay essential operating costs.  The Debtors' immediate cash needs, for which it seeks authorization, arise by virtue of its need to pay post petition obligations critical to the continued operation of Debtors' business, such as the salaries of the Debtors' employees, post-petition trade vendors, and other similar vital needs.  Absent the authority to use cash collateral, the Debtors will be unable to pay for the services that are essential to the maintenance of its operations and the successful GOB Sale.   In contrast, the authority to use cash collateral will provide the Debtors with liquidity to manage its business while the Debtors complete the GOB Sale.  Accordingly, use of cash collateral is crucial.

30. The Debtors believe that Harleysville is fully secured, as the value of Debtors' assets is substantially higher than the amount of its claim.  And, the price to be paid for Debtor's assets to be sold pursuant to the GOB Sale are also greater than Harleysville's debt.  In fact, Harleysville is over-secured.

31. Pursuant to the GOB Sale and the PFP Agreement (defined below), on the first business day following the entry of an Order by the Bankruptcy Court approving the GOB Sale, PFP shall fund fifty (50%) percent of the Guaranteed Amount (the "Guaranteed Amount"), (*See,* Section 3.3 of the Sale Agreement attached to the Motion to Approve GOB Sale), which Guaranteed Amount is estimated to be approximately $4.6 million.

32. Harleysville is owed approximately $1.5 million, which, according to the PFP Agreement and terms of the GOB Sale shall be paid first, with an additional $500,000 to other Secured Creditors from the Guaranteed Amount.

33. In the event the GOB Sale is not approved, the funds generated from the operation of the Debtors' business shall be used for the monthly payments due to Harleysville and to pay other expenses related to the operation of the business outlined in the Budget.

**B. GOB Sale Motion**

34. Pre-Petition, as they considered their options concerning their financial issues, Debtors met with bankers, sought out new investors, other potential merger targets and discussed refinancing with Harleysville. The Debtors also considered closing under-performing stores and retrenching with financially leaner operations. None of these efforts were successful.

35. In addition to attempts to obtain financing and/or sell the business, the Debtors requested proposals from different liquidation companies. After discussions with such liquidation companies, the Debtors determined that a proposal from Planned Furniture Promotions, Inc. ("PFP") was the highest and best proposal and will result in the greatest return to the Debtors' estates and their creditors, both secured and unsecured.

36. As a result of extensive negotiations, the Debtors and PFP entered into the September 19, 2008 Sale Promotion Consulting Agreement (the "PFP Agreement") for the liquidation of the Debtors' inventory (the "Company Inventory") as part of a "Going Out of Business Sale" ("GOB Sale").

37. Under the terms of the PFP Agreement, PFP will serve as the Debtors' agent for the purpose of conducting GOB Sales at all of the Debtors' sale locations (the "Sale Locations"). As set forth in the PFP Agreement, PFP will;

(a) provide a team of experienced furniture personnel including a manager and additional sales personnel for the conduct of the Sale. PFP will also arrange for administrative, clerical and warehouse personnel, as necessary;

(b) provide assistance and direction with Sale-related operations including merchandising, display, pricing, tagging, advertising, administrative, sales, delivery, service and other aspects regarding the conduct of the Sale;

(c) make available the benefit of its buying power to provide Additional Inventory for the Sale…

(d) assume responsibility for Sale Expenses … pursuant to the terms and conditions of th[e] Agreement; and

(e) arrange for the advance of funds for Sale Expenses, in PFP's discretion, which advances shall be reimbursed from the proceeds of the Sale.

38. In addition to these aforementioned services, PFP shall assist the Debtors in satisfying customer orders for which a deposit was made prior to the start of the Sale (the "Pre-Sale Orders") and shall receive a commission of five percent (5%) of the gross sales amount (excluding sales taxes) for completing Pre-Sale Orders.

39. PFP will pay DD-OH, in advance of the GOB Sale, 85% of the value of the Company Inventory and 30% of the value of what is defined as "Other Inventory" and PFP will also pay for the cost of the GOB Sales themselves.

**C. Substantive Consolidation Motion**

40. OH, OHFF, Garber JDG of DE, LP and JDG of PA, LP have been effectively merged into DD-OH.

41. All of the assets, liabilities and business functions have been transferred into DD-OH and as such, separating them would be prohibitive and a detriment to their creditors. In fact, the only remaining assets held by the Merged Companies are interests in DD-OH.

