**BARTON BARTON & PLOTKIN LLP**
Eric W. Sleeper (EWS 0528)
Mathew E. Hoffman (MEH 9538)
420 Lexington Avenue
New York, NY 10170
(212) 687-6262
*Attorneys for Plaintiff, Official*
  *Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re<br><br>DD-OH FAMILY PARTNERS, LLC, t/a DD HUBER FURNITURE & DESIGN, and OSKAR HUBER FURNITURE & DESIGN, *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 08-28140 (JHW)<br><br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS of DD-OH FAMILY PARTNERS, LLC, t/a DD HUBER FURNITURE & DESIGN, and OSKAR HUBER FURNITURE & DESIGN, *et al.*<br><br>Plaintiff,<br><br>v.<br><br>FIFT, LP, EXIT05, LLC, RONALD HUBER, DONALD HUBER, O. ROBERT HUBER, and HARLEYSVILLE NATIONAL BANK AND TRUST COMPANY,<br><br>Defendants. | Adv. Proc. No.<br><br><br>**<u>VERIFIED COMPLAINT</u>** |

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff"), by its undersigned counsel, as and for its complaint against defendants FIFT, LP ("FIFT"), Exit05, LLC ("Exit05"), Ronald Huber ("Ron Huber"), Donald Huber, O. Robert Huber ("Robert Huber") (Ron Huber, Donald Huber, and Robert Huber are sometimes referred

to herein collectively as the "Huber Brothers"), and Harleysville National Bank and Trust Company ("HNB"), hereby alleges, upon knowledge as to the Committee and its members, and otherwise upon information and belief, as follows:

## **INTRODUCTION**

1.       On September 22, 2008 (the "Petition Date"), each of DD-OH Family Partners, LLC t/a DD Huber Furniture & Design and Oskar Huber Furniture and Design ("DD-OH"), Oskar Huber Fine Furniture, Inc. ("Oskar Huber Fine Furniture"), Oskar Huber, Inc. ("Oskar Huber") (Oskar Huber Fine Furniture and Oskar Huber being referred to collectively herein as the "Huber Companies"); JD Garber Furniture, LP ("JD Garber"), JDG of DE, LP, and JDG of PA, LLP (JD Garber, JDG of DE, LP, and JDG of PA, LLP being referred to herein collectively as the "Garber Companies") (the Huber Companies, the Garber Companies, and DD-OH being referred to herein collectively as the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Code, 11 USC § 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey.

2.       By Order dated September 23, 2008, the Bankruptcy Court administratively consolidated the Debtors' respective cases, pursuant to Fed. R. Bankr. P. 1015(b), with the caption of the jointly administered cases as above (the "Bankruptcy Proceeding").

3.       The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.       This proceeding arises out of the admitted fraudulent transfers by the principals of the Debtors who took the valuable real estate assets of the Debtors and transferred them to entities they controlled with the stated intention of removing them from the reach of the Debtors'

creditors.  HNB was a knowing participant in these fraudulent transfers and aided and abetted their execution.

5.     HNB has asserted a "secured" claim against the Debtors' estate(s) of more than $5 million, arising from loans which HNB made to Debtor Oskar Huber and to non-Debtors FIFT and Exit05, and from various security agreements and guaranties by which Oskar Huber was caused to give substantially all of its assets as collateral to secure those loans.  As alleged herein, HNB actively aided and abetted the fraudulent transfer of Oskar Huber's valuable real estate assets to non-Debtors FIFT and Exit05, which share common ownership and management by the Huber Brothers with Oskar Huber, thereby wrongly putting those assets out of reach of the Debtors' other creditors, including the members of the Committee and the general unsecured creditors they represent.

6.     Although HNB concedes that those real estate assets are more than sufficient to secure all of its loans (assuming it had secured claims), HNB has chosen instead to assert a claim seeking payment of all of the loans from the Debtors' estate(s), which would all but obliterate any distribution to the Debtors' other creditors, including the unsecured creditors represented by the Committee.  HNB's flagrant disregard for the Debtors and their other creditors is further evidenced by, for instance, its admitted imposition of a default rate of interest on its loans to FIFT and Exit05 purely as a means of leverage with respect to those companies and the Debtors, rather than for any legitimate reason.

7.     Further, all of the Huber Companies' remaining assets were transferred to DD-OH, which was formed by the merger of the Huber and Garber Companies as of March 1, 2008, and HNB failed to take steps necessary to perfect and no longer has a valid security interest in those assets.

8.     By this Complaint, the Committee alleges claims against FIFT, Exit05, and the Huber Brothers for the fraudulent transfer of Oskar Huber's valuable real estate assets under the Pennsylvania and New Jersey Uniform Fraudulent Transfer Acts and/or sections 548 and 550 of the Bankruptcy Code, against the Huber Brothers for breach of their fiduciary duties owed to Oskar Huber and its creditors, and against HNB for knowingly aiding and abetting those transfers and breaches, and the liens associated therewith, seeking avoidance of the transfers, accounting of the proceeds thereof, imposition of constructive trusts, injunctive relief, and damages.  The Committee also alleges claims against HNB for avoidance of its liens, for disallowance of its "secured" claim under section 502 of the Bankruptcy Code, for equitable subordination of its claim under section 510(c) of the Bankruptcy Code, and pursuant to the equitable doctrine of marshalling of assets.

## PARTIES

9.     Plaintiff Committee represents the Debtors' unsecured creditors, with aggregate claims against the Debtors' estate(s) in excess of $14 million, and was appointed by the United States Trustee on or about October 2, 2008, pursuant to section 1102(a)(1) of the Bankruptcy Code.

10.    Defendant FIFT is a Pennsylvania limited partnership, with its offices located at 618 Second Street Pike, Southampton, Pennsylvania 18966.

11.    Defendant Exit05 is a New Jersey limited liability company, with its offices located at 618 Second Street Pike, Southampton, Pennsylvania 18966.

12.    Defendant HNB is a financial institution incorporated in Pennsylvania, with its main offices located at 483 Main Street, Harleysville, Pennsylvania 19438.

13.     Defendant Ron Huber is an individual residing at 98 S. Traymore Avenue, Ivyland, Pennsylvania 18974, and was and/or is, at all relevant times, a shareholder, director, and a president of Oskar Huber and of Oskar Huber Fine Furniture, and a controlling principal of FIFT and Exit05.

14.     Defendant Donald Huber is an individual residing at 648 Brighton Drive, Hatfield, Pennsylvania 19440, and was and/or is, at all relevant times, a shareholder, director, and principal of Oskar Huber and of Oskar Huber Fine Furniture, and a controlling principal of FIFT and of Exit05.

15.     Defendant Robert Huber is an individual residing at 653 Sumneytown Pike, North Wales, Pennsylvania 19454, and was and/or is, at all relevant times, a shareholder, director, and principal of Oskar Huber and of Oskar Huber Fine Furniture, and a controlling principal of FIFT and of Exit05.

## JURISDICTION

16.     This is an adversary proceeding under Fed. R. Bankr. P. 7001, and is a core proceeding under 18 U.S.C. § 157(b)(2)(A), (H), (K), and (O).

17.     This Court has jurisdiction over this proceeding under 28 U.S.C. § 1334.

18.     Venue of this proceeding in this Court is proper under 28 U.S.C. § 1409(a).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

19.     The Huber Companies were and/or are, at all relevant times, each a closely held corporation owned by the Huber Brothers and/or their family members, with offices located at 618 Second Street Pike, Southampton, Pennsylvania.

20.     The Huber Companies were and/or are, at all relevant times, New Jersey corporations engaged in owning and/or operating a retail furniture business which has been owned and operated by members of the Huber family since around 1927.

21.     In addition to the Huber Companies' retail furniture business, at all relevant times up to the period of approximately 2004 to 2006, Oskar Huber owned valuable real estate, consisting of certain property located at or near 606-618 Second Street Pike, Southampton, Pennsylvania (the "Southampton Property"), and certain property located at or near 101 West 8th Street, Ship Bottom, New Jersey (the "Ship Bottom Property").