42. Since the Merger, DD-OH has held itself out to all creditors as one business entity.

11

43. In addition, there will clearly be a savings in costs and time by eliminating the need to disentangle the records and accounts.   While the Debtors hope to be able to make a distribution to unsecured creditors, the available funds may be limited.  As such, the increased administrative costs in attempting to disentangle and undue the merged and effectively consolidated entities would be cost prohibitive and provide no benefit to the estate.

44. Consolidation will further eliminate duplicative claims registers and the need to adjudicate the question of which Debtor is liable, as well as, the requirements of each Debtor entity to prepare separate operating reports and pay separate fees to the Office of the United States Trustee.

45. The Debtors believe that it is in the best interest of the creditors and will enhance the efficiency of administration if the estates are substantively consolidated. As such, the Debtors request substantive consolidation of the bankruptcy cases and respective estates of DD-OH, OH, OHFF, Garber, JDG of DE, LP and JDG of DE, LP.

**D. Wages Motion**

46. In the ordinary course of their businesses, the Debtors incur payroll obligations to their respective employees for the performance of their services.  The Debtors currently have approximately 220 employees (collectively, the "Employees").  The Debtors' Employees are both salaried and hourly employees.

47. ADP, The Debtors' payroll service withdraws the amounts necessary to satisfy the Debtors' payroll obligations, including necessary withholdings for state and local taxes, insurance premiums and contributions as well as certain court ordered garnishments (the "Debtors' Wage Obligations") from the Debtors payroll account maintained at Harleysville National Bank.  The majority of the Debtors' Employees receive their net pay via direct deposit.

48. The Debtors are participants in or are obligated under various salary and wage policies, savings plans, insurance plans and other programs designed to provide benefits for their Employees, including, but not limited to payment of insurance premiums for their Employees. A portion of the premiums are the responsibility of the Debtors and the remaining portion is voluntarily withheld from the Employees' wages at the Employees consent or direction. Certain Employees also participate in savings and 401K plans and others are subject to mandatory or voluntary withholding for child support or other court-ordered garnishments. ADP withdraws the gross amount necessary to prepare Employee paychecks and makes the necessary deductions from the Employees' net pay.

49. Continued payment when due of wages, salaries and commissions and the continuation, without interruption, of all savings plans, insurance plans and other compensation policies is necessary to ensure the ongoing services of the Debtors' Employees. The Employees are vital to the Debtors' continuing operations and to the ultimate ability of the Debtors to reorganize in this Chapter 11 Case.

50. As of the Petition Date, the Employees had earned or had accrued in their favor various sums or credit for (i) wages, salaries, commissions and vacation pay, and (ii) other employee benefits, including, without limitation, those due to or for the benefit of the Employees under various health, life and savings plans and severance and vacation plans (collectively, the "Compensation").

51. On or about September 18, 2008, the Employees were paid wages for the period September 1, 2008 through September 14, 2008. The next payroll is scheduled to be released on October 1, 2008 for the period September 15, 2008 through September 28, 2008.

52. The gross amount of funds necessary to cover wages, commissions and benefits due upon the approval of the Wages Motion for the seven (7) day pre-Petition period is estimated at $170,000. The amount of accrued but unpaid vacation time for the Employees is estimated at $117,000.

53. Any delay in paying the Compensation could severely disrupt the Debtors' relationship with their Employees and irreparably impair the Employees' morale at the very time that their dedication, confidence and cooperation are most critical. If the relief requested herein is not granted, the Debtors' Employees may suffer great hardship and, in many instances, financial difficulties, given that these monies are needed to enable them to meet their own personal obligations.

54. Therefore, the Debtors seek authorization, but not the obligation, to pay the following pre-petition amounts as and when they become payable:

    a. wages salaries, vacation pay accrued but unused by the Employees as of the Petition Date, and commissions (including contributions to savings plans and all federal, state, and local payroll-related taxes, deductions and withholdings pertaining to such payments) that arose or accrued prior to the Petition Date;

    b. workers' compensation and related benefits and claims of the Employees that arose or accrued prior to the Petition Date; and health, medical, and disability claims for the Employees, and the Debtors' portion of any and all premiums on insurance policies pertaining thereto, together with all costs and expenses incurred in connection with the servicing and processing of such claims that arose or accrued prior to the Petition Date.

    c. any required withholding and/or garnishments necessary to satisfy the Debtors' and/or Employees' obligations for child support or other court ordered garnishment.