22.     The Southampton and Ship Bottom Properties were most recently appraised at a collective value exceeding $10 million.

23.     Both the Southampton and Ship Bottom Properties housed stores and/or offices of the Huber Companies, and the Southampton Property also generated substantial rental income from unaffiliated commercial tenants.

24.     At all times relevant herein, the Huber Brothers served as the directors and co-presidents of each of the Huber Companies, although Ron Huber was primarily responsible for managing those companies.

25.     HNB began providing banking services and financing to the Huber Companies and affiliated businesses, including substantial loans and/or credit, in or around 2003.

26.     In particular, among other things, from 2004 to 2007 HNB extended loans and/or credit to Oskar Huber of around $2 million, and to FIFT and Exit05, which are affiliated with the Huber Companies through common ownership and management, of more than $3 million.

27.     As alleged in more detail below, HNB's loans to non-Debtors FIFT and Exit05 were caused to be cross-collateralized with and guaranteed by Debtor Oskar Huber, which HNB

contends supports its alleged secured claim against the Debtors' estate(s) herein of more than $5 million.

## HNB's Loans to Oskar Huber

28.     On or about March 4, 2005, HNB made Loan No. 108671005 to Oskar Huber in the original principal amount of $1 million ("OH Loan 1"), the alleged purpose of which was to enable the Huber Companies to purchase inventory.

29.     Concurrently with OH Loan 1 on March 4, 2005, the three Huber Brothers executed a commercial security agreement to HNB of that date, on behalf of both Huber Companies, giving HNB interest in the Huber Companies' assets as collateral for OH Loan 1.

30.     The aforesaid commercial security agreement forbade the Huber Companies from selling or otherwise transferring or disposing of the assets, other than inventory sold or accounts collected in the ordinary course of business.

31.     In addition, on or about August 22, 2006, HNB made Loan No. 1066451001 to Oskar Huber in the original principal amount of $750,000.00 ("OH Loan 2"), the purpose of which was allegedly to enable the Huber Companies to purchase inventory.

32.      Concurrently with OH Loan 2 on August 22, 2006, the three Huber Brother executed a commercial security agreement to HNB on behalf of Oskar Huber, giving HNB an interest in all of Oskar Huber's inventory, chattel paper, accounts, equipment, and general intangibles as collateral for Loan 2.

33.     In addition, on or about March 11, 2005, upon the application of Oskar Huber, HNB opened Letter of Credit No. 1086371005/360, for an initial aggregate amount of $100,000 in favor of The CIT Group/Commercial Services ("CIT Group") as beneficiary, for which Oskar

Huber was obligated to reimburse HNB for all monies received by CIT Group (the "OH Letter of Credit").

34.     Oskar Huber's repayment obligations with respect to the OH Letter of Credit were covered by the commercial security agreements executed by Oskar Huber to HNB in connection with OH Loans 1 and 2.

### The Transfer of Oskar Huber's
### Valuable Real Estate Assets to FIFT in 2004

35.     Beginning in or around 2001 and continuing through 2008, the Huber Companies experienced consecutive operating losses.

36.     In or around 2004, the Huber Brothers decided to transfer ownership of Oskar Huber's real estate assets to a different entity owned by them, with the actual intent to remove those valuable assets from the claims or benefit of Oskar Huber's creditors (with the exception of HNB).

37.     On or about February 6, 2004, the Huber Brothers caused FIFT to be formed as a Pennsylvania limited partnership for the purpose of "purchasing" and owning Oskar Huber's valuable real estate asset comprised of the Southampton Property.

38.     Also on or about February 6, 2004, the Huber Brothers caused the formation of a Pennsylvania corporation, which they chose to name SMTMGP, Inc. ("SMTMGP"), to serve as the general partner of FIFT.

39.     The name "SMTMGP" which the Huber Brothers chose for this newly formed corporation ironically stood for "Show Me The Money – General Partner."

40.     The limited partners of FIFT and shareholders of SMTMGP were, and still are, identical, consisting of the Huber Brothers and their respective spouses, and Ron Huber was and still is president of SMTMGP.

41.     Initially, the Huber Brothers decided to transfer only the income-producing portions of the Southampton Property away from Debtor Oskar Huber to non-Debtor FIFT.

42.     The Southampton Property was subdivided into Unit A, which comprised approximately 55 per cent of the Southampton Property and was occupied by an Oskar Huber retail store and the Huber Companies' offices, and Units B and C, which comprised approximately 45 per cent of the Southampton Property and were leased to and occupied by tenants reportedly unrelated to the Huber Companies.

43.     On or about February 27, 2004, FIFT "purchased" Units B and C of the Southampton Property from Oskar Huber for $1,575,000, which purchase price was determined entirely by the Huber Brothers, without the benefit of any third-party appraisal of the subject properties, without the involvement of any real estate expert, agent, or broker, and without any separate representation of Oskar Huber in the transaction.

44.     HNB financed the majority of the "purchase price" by means of a new mortgage loan to FIFT.

45.     More specifically, on or about February 27, 2004, HNB made Loan No. 7717676101 to FIFT in the original principal amount of $1,181,457.00 ("FIFT Loan 1"), for the purpose of financing FIFT's "purchase" of Units B and C of the Southampton Property from Oskar Huber, which loan Oskar Huber was later caused to guarantee.

46.     HNB sought to make sure that its loan would be amply protected, by obtaining an independent appraisal report of the entire Southampton Property, dated February 18, 2004, which

reported the aggregate value of Units A, B, and C to be $5,500,000 – even though FIFT was "purchasing" Units B and C, comprising 45 per cent of the Southampton Property, for only $1,575,000.

47.    None of the Huber Brothers or their spouses contributed any money toward FIFT's purchase of Units B and C of the Southampton Property, and, further, none of them ever contributed any capital to either FIFT or SMTMGP.

48.    FIFT's payments to HNB on FIFT Loan 1 came exclusively from the rent paid to FIFT by the tenants of Units B and C, and Oskar Huber received no income from the transferred properties.

49.    The Huber Brothers' intent and purpose in causing the creation of FIFT and SMTMGP, in obtaining FIFT Loan 1 from HNB, and in causing Oskar Huber to transfer Units B and C of the Southampton Property to FIFT in exchange for substantially less than their fair market value, were principally, if not exclusively, to hinder, delay, or defraud creditors of the financially struggling Huber Companies.

50.    HNB knew and understood, at all relevant times, that the ultimate purpose of FIFT Loan 1, and the purpose of the creation of FIFT and SMTMGP, and of the transfer of Units B and C of the Southampton Property from Oskar Huber to FIFT, was principally, if not exclusively, to hinder, delay, or defraud other creditors of the financially struggling Huber Companies.

## The Transfer of the Remainder of Oskar
## Huber's Valuable Real Estate Assets to FIFT and Exit05 in 2006

51.    In or around early 2006, the Huber Brothers also decided to transfer Oskar Huber's remaining, valuable real estate assets, consisting of Unit A of the Southampton Property

and the Ship Bottom Property, to other entities owned by them, the purpose of which was principally, if not exclusively, to remove those properties from the reach of Oskar Huber's creditors (other than HNB), as was the purpose of the earlier transfer of Units B and C of the Southampton Property to FIFT.

52.     Prior to those transfers taking place, HNB required Oskar Huber and FIFT to execute additional commercial security agreements with respect to the Southampton and Ship Bottom Properties.

53.     Specifically, on or about February 6, 2006, the Huber Brothers executed a commercial security agreement to HNB, on behalf of FIFT, memorializing HNB's mortgaged interest in Units B and C of the Southampton Property, and all of FIFT's present and future interests and rights in contracts, leases, subleases, and accounts relating thereto, as collateral for OH Loan 1, and to secure other existing and future debts and obligations of FIFT to HNB.

54.     Also on or about February 6, 2006, the Huber Brothers executed a commercial security agreement to HNB, on behalf of Oskar Huber, memorializing HNB's mortgaged interest in Unit A of the Southampton Property, and all of Oskar Huber's present and future interests and rights in contracts, leases, subleases, and accounts relating thereto, as collateral for OH Loan 1, and to secure other existing and future debts and obligations of Oskar Huber to HNB.