55. The Debtors are aware that some prepetition wage and reimbursement checks that were issued for earlier pay periods may remain uncashed and outstanding as of the Petition Date. Therefore, the Debtors seek a provision directing the Debtors' banks to honor all pre-Petition Date payroll and reimbursement checks, as well as checks issued pursuant to the Order granting the Wages Motion. The

14

Debtors will provide their bank, or banks, with a listing of all pre-Petition checks that represent outstanding wage checks.

**E. Utilities Motion**

56. In connection with the operation of their businesses and management of their properties, the Debtors obtain gas, water, sewer, electric, telephone and telecommunication, and other similar utility services provided by approximately nineteen (19) utility companies (each a "Utility Company," and collectively, the "Utility Companies").

57. The Debtors are aware that the Bankruptcy Code contains provisions that require the Debtors to provide adequate assurance to the Utility Companies that payments will be made for future utility services. Through the Utilities Motion, the Debtors request that the Court determine that the Debtors' Utility Companies are adequately assured of payment and have suggested a procedure for same, including, *inter alai,* the establishment of a deposit, if requested and an ability for Utility Companies to request a hearing on contested issues.

58. The Debtors fully intend to pay all post-petition obligations owed to the Utility Companies in a timely manner, and fully expects to have the use of cash collateral– subject to this Court's approval - which will be more than sufficient to do so.

59. The Debtors believe that its proposals outlined in the Utilities Motion are sufficient to satisfy the requirements of the Bankruptcy Code.

**F. Customer Deposits Motion**

60. In the ordinary course of the Debtors' businesses, the Debtors received deposits from its customers for orders to be filled through special order or for which inventory was not available at the time of the customer's purchase. Customer deposits are currently being held by the Debtors from both individual and commercial customers. Typically, customers place deposits representing 50% of the final

15

purchase price. As of the Petition Date, the Debtors estimate that they are holding approximately $2,603,647.00 in deposits for its customers (the "Deposits").

61. As part of the GOB Sale, PFP will be assisting the Debtors in fulfilling certain order from which Deposits have been paid to the Debtors.

62. The Debtors' pre-Petition business was successful, in part, based upon the customers' ability to place special orders or to order furniture and goods that could be obtained by the Debtors in a short time. Such programs engendered significant good-will for the Debtors with their customers. The ability to honor the Pre-Sale Orders will serve to preserve the value of the Debtors' estate and maximize recovery for the benefit of all creditors.

63. The Customer Deposits Motion seeks authority to honor the customer orders, to the extent possible, for which the Debtors hold Deposits.

**G. Bank Accounts Motion**

64. Prior to the Petition Date, each of the Debtors, in the ordinary course of business, maintained no less than fourteen (14) bank accounts at five (5) separate banks, Harleysville National Bank ("Harleysville"), The Bankcorp Bank ("Bankcorp"), Bank of America ("BofA"), Wachovia, and PNC Bank ("PNC"). A complete listing of the Debtors' pre-Petition accounts (the "Bank Accounts") are shown on Exhibit "A" to the Bank Accounts Motion.

65. Twelve of the Bank Accounts (the "pre-Merger Accounts") were utilized before the merger of the Huber and Garber Companies, whereas, two of the Bank Accounts (the " PNC Accounts") were opened post-Merger.

66. In the Banks Accounts Motion, the Debtors seek a waiver of the United States Trustee's requirement that the all of their Bank Accounts be closed and new bank accounts be opened. Specifically, the Debtors seek to maintain the PNC Accounts as their post-Petition DIP Accounts. As

16

part of the Merger, the Debtors intended to transition the pre-Merger Accounts to the PNC Accounts but have not utilized them until just prior to the Petition Date. The Debtors will be able to close the pre-Merger Accounts within a short time post-Petition.

67. If enforced in this case, the requirements set forth in the United States Trustee's Guidelines would cause disruption in the Debtors' businesses and would impair their efforts to reorganize. For example, the Debtors' payroll agent, ADP, automatically sweeps funds from the Debtors' payroll account at Harleysville to make payroll, tax payments and other required withholdings and deductions from the employees' wages. Consequently, the abrupt closing any of the Bank Accounts could create a severe disruption to the Debtors' operations. The Debtors have already contacted ADP about changing its automatic sweep from the Harleysville payroll account and will utilize the PNC payroll account for its next payroll (scheduled to be released on or about October 1, 2008).

68. Maintenance of the Bank Accounts (some temporarily, and others permanently) would greatly facilitate the Debtors' "seamless transition" to post-petition operations. To avoid delays in payment of debts incurred post-petition and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain the existing Bank Accounts. A termination of the Bank Accounts immediately after the filing will be tremendously disruptive and time consuming.