55.     Also on February 6, 2006, the Huber Brothers executed another commercial security agreement to HNB, on behalf of Oskar Huber, memorializing HNB's mortgaged interest in the Ship Bottom Property, and Oskar Huber's present and future interests and rights in contracts, leases, subleases, and accounts relating thereto, as collateral for OH Loan 1, and to secure other existing and future debts and obligations of Oskar Huber to HNB.

56.     On or about February 11, 2006, the Huber Brothers caused Exit05 to be formed as a New Jersey limited liability company for the purpose of "purchasing" and owning the Ship Bottom Property from Oskar Huber.

57.     The members of Exit05 were, and still are, the Huber Brothers and their respective spouses.

58.     On or about February 28, 2006, Exit05 "purchased" the Ship Bottom Property from Oskar Huber for $1,250,000, which amount was determined entirely by the Huber Brothers, without the benefit of a third-party appraisal of the subject property, without the involvement of any real estate expert, agent, or broker, and without any separate representation of Oskar Huber in the transaction.

59.     Exit05 financed the entire purchase price of the Ship Bottom Property by means of a new mortgage loan from HNB, which Oskar Huber was caused to guarantee.

60.     More specifically, on or around February 28, 2006, HNB made Loan No. 7759137001 to Exit05 in the original principal amount of $1,250,000 ("Exit05 Loan"), for the purpose of financing Exit05's "purchase" of the Ship Bottom Property from Oskar Huber.

61.     HNB sought to make sure that its new loan would be amply protected by obtaining an independent appraisal report of the Ship Bottom Property, dated August 10, 2005, which valued that property at $2,500,000 – even though Exit05 was "purchasing" the Ship Bottom Property for only $1,250,000, or half of its appraised value.

62.     None of the Huber Brothers or their spouses contributed any money toward Exit05's purchase of the Ship Bottom Property, and, further, none of them ever contributed any capital to Exit05.

63.     Upon the transfer, Oskar Huber became a tenant of Exit05 and was caused to pay Exit05 rent for the same property which Oskar Huber had previously owned, and Exit05's payments to HNB on the Exit05 Loan came exclusively from the rents it received from Oskar Huber.

64.     Concurrently with the Exit05 Loan, on February 28, 2006, the Huber Brothers caused Oskar Huber to guarantee Exit05's timely repayment and satisfaction of the Exit05 Loan to HNB, by executing and delivering to HNB a commercial guaranty of that date on behalf of Oskar Huber (the "Exit05 Loan Guaranty").

65.     The Exit05 Loan Guaranty was caused to be secured by the commercial security agreements which Oskar Huber had previously executed in favor of HNB in connection with OH Loans 1 and 2, each of which was to secure existing and future debts and obligations of Oskar Huber to HNB.

66.     In addition, on or about November 30, 2006, FIFT "purchased" Unit A of the Southampton Property from Oskar Huber for $1,250,000, which amount was determined entirely by the Huber Brothers, without the benefit of a third-party appraisal of the subject property, without the involvement of any real estate expert, agent, or broker, and without any separate representation of Oskar Huber in the transaction.

67.     FIFT financed the entire purchase price of Unit A of the Southampton Property by means of a new mortgage loan from HNB.

68.     More specifically, on or about November 30, 2006, HNB made Loan No. 7777461001 to FIFT in the original principal amount of $1,250,000 ("FIFT Loan 2"), for the purpose of financing FIFT's "purchase" of Unit A of the Southampton Property from Oskar Huber.

69.    HNB sought to make sure that its loan would be well protected by obtaining its own independent appraisal report of Unit A of the Southampton Property, dated October 6, 2006, which valued that property at $5,600,000 – even though FIFT was "purchasing" Unit A for only for only $1,250,000, which was much less than one third of its appraised value.

70.    Once again, none of the Huber Brothers or their spouses contributed any money toward FIFT's purchase of Unit A of the Southampton Property.

71.    Upon the transfer, Oskar Huber became a tenant of FIFT and was caused to pay FIFT rent for the same property which Oskar Huber had previously owned, and FIFT's payments to HNB on FIFT Loan 2 came exclusively from the rents it received from Oskar Huber.

72.    Concurrently with FIFT Loan 2 on November 30, 2006, the Huber Brothers caused Oskar Huber to guarantee FIFT's timely repayment and satisfaction of FIFT Loan 2 to HNB, and other existing and future debts and obligations of FIFT to HNB (allegedly including FIFT Loan 1), by executing and delivering to HNB a commercial guaranty of that date on behalf of Oskar Huber (the "FIFT Loan Guaranty").

73.    The FIFT Loan Guaranty was caused to be secured by the commercial security agreements which Oskar Huber had previously executed in favor of HNB in connection with OH Loans 1 and 2, each of which was to secure existing and future debts and obligations of Oskar Huber to HNB.

74.    The Huber Brothers' intent and purpose in causing the creation of Exit05, in obtaining the Exit05 Loan and FIFT Loan 2 from HNB, in causing Oskar Huber to transfer Units A of the Southampton Property to FIFT in exchange for substantially less than the property's fair market value, in causing Oskar Huber to transfer the Ship Bottom Property to Exit05 in exchange for substantially less than the property's fair market value, in causing Oskar Huber to give the

FIFT and Exit05 Loan Guaranties, and in causing Oskar Huber to pay rent to FIFT and Exit05 for its use of properties which it had previously owned, were principally, if not exclusively, to hinder, delay, or defraud creditors of the financially struggling Huber Companies.

75. HNB knew and understood, at all relevant times, that the ultimate purpose of the Exit05 Loan and of FIFT Loan 2, the creation of Exit05, FIFT, SMTMGP, the transfer of the Southampton and Ship Bottom Properties from Oskar Huber to FIFT and Exit05 respectively, and the FIFT and Exit05 Loan Guaranties given by Oskar Huber, was principally, if not exclusively, to hinder, delay, or defraud the other creditors of the financially struggling Huber Companies.

76. By their alleged "purchases" of the Southampton and Ship Bottom Properties, FIFT and Exit05 removed those valuable assets from Debtor Oskar Huber while knowingly providing no cash or cash flow benefit to Oskar Huber.

77. Further, FIFT and Exit05 not only caused Oskar Huber to guarantee and, purportedly, to cross-collateralize the loans they received from HNB to purchase the Southampton and Ship Bottom Properties, they also caused Oskar Huber to pay all or most of their new loan obligations to HNB indirectly through its rental payments to FIFT and Exit05.

### FIFT's and Exit05's Receipt and Distribution of Rental Income from Oskar Huber

78. At all relevant times, the Ship Bottom Property housed one of Oskar Huber's retail furniture stores, and Unit A of the Southampton Property housed another of Oskar Huber's retail furniture stores, as well as the shared offices of the Huber Companies, Exit05, and FIFT.

79. Upon the transfer of the Ship Bottom Property to Exit05 on or about February 28, 2006, Oskar Huber became a tenant of Exit05 and was caused to pay rent to Exit05 for its use of the property which it had previously owned.

80. Exit05 used the rental income received from Oskar Huber to make payments on and/or service loan(s) from HNB and to pay any expenses incurred by it in owning or maintaining the Ship Bottom Property.

81. Exit05 had no other expenses other than those related to is loan(s), and ownership and maintenance of the Ship Bottom Property, because Exit05 owned no other assets, had no employees, and paid nothing for the office space which it shared with the Huber Companies.

82. Exit05's rental income from Oskar Huber generally exceeded its expenses, and Exit05 regularly distributed all or most of the difference to its members, *i.e.*, the Huber Brothers and their respective spouses, but distributed nothing to Oskar Huber.

83. Upon the transfer of Unit A of the Southampton Property to FIFT on or about November 30, 2006, Oskar Huber became a tenant of FIFT and was caused to pay rent to FIFT for its use of the property which it had previously owned.