69. The Debtors will make all efforts to add the "Debtor-in-Possession" designation to the PNC Accounts and to add the DIP notation and the appropriate case number to each check that is issued post petition.

70. To minimize expense to the estate, the Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to letterheads, purchase orders, invoices, etc.), without reference to their status as debtors-in-possession.

17

71. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as chapter 11 debtors-in- possession.  Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtors' business operations.  For this reason, the Debtors request that they be authorized to use their business forms without placing the label "debtor-in-possession" on each such form.  However, the Debtors will use reasonable efforts to mark their post-petition business forms with a DIP description.

72. The Debtors believe that its proposals from the continued use of the Bank Accounts and Business Forms will satisfy the requirements of the Office of the United States Trustee.

73. The Debtors are also requesting a waiver of the investment requirements of the Bankruptcy Code that require that a debtor's cash should be deposited in a manner that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. §345(a).  For deposits that are not insured or guaranteed by the federal government, the debtor may be required to obtain a bond.

74.  While the Debtors do not believe that the balance in any of the Bank Accounts routinely exceed the FDIC insurance limits, or do so for an extended period of time, there are times that such a balance may exist.  The principal accounts the Debtors intend to maintain post-petition, the PNC Accounts, will be maintained at a financially stable banking institution, one familiar to the Office of the United States Trustee.  The Debtors assert that a waiver of the requirements of Bankruptcy Code § 345 will not pose a risk the Debtors' estates or their creditors.

75. Requiring the Debtors to change their deposits or comply with the procedures outlined in Bankruptcy Code § 345 could cause a disruption in the Debtors' business and impede the Debtors' reorganization efforts.  Requiring additional bank accounts to maintain deposit levels within the FDIC insurance limits would add unnecessary administrative burdens on the estates.

18

LV1 988798v1 09/23/08

**H. Joint Administration Motion.**

76. While the Debtors have filed the Substantive Consolidation Motion, it is not scheduled to be heard at the same time as the Joint Administration Motion. Pending the entry of an order substantively consolidating the Debtors' cases, the Debtors believe that there is a need to jointly administer the case.

77. In order to service optimally and economically these pending Chapter 11 cases, these Chapter 11 cases should be jointly administered, for procedural purposes only, under the case number assigned to DD-OH. Many of the motions, adversary proceedings, hearings and orders that will be involved in these Chapter 11 cases will affect each Debtor. Joint administration will reduce fees and costs and ease the onerous administrative burden of having to file multiple documents.

78. The rights of the respective creditors of the Debtors will not be adversely affected by joint administration of these cases because this Motion requests only administrative consolidation of the estates, and the Debtors are not at this time seeking substantive consolidation. Each creditor may still file a claim against a particular Debtor's estate. Thus, the rights of all creditors will be enhanced by the reduced costs resulting from joint administration.

**I. Extension of Time Motion**.

79. The Debtors are unable to prepare and complete their Schedules of Assets and Liabilities, Statement of Financial Affairs, and Schedule of Executory Contracts and Unexpired Leases (the "Schedules and Statements") within the statutory fifteen (15) days subsequent to the Petition Date.

80. In order to prepare the Schedules and Statements as required by Bankruptcy Code § 521 and Bankruptcy Rule 1007(b), the Debtors must gather information from books, records and documents relating to a multitude of business entities, transactions and contracts. Consequently, collection of the information requires an expenditure of substantial time and effort on the part of the Debtors' employees.

19

81. The Debtors have already mobilized its employees to work on preparation of the Schedules and Statements. The Debtors have also filed an application to retain NachmanHaysBrownstein, Inc. ("NHB") as financial advisors for the Debtors. NHB will be assisting the Debtors and their employees in preparing the required documents. However, in light of the amount of work required in preparing the Schedules and Statements, as well as the competing demands of Debtors' employees (including management) in connection with the commencement of these chapter 11 proceedings and the retention of NHB, it is unlikely that the Schedules and Statements will be completed within the short fifteen (15) day period allowed for by the Bankruptcy Rules.

82. At this time, the Debtors anticipate that they will need an additional thirty (30) days from October 7, 2008, the current deadline, to prepare and file the Schedules and Statements in the appropriate format prescribed by the Bankruptcy Code and the Bankruptcy Rules. The Debtors seek an extension to November 6, 2008.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing, statements are willfully false, I am subject to punishment.

Dated: September 22, 2008        DD-OH FAMILY PARTNERS, LLC

By: _____*/s/ J. David Garber*_____
    **J. David Garber, CEO**