84. FIFT used the rental income it received from Oskar Huber, and from the tenants of Units B and C of the Southampton Property, to make payments on and/or service loan(s) with HNB and to pay any expenses incurred by it in owning or maintaining the Southampton Property.

85. FIFT had no other expenses other than those related to its loan(s), and ownership and maintenance of the Southampton Property, because FIFT owned no other assets, had no employees, and paid nothing for the office space which it shared with the Huber Companies.

86.     FIFT's rental income from Oskar Huber and its other tenants generally exceeded its expenses, and FIFT regularly distributed all or most of the difference to its partners, *i.e.*, the Huber Brothers and their respective spouses, but distributed nothing to Oskar Huber.

### HNB's Downgrading of Its Loans
### to Oskar Huber, FIFT, and Exit05

87.     Even though Oskar Huber, FIFT and Exit05 were current on their obligations at the time, sometime in or around, or prior to, February 2007, HNB downgraded all of its loans to Oskar Huber, FIFT, and Exit05 to "substandard," within just two to three months after the transfer of the last significant real estate asset of Oskar Huber, Unit A at the Southampton Property with a then appraised value exceeding $5,000,000.00.

88.     Even though Oskar Huber, FIFT and Exit05 were current on their obligations to HNB at the time, sometime in or around early or mid-2007, HNB told Ron Huber that it no longer wanted to finance Oskar Huber, FIFT, and Exit05, and insisted that those companies had to find new financing, from a source other than HNB, to replace the financing from HNB.

89.     Thereafter, the Huber Companies were compelled to actively search for new financing for Oskar Huber, FIFT, and Exit05, and to inform HNB regularly of the status of the search for new financing and of Oskar Huber's financial condition and performance.

### The Merger of the Huber and
### Garber Companies into DD-OH

90.     The Garber Companies were and/or are, at all relevant times, each a closely held corporation owned by members of the Garber family, engaged in the retail furniture business in and around southeastern Pennsylvania and Delaware.

91.     In or around mid- or late 2007, the Huber Brothers and principals of the Garber Companies began discussing and negotiating the merger of all of the Huber and Garber

Companies into a newly created entity which would combine their respective assets and retail furniture businesses.

92.     In furtherance of those discussions and negotiations, on or about February 20, 2008, the Huber Brothers and the principals of the Garber Companies caused the formation of a new entity, DD-OH, as a Pennsylvania limited liability company, filed the requisite documentation with the office of the Secretary of State of Pennsylvania, and began to transfer the assets, liabilities, and operations of the Huber and Garber Companies into DD-OH, with the merger effective as of March 1, 2008.

**HNB's Acquiescence to the Merger
of the Huber Companies into DD-OH**

93.     Ron Huber informed HNB of the merger discussions between the Huber and Garber Companies well before the actual merger took place, and kept HNB apprised of the status of the merger discussions and when they expected to effect the merger.

94.     In particular, on or around February 21, 2008, HNB officers Allen Loeb, who had been responsible for the Huber Companies account at HNB; Donald ("Don") Mishler, who was taking over the Huber Companies account from Allen Loeb; and James McGowen, who supervised both Allen Loeb and Don Mishler at HNB, met with both Ron Huber and David Garber, principal of the Garber Companies, in response to Ron Huber's request for a meeting "to review where we stand with the merger and what our financial plans are."

95.     At that meeting, Ron Huber told the HNB officers that he and David Garber expected the merger of the Huber and Garber Companies to take place by March 1, 2008, and discussed specific details of the merger, including what the new company's combined balance sheet would look like.

96.    In correspondence dated February 25, 2008, James McGowan told Don Mishler, Allen Loeb, and HNB Chief Executive Officer ("CEO") Paul Geraghty that he believed the merger of the Huber and Garber Companies "would enhance our collateral position" with respect to the Huber Companies.

97.    At no time did anyone from HNB ever tell Ron Huber, or anyone else from the Huber or Garber Companies, that HNB did not approve of the merger.

### HNB's Claim Against the Debtors' Estate(s)

98.    Pursuant to default provisions of the relevant loan documents, a default by Oskar Huber on any of its loan obligations to HNB allegedly constituted a default on all of five of the aforesaid loans – *i.e.*, OH Loans 1 and 2, FIFT Loans 1 and 2, and the Exit05 Loan – and would give HNB the right to accelerate all of those loans at once.

99.    In or around the summer of 2008, the term of one or more of HNB's loans to Oskar Huber matured, and HNB refused to extend it, thereby rendering Oskar Huber in default.

100.    On or about September 9, 2008, HNB notified FIFT that HNB deemed FIFT in default of FIFT Loans 1 and 2, under the cross-default provisions of the relevant loan documents.

101.    Also or about September 9, 2008, HNB notified Exit05 that HNB deemed Exit05 in default of the Exit05 Loan, under the cross-default provisions of the relevant loan documents.

102.    Further, HNB indicated it would retroactively institute against FIFT and Exit05 substantially higher default interest rates on their respective loans, even though neither FIFT nor Exit05 had actually defaulted on the loans, and the purported cross-defaults of those loans did not cause HNB to incur any additional expense.

103.    Indeed, HNB conceded in its own internal correspondence that its purpose in charging FIFT and Exit05 the default interest rates was to pressure the Huber Brothers and to leverage its position with respect to its loans to Oskar Huber, FIFT and Exit05.

104.    On or about December 8, 2008, HNB filed its Proof of Claim against the Debtors' estate(s) in the Bankruptcy Proceeding, by which HBN asserted an alleged secured claim in the aggregate amount of $5,916,805.46, including claims asserted under the FIFT and Exit05 Loan Guaranties, comprised as follows:

       a.    $926,110.26 relating to OH Loan 1, including, among other things, outstanding principal, interest, and legal fees;

       b.    $531,391.62 relating to OH Loan 2, including, among other things, outstanding principal and interest;

       c.    $926,110.26 relating to Oskar Huber's guaranty of FIFT Loan 1, including, among other things, outstanding principal, interest, and a prepayment penalty.

       d.    $1,254,358.96 relating to the Exit05 Loan, including, among other things, outstanding principal and interest, and a prepayment penalty;

       e.    $2,040,136.45 relating to FIFT Loan 2, including, among other things, outstanding principal and interest, and a prepayment penalty; and

       f.    $100,000 relating to the OH Letter of Credit.

## **Applicable Law**

105.    This adversary proceeding and the claims asserted herein are subject to and generally governed by the Bankruptcy Code.

106.    The Huber Companies are New Jersey corporations and, therefore, the internal affairs of those corporations are governed by New Jersey law.

107.    The commercial security agreement executed by the Huber Companies in favor of HNB dated March 4, 2005, to secure OH Loan 1, and the commercial security agreement which Oskar Huber executed in favor of HNB dated August 22, 2006, to secure OH Loan 2, each provides that with respect to procedural matters related to the perfection and enforcement of HNB's rights against the collateral secured thereunder, it is governed by the laws of the State of New Jersey except to the extent preempted by applicable federal law, and that in the event of a default thereunder, HNB has the rights of a secured party under the New Jersey Uniform Commercial Code.

108.    The commercial security agreement which FIFT executed in favor of HNB dated February 6, 2006, with respect to Units B and C of the Southampton Property, to secure OH Loan 1, provides that that it is governed by the laws of the Commonwealth of Pennsylvania except to the extent preempted by federal law, and that, in the even of a default thereunder, HNB has the rights of a secured party under the Pennsylvania Uniform Commercial Code.

109.    The commercial security agreement which Oskar Huber executed in favor of HNB dated February 6, 2006, with respect to Unit A of the Southampton Property, to secure OH Loan 1, provides that that it is governed by the laws of the Commonwealth of Pennsylvania except to the extent preempted by federal law, and that, in the even of a default thereunder, HNB has the rights of a secured party under the Pennsylvania Uniform Commercial Code.

110.    The commercial security agreement which Oskar Huber executed in favor of HNB dated February 6, 2006, with respect to the Ship Bottom Property, to secure OH Loan 1, provides that with respect to procedural matters related to the perfection and enforcement of HNB's rights against the collateral secured thereunder, it is governed by the laws of the State of New Jersey except to the extent preempted by applicable federal law, and that in the event of a

default thereunder, HNB has the rights of a secured party under the New Jersey Uniform

Commercial Code.

111.    The FIFT Loan Guaranty and Exit05 Loan Guaranty each provides that it is

governed by the laws of the Commonwealth of Pennsylvania except to the extent preempted by

applicable federal law.

### COUNT I
(Against FIFT and the Huber Brothers under the Pennsylvania
Uniform Fraudulent Transfer Act, 12 Pa. C.S. § 5101, *et seq.*)

112.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth

in paragraphs 1 through 111 hereof, as if set forth fully and at length herein.

113.    As alleged herein, on or about February 27, 2004, Ron Huber, Donald Huber,

Robert Huber, and FIFT each transferred or caused to be transferred Units B and C of the

Southampton Property, and, or about November 30, 2006, Ron Huber, Donald Huber, Robert

Huber, and FIFT each transferred or caused to be transferred Unit A of the Southampton

Property, from Oskar Huber to FIFT.

114.    Each of Ron Huber, Donald Huber, and Robert Huber is an insider under the

Pennsylvania Uniform Transfer Act, in that each of them is an owner and/or officer of Oskar

Huber, as well as of FIFT and FIFT's general partner SMTMGP.

115.    FIFT is an insider under the Pennsylvania Uniform Transfer Act, in that its

ownership and management were and are substantially identical to the ownership and

management of Oskar Huber.

116.    Ron Huber, Donald Huber, Robert Huber, and FIFT each caused each of the

aforesaid transfers for the purpose and with actual expressed intent, in whole or in substantial

part, to hinder, delay, or defraud present and/or future creditors of Oskar Huber, including the members of the Committee and the general unsecured creditors they represent.

117.    Additionally, and alternatively, each of the aforesaid transfers of real property from Oskar Huber to FIFT was made without fair consideration and/or for less than reasonably equivalent value given in exchange.

118.    At the time of each of the aforesaid transfers of real property from Oskar Huber to FIFT, Ron Huber, Donald Huber, Robert Huber, and FIFT each knew that Oskar Huber was suffering ongoing operating losses, and that Oskar Huber was, or was in danger of becoming, insolvent and/or unable to pay its creditors timely.

119.    Based upon the foregoing, each of the aforesaid transfers violates 12 Pa. C.S. § 5104.

120.    The Committee did not know of, and could not reasonably have discovered, the aforesaid fraudulent transfers sooner than one year prior to the commencement of the Bankruptcy Proceeding.

121.    Therefore, the Committee and the Debtors' estate(s) are entitled to the following relief: (i) avoidance of the aforesaid transfers in their entireties, and the return of Units A, B, and C of the Southampton Property to the Debtors' estate(s); (ii) an accounting by FIFT of all monies it has received as rent or other income from Oskar Huber, and from other tenants and lessees of the Southampton Property, and of the disposition of those funds; (iii) an accounting by each of the Huber Brothers of all monies they and/or their respective spouses have received as distributions from FIFT; (iv) imposition of a constructive trust and/or lien against all property fraudulently transferred to FIFT, and on the proceeds thereof, including distributions of the

proceeds by FIFT; and (v) a preliminary and permanent injunction against any disposition of the transferred property or of the proceeds thereof by FIFT and/or its partners.

## COUNT II
(Against FIFT for Avoidance under section
548 of the Bankruptcy Code, 11 U.S.C. § 548)

122.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 121 hereof, as if set forth fully and at length herein.

123.    As alleged herein, the aforesaid fraudulent transfer of Unit A of the Southampton Property from Oskar Huber to FIFT took place on November 30, 2006, which was within two years before the Petition Date.

124.    Therefore, the aforesaid fraudulent transfer is avoidable under section 548 of the Bankruptcy Code.

125.    Therefore, pursuant to sections 548 and 550 of the Bankruptcy Code, the Committee and the Debtors' estate(s) are entitled to the following relief: (i) avoidance of the aforesaid fraudulent transfer in its entirety and the return of Unit A of the Southampton Property to the Debtors' estate(s); (ii) an accounting by FIFT of all monies it has received as rent or other income from Oskar Huber, and from any other tenants and lessees of Unit A of the Southampton Property, and of the disposition of those funds; (iii) an accounting by each of the Huber Brothers of all monies they and/or their respective spouses have received as distributions from FIFT; (iv) imposition of a constructive trust and/or lien against all property fraudulently transferred to FIFT, and on the proceeds thereof, including distributions of the proceeds by FIFT;  and (v) a preliminary and permanent injunction against any disposition of the transferred property by FIFT and/or its partners.

**COUNT III**
(Against Exit05 and the Huber Brothers under the New Jersey
Uniform Fraudulent Transfer Act, N.J. Stat. § 25:2-20, *et seq.*)

126.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 125 hereof, as if set forth fully and at length herein.

127.    As alleged herein, on or about February 28, 2006, Ron Huber, Donald Huber, Robert Huber, and Exit05 each transferred, or caused to be transferred, the Ship Bottom Property from Oskar Huber to Exit05.

128.    Each of Ron Huber, Donald Huber, and Robert Huber is an insider under the Pennsylvania Uniform Transfer Act, in that each of them is an owner and/or officer of Oskar Huber, as well as an owner and/or officer of Exit05.

129.    Exit05 is an insider under the New Jersey Uniform Transfer Act, in that its ownership and management were and are substantially identical to the ownership and management of Oskar Huber.

130.    Ron Huber, Donald Huber, Robert Huber, and Exit05 each caused the aforesaid transfer for the purpose and with actual expressed intent, in whole or in substantial part, to hinder, delay, or defraud present and/or future creditors of Oskar Huber, including the members of the Committee and the general unsecured creditors they represent.

131.    Additionally, and alternatively, the aforesaid transfer of real property from Oskar Huber to Exit05 was made without fair consideration and/or for less than reasonably equivalent value given in exchange.

132.    At the time of the aforesaid transfer of real property from Oskar Huber to Exit05, Ron Huber, Donald Huber, Robert Huber, and Exit05 each knew that Oskar Huber was suffering

ongoing operating losses, and that Oskar Huber was, or was in danger of becoming, insolvent and/or unable to pay its creditors timely.

133.    Based upon the foregoing, each of the aforesaid transfers violates N.J. Stat. § 25:2-25.

134.    Therefore, the Committee and the Debtors' estate(s) are entitled to the following relief: (i) avoidance of the aforesaid transfer in their entireties, and the return of the Ship Bottom Property to the Debtors' estate(s); (ii) an accounting by Exit05 of all monies it has received as rent or other income from Oskar Huber, and from any other tenants and lessees of the Ship Bottom Property, and of the disposition of those funds; (iii) an accounting by each of the Huber Brothers of all monies they and/or their respective spouses have received as distributions from Exit05; (iv) imposition of a constructive trust and/or lien against all property fraudulently transferred to FIFT, and on the proceeds thereof, including distributions of the proceeds by Exit05; and (v) a preliminary and permanent injunction against any disposition of the transferred property of the proceeds thereof by Exit05 and/or its members.

**COUNT IV**
(Against the Huber Brothers for breach of fiduciary duty
owed to Oskar Huber, under New Jersey common law)

135.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 134 hereof, as if set forth fully and at length herein.

136.    At all relevant times, Ron Huber, Donald Huber, and Robert Huber each was and/or is a director, officer, and/or controlling shareholder of Oskar Huber, and, as such, each of them owed a fiduciary duty not to undertake actions adverse to Oskar Huber's interests.

137.    Ron Huber, Donald Huber, and Robert Huber each breached his aforesaid fiduciary duty to Oskar Huber by causing the transfers of the Southampton and Ship Bottom

Properties to FIFT and Exit05, respectively, thereby causing Oskar Huber to forego rental income from the Southampton Property and causing Oskar Huber to pay rents to FIFT and Exit05 for its use and occupancy of properties which Oskar Huber had previously owned, and by causing Oskar Huber allegedly to guarantee FIFT Loans 1 and 2, and the Exit05 Loan, without providing any cash or cash flow benefit to Oskar Huber thereby.

138.   Further, Ron Huber, Donald Huber, and Robert Huber each personally benefited from his aforesaid breach of fiduciary duty to Oskar Huber, by causing the transfer of Oskar Huber's valuable real estate assets, the transfer of cash from Oskar Huber to FIFT and Exit05 through rental payments, and the diversion of rental income, from Oskar Huber to FIFT and/or Exit05, both of which were owned entirely by the Huber Brothers and their respective spouses.

139.   The aforesaid breach of fiduciary duty on the part of each of Ron Huber, Donald Huber, and Robert Huber has damaged Oskar Huber by depriving it of valuable real estate assets, rental income, and cash without providing any commensurate benefit to Oskar Huber.

140.   Therefore, the Committee and the Debtors' estate(s) are entitled to damages from Ron Huber, Donald Huber, and Robert Huber, in an amount to be determined at trial, avoidance of the aforesaid transfers in their entireties, and the return of the Southampton and Ship Bottom Properties to the Debtors' estate(s).

## COUNT V
(Against the Huber Brothers for breach of fiduciary and/or quasi-trust
duty owed to Oskar Huber's creditors, under New Jersey common law)

141.   Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 140 hereof, as if set forth fully and at length herein.

142.   At all relevant times, Ron Huber, Donald Huber, and Robert Huber each was and/or is a director, officer, and/or controlling shareholder of Oskar Huber.

143.    At the time of each of the aforesaid transfers of real property from Oskar Huber to FIFT and Exit05, Ron Huber, Donald Huber, and Robert Huber each knew that Oskar Huber was suffering ongoing operating losses, and that Oskar Huber was becoming insolvent and/or unable to pay its creditors timely, and, as such, each of them owed a fiduciary and/or "quasi-trust" duty to Oskar Huber's creditors not to favor one creditor over another, and, further not to favor themselves over any creditor.

144.    Each of Ron Huber, Donald Huber, and Robert Huber breached his aforesaid fiduciary and/or quasi-trust duty to Oskar Huber's creditors by causing the transfers of the Southampton and Ship Bottom Properties to FIFT and Exit05, respectively, thereby causing Oskar Huber to forego rental income from the Southampton Property and causing Oskar Huber to pay rents to FIFT and Exit05 for its use and occupancy of properties which Oskar Huber had previously owned, and by causing Oskar Huber allegedly to guarantee FIFT Loans 1 and 2, and the Exit05 Loan, thereby favoring HNB over Oskar Huber's other creditors.

145.    Further, Ron Huber, Donald Huber, and Robert Huber each breached his aforesaid fiduciary and/or quasi-trust duty to Oskar Huber's creditors by causing the transfer of Oskar Huber's valuable real estate assets, the transfer of cash from Oskar Huber to FIFT and Exit05 through rental payments, and the diversion of rental income, from Oskar Huber to FIFT and/or Exit05, both of which were owned entirely by the Huber Brothers and their respective spouses, thereby benefiting and favoring themselves over Oskar Huber's creditors.

146.    The aforesaid breaches of fiduciary and/or quasi-trust duty on the part of each of Ron Huber, Donald Huber, and Robert Huber has damaged Oskar Huber by depriving it of valuable real estate assets, rental income, and cash without providing any commensurate benefit to Oskar Huber.

147.     Therefore, the Committee and the Debtors' estate(s) are entitled to damages from Ron Huber, Donald Huber and Robert Huber, in an amount to be determined at trial, avoidance of the aforesaid transfers in their entireties, and the return of the Southampton and Ship Bottom Properties to the Debtors' estate(s).

## COUNT VI

(Against the Huber Brothers for alter ego liability
with respect to FIFT, under Pennsylvania common law)

148.     Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 147 hereof, as if set forth fully and at length herein.

149.     Ron Huber, Donald Huber, Robert Huber, and their respective spouses were and/or are, at all relevant times, the limited partners of FIFT and the shareholders of its general partner SMTMGP, and Ron Huber, Donald Huber, and Robert Huber were the controlling principals of FIFT and SMTMGP.

150.     None of the Huber Brothers or their respective spouses ever contributed any capital to FIFT or SMTMGP.

151.     At all relevant times, FIFT and SMTMGP each maintained its only office address at the offices of the Huber Companies (of which the Huber Brothers were also the owners and controlling principals), but did not actually maintain any separate office space, did not have its own employees, did not have its own accountant or bookkeeper, did not hold partners' or management meetings, did not own any assets other than the fraudulently transferred Southampton Property, and did not pay any rent or management fee to either of the Huber Companies.

152.    Further, the Huber Brothers caused all profits of FIFT and SMTMGP to be distributed regularly to themselves and their respective spouses, rather than causing any such profits to be invested into or retained as a reserve by FIFT or SMTMGP.

153.    Ron Huber, Donald Huber, and Robert Huber each caused FIFT and SMTMGP to be formed, and utilized FIFT and SMTMGP, for the sole purpose of perpetrating the fraudulent transfer of the Southampton Property, cash assets, and rental income away from Oskar Huber, and out of the reach of Oskar Huber's creditors, for the Huber Brothers' own benefit at the expense of Oskar Huber and its creditors.

154.    Thus, the Huber Brothers formed and operated FIFT and SMTMGP as mere instrumentalities of themselves, without regard to corporate formalities.

155.    For the foregoing reasons, the Court should disregard the separate business entity forms of FIFT and SMTMGP and deem them as mere alter egos of the Huber Brothers, so that each of the Huber Brothers is found liable herein to the same extent as FIFT.

156.    Therefore, the Committee and the Debtors' estate(s) are entitled to damages, in an amount to be determined at trial, from Ron Huber, Donald Huber, and Robert Huber, as well as the following relief: (i) avoidance of the aforesaid transfers in their entireties, and the return of Units A, B, and C of the Southampton Property to the Debtors' estate(s); (ii) an accounting of all monies received by FIFT as rent or other income from Oskar Huber, and from other tenants and lessees of the Southampton Property, and of the disposition of those funds; (iii) an accounting by each of the Huber Brothers of all monies they and/or their respective spouses have received as distributions from FIFT; (iv) imposition of a constructive trust and/or lien against all property fraudulently transferred to FIFT, and on the proceeds thereof, including distributions of the

proceeds by FIFT; and (v) a preliminary and permanent injunction against any disposition of the transferred property or of the proceeds thereof by FIFT and/or its partners.

## COUNT VII

(Against the Huber Brothers for alter ego liability
with respect to Exit05, under New Jersey common law)

157.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 156 hereof, as if set forth fully and at length herein.

158.    Ron Huber, Donald Huber, Robert Huber, and their respective spouses were and/or are, at all relevant times, the members of Exit05, and Ron Huber, Donald Huber, and Robert Huber were the controlling principals of Exit05.

159.    None of the Huber Brothers or their respective spouses ever contributed any capital to Exit05.

160.    At all relevant times, Exit05 maintained its only office address at the offices of the Huber Companies (of which the Huber Brothers were also the owners and controlling principals), but did not actually maintain any separate office space, did not have its own employees, did not have its own accountant or bookkeeper, did not hold members' or management meetings, did not own any assets other than the fraudulently transferred Ship Bottom Property, and did not pay any rent or management fee to either of the Huber Companies.

161.    Further, the Huber Brothers caused all profits of Exit05 to be distributed regularly to themselves and their respective spouses, rather than causing any such profits to be invested into or retained as a reserve by Exit05.

162.    Ron Huber, Donald Huber, and Robert Huber each caused Exit05 to be formed, and utilized Exit05, for the sole purpose of perpetrating the fraudulent transfer of the Ship

Bottom Property and cash assets away from Oskar Huber, and out of the reach of Oskar Huber's creditors, for the Huber Brothers' own benefit at the expense of Oskar Huber and its creditors.

163.    Thus, the Huber Brothers formed and operated Exit05 as a mere instrumentality of themselves, without regard to corporate formalities.

164.    For the foregoing reasons, the Court should disregard the separate business entity form Exit05 and deem it a mere alter ego of the Huber Brothers, so that each of the Huber Brothers is found liable herein to the same extent as Exit05.

165.    Therefore, the Committee and the Debtors' estate(s) are entitled to damages, in an amount to be determined at trial, from Ron Huber, Donald Huber, and Robert Huber, as well as the following relief: (i) avoidance of the aforesaid transfer in its entirety, and the return of the Ship Bottom Property to the Debtors' estate(s); (ii) an accounting of all monies received by Exit05 as rent or other income from Oskar Huber, and of the disposition of those funds; (iii) an accounting by each of the Huber Brothers of all monies they and/or their respective spouses have received as distributions from Exit05; (iv) imposition of a constructive trust and/or lien against all property fraudulently transferred to Exit05, and on the proceeds thereof, including distributions of the proceeds by Exit05; and (v) a preliminary and permanent injunction against any disposition of the transferred property or of the proceeds thereof by Exit05 and/or its members.

## **COUNT VIII**
(Against HNB for aiding and abetting the Huber Brothers' breaches
of their fiduciary duties to Oskar Huber, under New Jersey common law)

166.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 165 hereof, as if set forth fully and at length herein.

167.   HNB knowingly and substantially participated in the Huber Brothers' aforesaid breaches of their respective fiduciary duties to Oskar Huber, by providing financing to FIFT and Exit05 for each of the aforesaid transfers of the Southampton and Ship Bottom Properties, and by permitting the transfers of the properties away from Oskar Huber even though such transfers were otherwise forbidden pursuant to the commercial security agreements which Oskar Huber had executed in favor of HNB.

168.   HNB knew, at all relevant times, that it was financing the transfers of Oskar Huber's valuable real estate assets without fair consideration being given to Oskar Huber and/or for less than reasonably equivalent value given in exchange, that the transferees were owned and controlled entirely by the Huber Brothers and their respective spouses, that the transfers provided no cash or cash flow benefit to Oskar Huber, and that the ultimate goal of each transfer was to benefit the Huber Brothers personally at the expense of Oskar Huber.

169.   Based on the foregoing, HNB aided and abetted the aforesaid breaches of fiduciary duty on the part of each of the Huber Brothers.

170.   Therefore, the Committee and the Debtors' estate(s) are entitled to damages from HNB, in an amount to be determined at trial, and to the following relief: (i) avoidance of the aforesaid transfers in their entireties and the liens thereon, and the return of the Southampton and Ship Bottom Properties to the Debtors' estate(s); (ii) an accounting by HNB of all monies it has received from FIFT or Exit05, or any party affiliated with them, for FIFT Loans 1 and 2 as well as the Exit05 Loan, and any payments, including as to interest,  made thereon since the Petition Date; (iii) imposition of a constructive trust and/or lien against all such monies; and (iv) a preliminary and permanent injunction against any disposition of the transferred property by HNB.

<u>**COUNT IX**</u>
(Against HNB for aiding and abetting the Huber
Brothers' breaches of their fiduciary and/or quasi trust duties
to Oskar Huber's other creditors, under New Jersey common law)

171.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 170 hereof, as if set forth fully and at length herein.

172.    HNB knowingly and substantially participated in the Huber Brothers' aforesaid breaches of their respective fiduciary duties to Oskar Huber and their fiduciary and/or quasi-trust duties to Oskar Huber's creditors, by providing financing to FIFT and Exit05 for each of the transfers, and by permitting Oskar Huber to transfer the properties even though such transfer was otherwise forbidden pursuant to the commercial security agreements which Oskar Huber had executed in favor of HNB.

173.    Further, HNB compelled the Huber Brothers to favor HNB over Oskar Huber's other creditors, by requiring the Huber Brothers to give HNB mortgage liens on the transferred properties, and by requiring the Huber Brothers to execute the FIFT and Exit05 Loan Guaranties on behalf of Oskar Huber which were to be secured by Oskar Huber's remaining assets.

174.    HNB knew, at all relevant times, that the purpose and effect of each of the aforesaid fraudulent transfers were, in whole or in substantial part, to hinder, delay, or defraud present and/or future creditors of Oskar Huber, other than HNB, including the members of the Committee and the general unsecured creditors they represent.

175.    Further, HNB knew, at all relevant times, that the transfer transactions actually favored HNB over Oskar Huber's other creditors, and that the Huber Brothers' ultimate goal in causing the transfers was to benefit themselves personally at the expense of Oskar Huber's creditors, other than HNB.

176.    Based on the foregoing, HNB aided and abetted the aforesaid breaches of fiduciary and/or quasi-trust duty on the part of each of the Huber Brothers.

177.    Therefore, the Committee and the Debtors' estate(s) are entitled to damages from HNB, in an amount to be determined at trial, and to the following relief: (i) avoidance of the aforesaid transfers in their entireties and the liens thereon, and the return of the Southampton and Ship Bottom Properties to the Debtors' estate(s); (ii) an accounting by HNB of all monies it has received from FIFT or Exit05, or any party affiliated with them, for FIFT Loans 1 and 2 as well as the Exit05 Loan, and any payments, including as to interest,  made thereon since the Petition Date; (iii) imposition of a constructive trust and/or lien against all such monies; and (iv) a preliminary and permanent injunction against any disposition of the transferred property by HNB.

## COUNT X
(Against HNB for aiding and abetting fraudulent
transfers to FIFT, under Pennsylvania common law)

178.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 177 hereof, as if set forth fully and at length herein.

179.    HNB knowingly and substantially participated in the aforesaid fraudulent transfer of Units B and C of the Southampton Property, and the aforesaid fraudulent transfer of Unit A of the Southampton Property, from Oskar Huber to FIFT, by providing financing to FIFT for each of the transfers, and by permitting Oskar Huber to transfer the properties even though such transfer was otherwise forbidden pursuant to the commercial security agreements which Oskar Huber had executed in favor of HNB.

180.    HNB knew, at all relevant times, that the purpose of each of the aforesaid fraudulent transfers was, in whole or in substantial part, to hinder, delay, or defraud present

and/or future creditors of Oskar Huber, including the members of the Committee and the general unsecured creditors they represent.

181.    Based on the foregoing, HNB aided and abetted the aforesaid fraudulent transfers of the Southampton Property to FIFT.

182.    Therefore, the Committee and the Debtors' estate(s) are entitled to damages from HNB, in an amount to be determined at trial, and to the following relief: (i) avoidance of the aforesaid transfers in their entireties and the liens thereon, and the return of the Southampton Property to the Debtors' estate(s); (ii) an accounting by HNB of all monies it has received from FIFT, or any party affiliated with FIFT, for FIFT Loans 1 and 2, and any payments, including as to interest,  made thereon since the Petition Date; (iii) imposition of a constructive trust and/or lien against all such monies; and (iv) a preliminary and permanent injunction against any disposition of the transferred property by HNB.

### COUNT XI
(Against HNB for aiding and abetting fraudulent
transfers to Exit05, under New Jersey common law)

183.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 182 hereof, as if set forth fully and at length herein.

184.    HNB knowingly and substantially participated in the aforesaid fraudulent transfer of the Ship Bottom Property from Oskar Huber to Exit05, by providing financing to Exit05 for the transfer, and by permitting Oskar Huber to transfer the property even though such transfer was otherwise forbidden pursuant to the commercial security agreements which Oskar Huber had executed in favor of HNB.

185.    HNB knew, at all relevant times, that the purpose of the aforesaid fraudulent transfer was, in whole or in substantial part, to hinder, delay, or defraud present and/or future

creditors of Oskar Huber, including the members of the Committee and the general unsecured creditors they represent.

186.   Based on the foregoing, HNB aided and abetted the aforesaid fraudulent transfer of the Ship Bottom Property to Exit05.

187.   Therefore, the Committee and the Debtors' estate(s) are entitled to damages from HNB, in an amount to be determined at trial, and to the following relief: (i) avoidance of the aforesaid transfer in its entirety and the liens thereon, and the return of the Ship Bottom Property to the Debtors' estate(s); (ii) an accounting by HNB of all monies it has received from Exit05, or any party affiliated with Exit05, for the Exit05 Loan, and any payments, including as to interest, made thereon since the Petition Date; (iii) imposition of a constructive trust and/or lien against all such monies; and (iv) a preliminary and permanent injunction against any disposition of the transferred property by HNB.

## COUNT XII
(Against HNB for equitable subordination
under section 510(c) of the Bankruptcy Code)

188.   Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 187 hereof, as if set forth fully and at length herein.

189.   As alleged herein, HNB is guilty of misconduct in that it, among other matters alleged herein, knowingly aided and abetted the fraudulent transfers of Oskar Huber's valuable real estate assets to non-Debtors FIFT and Exit05.

190.   The aforesaid misconduct of HNB has unfairly disadvantaged and injured the members of the Committee, and the Debtors' general unsecured creditors whom they represent, by making Oskar Huber's real estate assets unavailable to satisfy the Debtors' debts owed to the Debtors' general unsecured creditors.

191.    Under the aforesaid circumstances, it would be inequitable and unconscionable for HNB to maintain priority of its claims against the Debtors' estate(s) over those of the members of the Committee, and the general unsecured creditors whom they represent, and subordination of HNB's liens, if any, and claims would be consistent with the provisions of the Bankruptcy Code.

192.    Therefore, HNB's liens, if any, and claims against the Debtors' estate(s), and HNB's mortgages on the Southampton Property and the Ship Bottom Property recovered hereby for the Debtors' estate(s), must be subordinated under the doctrine of equitable subordination and section 510(c) of the Bankruptcy Code.

### COUNT XIII
(Against HNB for disallowance of claim
under section 502 of the Bankruptcy Code)

193.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 192 hereof, as if set forth fully and at length herein.

194.    As alleged herein, all of the Huber Companies' assets were transferred to DD-OH upon the merger of the Huber and Garber Companies into DD-OH effective as of March 1, 2008.

195.    As also alleged herein, HNB knew, at all relevant times, of the Huber Companies' plan and intention to merge themselves with the Garber Companies into a new business entity, namely DD-OH, as of March 1, 2008.

196.    Further, as also alleged herein, HNB knew, at all relevant times, that pursuant to the aforesaid merger, all of the assets of the Huber Companies, both of which were New Jersey corporations, were to be, and were, commingled with those of Garber Companies and transferred to DD-OH,  a Pennsylvania limited liability company, effective as of March 1, 2008.

197.    Nevertheless, although HNB knew that the merger took place, it has failed to properly perfect any security interest it may have had in the assets formerly owned by the Huber Companies after they were transferred to DD-OH.

198.    By reason of the foregoing, HNB lost any security interest which it may have had in the Huber Companies' assets prior to the transfer of their assets to DD-OH, under N.J. Stat. § 12A:9-316.

199.    Further, HNB has failed to perfect any security interest it might have in any other assets of DD-OH, including those of the Garber Companies and those acquired or generated from the effective date of the merger and thereafter pursuant to, among other provisions, 13 Pa. C.S §§ 9307, 9308, 9310(a), as well as N.J. Stat. § 12A:9-316(a)(3), Example 5, and N.J. Stat. § 12A: 9-508(b), Example 4 (codifying U.C.C. § 9-508, Example 5).

200.    Therefore, because the Huber Companies no longer own any assets, and HNB has no valid security interest in any assets of DD-OH, HNB has no basis to assert that it is a secured creditor of the Debtors' estate(s).

201.    Therefore, (i) HNB's "secured" claim against the Debtors' estate(s) should be disallowed as a secured claim pursuant to, among other provisions, section 502 of the Bankruptcy Code, (ii) any and all payments made thereon since the Petition Date must be disgorged and returned to the benefit of the Debtors' estate(s), and (iii) any priority interest of HNB in any portion of the Guaranteed Amounts paid by Planned Furniture Promotions, Inc. to the Debtors must be terminated and dissolved.

## COUNT XIV
(Against HNB to compel marshalling of assets)

202.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in paragraphs 1 through 201 hereof, as if set forth fully and at length herein.

203.    To the extent HNB has any valid secured claim against the Debtors, HNB is a senior secured creditor to the general unsecured creditors as represented by the Committee.

204.    As alleged herein, HNB's secured loans to Oskar Huber were caused to be cross-collateralized by the substantial assets of non-Debtors FIFT and Exit05, and, therefore, HNB can elect to satisfy its secured claims, in whole or in part, from the assets of FIFT and Exit05 before looking to the Debtors' estate(s).

205.    It would be unfair and unjust to the Committee, and to other creditors of the Debtors' estate(s) subordinate to HNB, for HNB to exhaust the assets of the Debtors' estate(s) without first attempting to satisfy its claims from the significant assets of FIFT and Exit05, which assets are not available to the Committee or to other creditors of the estate(s).

206.    Therefore, under the equitable doctrine of marshalling of assets, HNB should be compelled to resort first to the assets of FIFT and Exit05 to satisfy any secured claims it may have before looking to the Debtors' estate(s).

**WHEREFORE**, plaintiff Committee of Unsecured Creditors respectfully demands judgment in its favor and against defendants as follows:

(a)    Against FIFT, Exit05, and each of the Huber Brothers, avoiding the fraudulent transfers of the Southampton and Ship Bottom Properties;

(b)    Against FIFT, Exit05, and each of the Huber Brothers, for an accounting by each of them of all monies received from the fraudulently transferred properties;

(c)      Imposing a constructive trust and/or lien against all properties fraudulently transferred to FIFT and/or Exit05, and against the proceeds thereof received by FIFT, Exit05, and/or each of the Huber Brothers ;

(d)      Against the Huber Brothers for damages;

(e)      Preliminarily and permanently enjoining disposition of the fraudulently transferred property and the proceeds thereof by or on behalf of FIFT and/or Exit05;

(f)      Against HNB, for damages and the avoidance of its liens;

(g)      Preliminarily and permanently enjoining disposition of the fraudulently transferred property and the proceeds thereof by or on behalf of HNB;

(h)      Equitably subordinating the claims of HNB against the Debtors' estate(s) to those of the Debtors' general unsecured creditors;

(i)      Disallowing the secured claims asserted by HNB against the Debtors' estate(s);

(j)      Disgorging and returning any and all payments made by the Debtors to HNB since the Petition Date;

(k)      Terminating and dissolving any priority interests of HNB in any portion of the Guaranteed Amounts paid by Planned Furniture Promotions, Inc. to the Debtors;

(l)      To the extent HNB has any valid secured claim, compelling HNB to resort first to the assets of FIFT and Exit05 to satisfy any secured claims before looking to the Debtors' estate(s);

(m)      Awarding plaintiff interest, costs, and attorneys' fees as permitted by law; and

(n)      Granting such other and further relief as this Court may deem just and proper.

Dated:    New York, New York               **BARTON BARTON & PLOTKIN LLP**
          March 20, 2009

                                           By:   /s/ Eric W. Sleeper
                                                Eric W. Sleeper (EWS 0528)
                                                Mathew E. Hoffman (MEH 9538)
                                                *Attorneys for Plaintiff Committee
                                                 of Unsecured Creditors*
                                                420 Lexington Avenue
                                                New York, NY 10170
                                                (212) 687-6262

## <u>VERIFICATION</u>

I, Eric W. Sleeper, counsel for the Committee, based upon the discovery taken to date in the Bankruptcy Case of Harleysville National Bank ("HNB"), the Debtors, FIFT, LP and Exit05 LLC (the "Non-Debtors"), including my review of the document production thereof, participation in the depositions of HNB and the Non-Debtors and review of the transcripts thereof, and my firsthand knowledge of the same, hereby verify under penalty of perjury under the laws of the United States of America that the foregoing pleasing is true and correct pursuant to 28 U.S.C. § 1746.

 /s/ Eric W. Sleeper
Eric W. Sleeper (EWS 0528)

Dated:   March 20, 2009