**FOX ROTHSCHILD LLP**
(Formed in the Commonwealth of Pennsylvania)
Princeton Pike Corporate Center
997 Lenox Drive, Bldg. 3
Lawrenceville, NJ  08648
(609) 896-3600; (609) 896-1469 (fax)
Hal L. Baume, Esquire (HB 6668)
Joseph R. Zapata, Jr. (JZ 0671)
hbaume@foxrothschild.com
jzapata@foxrothschild.com
Counsel for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>DD-OH Family Partners, LLC, *et al.,*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-28140 (JHW)<br>(Jointly Administered) |

**DEBTORS' SECOND MODIFIED DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE**

---

[1] The Debtors herein are Oskar Huber Fine Furniture Incorporated, Oskar Huber, Inc., DD-OH Family Partners, LLC, JD Garber Furniture, LP, JDG of DE, LP and JDG of PA, LP.

THIS SECOND MODIFIED DISCLOSURE STATEMENT, THE SECOND MODIFIED PLAN OF REORGANIZATION DATED JANUARY 15, 2010 ANNEXED HERETO AS EXHIBIT A, THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTORS.

**THE SECOND MODIFIED PLAN SUPERCEDES THE DEBTORS' FIRST MODIFIED PLAN OF REORGANIZATION FILED ON AUGUST 11, 2009 (THE "PRIOR PLAN").  ALTHOUGH THE UNSECURED CREDITORS VOTED TO ACCEPT THE PRIOR PLAN, IT COULD NOT BE CONFIRMED AND HAD TO BE RENEGOTIATED FOR THE REASONS SET FORTH IN SECTION III. J. HEREINBELOW.  THE RESULTS OF SUCH RENEGOTIATIONS ARE THE SECOND MODIFIED PLAN OF REORGANIZATION ATTACHED HERETO AS EXHIBIT A.**

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN STANDARD TIME, _____, **2010**, UNLESS EXTENDED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY (THE "BANKRUPTCY COURT").  YOUR VOTE ON THE PLAN IS IMPORTANT. THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO REORGANIZE IN A MANNER WHICH WILL BENEFIT THEIR CREDITORS AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11.  ADDITIONALLY, THE DEBTORS BELIEVE THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTORS' CREDITORS, ARISES FROM SIGNIFICANT NEGOTIATIONS

2

BETWEEN THE DEBTORS, THEIR PRIMARY SECURED CREDITOR, HARLEYSVILLE
NATIONAL BANK AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
ON BEHALF OF THE DEBTORS' GENERAL UNSECURED CREDITORS, AND THAT,
THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE
ESTATE.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

BY ORDER DATED _____, 2010, THE BANKRUPTCY
COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE
INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AND INTERESTS AGAINST
THE DEBTORS TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING
THEIR RIGHT TO VOTE ON THE PLAN.   APPROVAL OF THIS DISCLOSURE
STATEMENT BY THE BANKRUPTCY COURT, HOWEVER, DOES NOT CONSTITUTE A
DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS
SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE
BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF
VOTES ON THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION
CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY
INDICATED HEREIN.   THIS DISCLOSURE STATEMENT WAS COMPILED FROM
INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES AND IS
BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE,
INFORMATION AND BELIEF.

ALL OF THE FINANCIAL DATA RELIED UPON IN FORMULATING THE PLAN,

INCLUDING, WITHOUT LIMITATION, THE EVALUATIONS, ESTIMATES AND
PROJECTIONS CONTAINED HEREIN, AS WELL AS ALL OF THE FACTUAL
STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT
(COLLECTIVELY, THE "DISCLOSURE STATEMENT INFORMATION") WERE
PREPARED FROM AND/OR PROVIDED BY THE DEBTORS' BOOKS AND RECORDS,
ITS OFFICERS AND PROFESSIONALS.

HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE
DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS
INVOLVED.   BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS AND
INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY
CONSIDER THIS DISCLOSURE STATEMENT  IN ITS ENTIRETY.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE
STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY
EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF
THE PLAN ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE
RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE
TO ACCEPT OR REJECT THE PLAN.  NOTHING STATED HEREIN SHALL BE DEEMED
OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY,
OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY
OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER
LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS.
CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR
NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND

4

ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS OR THE PLAN REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT OR THE PLAN, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT OR PLAN.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

I.    **INTRODUCTION**

On September 22, 2008 (the "Petition Date"), Oskar Huber Fine Furniture Incorporated, Oskar Huber, Inc., DD-OH Family Partners, LLC, JD Garber Furniture, LP, JDG of DE, LP and JDG of PA, LP. (collectively, the "Debtors") filed petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Since the Petition Date, the Debtors have

5

remained in possession of their assets and managed their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtors submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes to accept or reject their Second Modified Plan of Reorganization dated January 15, 2010, a copy of which is annexed hereto as Exhibit A (the "Plan").[1]

The Bankruptcy Court has approved this Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor typical of the Voting Classes (as defined herein) contained in the Plan to make an informed judgment about whether to accept or reject the Plan. **A hearing to consider confirmation of the Plan (the "Confirmation Hearing") will be held on _____, 2010, Eastern Standard Time**, before the Honorable Judith H. Wizmur, Chief Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, 401 Market Street, Camden, New Jersey 08101.  At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements for confirmation under the Bankruptcy Code.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be filed and served so they are received **on or before _____, 2010 at 5:00 p.m., Eastern Standard Time**, in the manner described in Article IV, Section B of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

---

[1] Unless otherwise defined, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan.

LV1 1151169v2 01/18/10

Attached as exhibits to this Disclosure Statement are copies of the following documents:

Exhibit A:   The Plan;

Exhibit B:   Order of the Bankruptcy Court dated _____, 2010 (the "Disclosure Statement Order"), among other things, approving this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan; and

Exhibit C:   Creditor Trust Agreement.

Exhibit D:   Liquidation Analysis

Voting instructions are contained in Article IV, Section B of this Disclosure Statement. To be counted, your original Ballot must be duly completed, executed and served upon:

> FOX ROTHSCHILD, LLP
> PRINCETON PIKE CORPORATE CENTER
> 997 LENOX DRIVE, BLDG. 3
> LAWRENCEVILLE, NJ  08648
> ATTN.: ROBIN SOLOMON, PARALEGAL

Your Ballot must be received at the address listed above no later than by 5:00 p.m., Eastern Standard Time, on _____, 2010.  If your Ballot is not timely received, it may not be counted in determining whether the Plan has been accepted.  You are urged to carefully review the contents of the Plan and Disclosure Statement, including all exhibits annexed thereto, before making your decision to vote to accept or reject the Plan.  If you are the holder of a claim in Class 2 (Harleysville) or Class 3 (Allowed General Unsecured Claims), your claim is impaired (as defined in this Disclosure Statement) by the Plan and you are entitled to vote to accept or reject the Plan.  Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they may presently exist.

## II.   DESCRIPTION OF THE DEBTORS' BUSINESS AND REASONS FOR THE DEBTORS' CHAPTER 11 FILING

### A.    The Debtors' Business

The Debtors are furniture retailers and provide premier home furnishings and design centers in the greater Philadelphia and South Jersey area.  As of the Petition Date, the Debtors operated eight retail stores under various trade names in New Jersey and Pennsylvania and one outlet store in Allentown, Pennsylvania, offering a wide variety of furniture and household goods from such manufactures as Sealy Mattress Company, Hooker Furniture, and Rowe Furniture. The Debtors have distinguished themselves in the market by offering furniture to customers seeking quality furniture at a reasonable price.    The Debtors offer numerous custom order options for customers not offered by other major furniture retailers in the area.  The Debtors also provide design services that include home visits to assist customers in furnishing their homes.

*The Oskar Huber Entities*

Oskar Huber, Inc. is a New Jersey corporation incorporated in 1927 as a family-owned and operated business that has remained family-owned and has prospered for over three generations in Pennsylvania.  Oskar Huber, Inc. built its reputation by offering the highest quality furniture at an exceptional value and by completing the experience by providing its own delivery teams and trucks.  In 2000, Oskar Huber Fine Furniture, Inc. (and together with Oskar Huber, Inc., the "Huber Companies") was formed as a New Jersey corporation when the Huber Companies opened a store in Cherry Hill, New Jersey.   Oskar Huber Fine Furniture offered the same quality products to a new customer base.

The Huber Companies have offices located at 618 Second Street Pike, Southampton, Pennsylvania and prior to March 2008 operated at least six (6) retail furniture stores at the Lawrence Shopping Center, 2495  U.S. Route 1, Lawrenceville, New Jersey, the Valley Fair Shopping Center, 254 West Swedesford Road, Berwyn, Pennsylvania, 2005 Marlton Pike East,

8

Cherry Hill, New Jersey, 200 Tilton Road, Northfield, New Jersey, 101 8th Street, Ship Bottom, New Jersey and in Southampton, Pennsylvania which the Huber Companies lease from various entities.

The Huber Companies had annual sales of approximately $23 million in 2006.  In 2007, the Huber Companies opened two new stores and had annualized sales of over $26 million.

*The JD Garber Entities*

JD Garber Furniture, LP ("JD Garber") is a Pennsylvania Limited Partnership formed in 1997 as a family-owned and operated retail furniture business.  JD Garber Furniture, LP offered similar quality products to its customer base as the Huber Companies, but also appealed to customers seeking quality furniture at a slightly lower price.

JD Garber's offices were previously located in Whitehall PA and since the merger are also located at 618 Second Street Pike, Southampton, Pennsylvania. Prior to March 2008, JD Garber operated two retail furniture stores at 2028 McArthur Road, Whitehall, Pennsylvania and 1522 Bethlehem Pike, Hatfield, Pennsylvania and a furniture outlet at 1856 Catasauqua Road, Allentown, Pennsylvania.

JDG of DE, LP, a Delaware limited partnership, and JDG of PA, LP, a Pennsylvania limited partnership (and together with JD Garber Furniture, LP, collectively, the "Garber Companies") were formed in 2004 in order to own and operate four Lane Home Furnishings brand stores.

In 2003, JD Garber, who was already selling Lane Furniture in its stores, was approached by Lane Home Furnishings ("Lane") with an offer to become part of Lane's expansion into the furniture retail market with free-standing stores specific to their brand.

Over the course of the next four years, JD Garber invested in an expansion to accommodate eight stores to be opened under the Lane name in Pennsylvania, New Jersey and Delaware. JD Garber expanded its warehouse facilities, invested in state-of-art computer systems and formed the JDG entities all with an expectation of achieving higher profits and market share.

Of the eight stores, four were owned and operated by the JDG entities and four were owned by Lane but operated by the JDG entities. By the time the final store opened in December 2007, it was apparent that the hoped for benefits of increased sales and profits, market share and exposure to a larger customer base were not realized by the Garber Companies.

Prior to its relationship with Lane and the opening of the eight Lane stores, JD Garber historically had annual sales of $7 to 11 million. Following the opening of some of the Lane stores, the Garber Companies' sales increased, but not in an amount sufficient to offset the expenses related to the new stores or to even recoup the expansion costs incurred by JD Garber, resulting in a net decrease in income during the time it was involved with Lane.

In early 2008 after having spent a significant amount of money to accommodate the Lane relationship, Lane and the Garber Companies could not agree on a means of continuing with the business relationship and agreed to terminate same.

### *Merger between and among the Huber Companies and JD Garber Furniture LP*

After the Garber Companies' relationship with Lane ended, JD Garber was left with several hard assets, including delivery trucks, other equipment and a sophisticated inventory

control computer system that was much larger than necessary for the three locations. The Garber Companies had also put together a highly trained and nationally recognized IT, computer and sales management staff but not enough stores to benefit from having a significant amount of such assets. JD Garber was also left without a warehouse to store its inventory.

Over the course of 6 months in or around the middle to end of 2007, JD Garber and the Huber Companies engaged in discussions regarding the benefits of working together. JD Garber brought the "front-end" hard assets and strong merchandising talent and the Huber Companies brought six locations, the warehousing, inventory control, accounting operations and 80 years of experience in the furniture retail business. Both the Huber and Garber families believed a merger was in the best interest of their respective business and customers.

JD Garber and the Huber Companies came to realize that to be profitable in the retail furniture business, they had to have the benefit of economies of scale in advertising, purchasing, corporate overhead and delivery and warehousing. Therefore the Debtors maintain that effective as of March 1, 2008, JD Garber and the Huber Companies merged, forming DD-OH Family Partners, LLC although whether or not such merger was effective is a matter of dispute ("Merger"). The effectiveness of said Merger has been disputed by Harleysville in the Committee's Adversary Proceeding and Harleysville, and any other parties in interest, do not admit, and reserve the right to dispute that said Merger was effective.

DD-OH Family Partners, LLC, t/a DD Huber Furniture & Design and also t/a Oskar Huber Furniture & Design ("DD-OH" and together with the Huber Companies and JD Garber, the "Merged Companies"), a Pennsylvania limited liability company, maintains its offices at the Southampton location occupied by the Huber and JD Garber and now operates each of the nine locations previously operated separately by JD Garber and Huber Companies.

11

JD Garber and Huber Companies combined all of their assets, subject to all their liabilities, into DD-OH, with their sole assets being their respective ownership stakes in DD-OH. Debtors maintain that pursuant to the merger, DD-OH is owned 50% by Oskar Huber, Inc. and 50% by JD Garber.

Prior to the Merger, JD Garber and Huber Companies employed over 260 employees. Following the Merger, DD-OH employed approximately 220 employees, including 80 to 90 full- and part-time sales people in the nine locations. The remaining employees compromised (i) the combined "back office" staff at the Southampton location, (ii) IT and professional design staff, (iii) warehouse staff, and (iv) office staff at the nine retail locations.

The Merger held the promise of reduced costs in personnel, advertising, delivery and warehousing. Unfortunately, the Merged Companies never realized the benefits of the reduced overhead cost as sales began to fall markedly immediately following the Merger.

*Transfers of Real Estate by Oskar Huber, Inc.*

At one time, Oskar Huber Inc. owned the Southampton Property and the Ship Bottom Property from which it operated two stores. Over a period of time prior to the Petition Date, Oskar Huber Inc. transferred the Southampton Property to FIFT, LP, and transferred the Ship Bottom Property to Exit05, LLC.

Harleysville made mortgage loans with respect to the acquisition of such properties and as of the Petition Date Harleysville held a mortgage on the Southampton Property in the approximate amount slightly less than $3,000,000 and a mortgage on the Ship Bottom Property in the approximate amount of $1,200,000. Both mortgage loans were guaranteed by Oskar Huber Inc., which guarantee was secured by a Lien on Oskar Huber Inc**.**'s assets.

12

### B.    The Debtors' Prepetition Secured Debt

*Harleysville National Bank*

On or about March 4, 2005, Harleysville National Bank ("Harleysville") extended credit to Oskar Huber, Inc. for working capital in the amount of $1,000,000 (the "OH Commercial Loan").  To evidence its obligations to Harleysville under the OH Commercial Loan, Oskar Huber, Inc. executed certain notes, agreements, and other documents, including without limitation, a security agreement granting the Bank a security interest in, *inter alia*, all of Oskar Huber, Inc.'s inventory, equipment, accounts, chattel paper, instruments, letter-of-credit rights, letters of credit, documents, deposit accounts, and general intangibles (the "OH Collateral") and executed various documents in connection with the OH Commercial Loan and renewal of same as requested by Harleysville.

On or about August 8, 2006, Oskar Huber, Inc. entered into a Business Loan Agreement and Promissory Note for $750,000 with Harleysville.  The Loan (the "OH Term Loan" and together with the OH Commercial Loans referred to as the "OH Loans") was evidenced by a term note with a balloon payment due on August 22, 2008.  The OH Term Loan was also secured by the OH Collateral.

As of the Petition Date, the balance due under the OH Commercial Loan was approximately $1.0 million, including a drawn letter of credit on account of Oskar Huber for the benefit of The CIT Group/Commercial Services, Inc. evidenced by a certain Continuing Standby Letter of Credit Reimbursement Agreement in the face amount of $100,000, and the balance due on the OH Term Loan was approximately $500,000.  Accordingly, Harleysville loaned approximately $1,500,000 allegedly secured by some or all of the Debtors' assets.

In addition, as previously stated, Oskar Huber Inc. guaranteed the mortgage loan obligations of FIFT and Exit05 totaling approximately $4,200,000 which guaranty obligation was also allegedly secured by the OH Collateral. Harleysville has asserted that the Debtors' assets are subject to its Lien to secure the approximate sum of $5,700,000.

*Purchase Money Security Interests*

The following creditors have asserted liens on the inventory which they sold the Huber Companies: (ii) Bernhardt Furniture Company ("Bernhardt"), (iii) HDM Furniture Industries, Inc. ("HDM"); (iv) Stanley Furniture Company, Inc. ("Stanley") and (v) La-Z-Boy Incorporated ("La-Z-Boy," and together with Bernhardt, HDM and Stanley, the "Purchase Money Creditors"). As of the Petition Date, the following amounts remained due and owing to the Purchase Money Creditors:

1) Bernhardt - $85,600. During the pendency of these chapter 11 cases, Bernhardt was paid $81,322.35 in full satisfaction and discharge of its lien.

2) Stanley - $190,000. During the pendency of these cases, Stanley was paid $190,015.15 in full satisfaction and discharge of its lien.

3) HDM - $3,300. No proof of claim was filed by HDM in the Debtors bankruptcy cases prior to the Bar Date. The Debtors submit that HDM does not have a claim against the Debtors or their respective estates.

4) La-Z-Boy - $181,000. During the pendency of these chapter 11 cases, La-Z-Boy was paid $180,860.88 in full satisfaction and discharge of its lien.

*GE Commercial Distribution Finance Corporation*

GE Commercial Distribution Finance Corporation ("GECDFC,") asserts a lien on DD-OH's accounts, inventory, equipment, general intangibles, chattel paper, negotiable instruments

14

and computer equipment, including proceeds thereof in the approximate amount of $91,000.

DD-OH disputes the lien and has listed the amount on its schedules as a disputed amount.  No

proof of claim was filed by GECDFC in the Debtors bankruptcy cases prior to the Bar Date.  As

such, the Debtors submit that GECDFC does not have a claim against the Debtors or their

respective estates.

*The Debtors' Equipment and Personal Property Liens*

The Debtors had various equipment leases (the "Equipment Leases") which were

secured, *inter alia,* by specific pieces of equipment and/or fixtures.  The Debtors believe that

each of these Equipment Leases are "true leases" however, several parties to whom the Debtors

are obligated under these Equipment Leases have filed UCC statements asserting a security

interest in the various pieces of equipment.  As of the date of the filing of this Disclosure

Statement, all Equipment Leases have been rejected by the Debtors.

The Garber and Huber Companies are obligated on several purchase agreements for

vehicles utilized by the officers, directors and management personnel.

### C.    The Debtors' Other Prepetition Indebtedness

*Leases for the Store Locations*

DD-OH operated out of the following nine store locations: Whitehall, PA, Allentown,

PA, Hatfield, PA, Berwyn, PA, Ship Bottom, NJ, Northfield, NJ, Southampton, PA, Cherry Hill,

NJ, Lawrenceville, NJ.  The Debtors have rejected the leases for all store locations.  Proofs of

claim for lease rejection damages have been filed by the respective landlords against the Debtors

as general unsecured claims.

*Truck Leases*

DD-OH leased several trucks for delivery and other purposes.  All of the truck leases

15

have been rejected.  Proofs of claim for lease rejection damages have been filed by the respective

truck lessors as general unsecured claims.

*General Unsecured Claims*

Proofs of claim have been filed by general unsecured creditors against the estates totaling

$15,011,584.44.  It is anticipated that the amount of allowed general unsecured claims will be

materially reduced following the disallowance and/or reduction of duplicate claims, superseded

claims, previously paid claims, the agreed subordination of any and all insider claims, claims not

supported by the Debtors' books and records, and claims that are subject to other objections.

### D.    Factors Precipitating The Debtors' Chapter 11 Filing

In the 18 months prior to the Petition Date, the Garber and Huber Companies both

opened new stores anticipating that sales would remain constant and that more locations would

increase their respective market shares and exposure.  With the Merger, the Garber and Huber

Companies expected decreased costs and increased profits based upon the economies of scale.

Just following the Merger, the credit crisis hit and the United States economy as a whole

took a downturn.  As a result, sales declined immediately and DD-OH had difficulty finding

qualified sales people.  In addition to the credit effect on the housing market (which has a strong

correlation to the home furnishings market), consumers were feeling the effects of higher gas and

food prices as well as uncertainty over the political future of the country. As a result, sales

continued to decline and DD-OH had even further difficulty finding and keeping qualified sales

people.

Within a few months of the Merger, sales had declined forty to fifty percent (40%-50%)

from the pre-Merger levels.  At the same time, the costs of inventory increased, affected by the

sharp increase in the cost of manufacturing and shipping finished goods.   Delivery costs also

increased for the Merged Companies as the price of fuel made the home delivery the Merged

16

Companies were known for far more expensive.   Freight costs have increased on the average of once each month, further reducing the Merged Companies' profit margins.

With the reduction in income, concerns in general from potential lenders about furniture being "a high risk industry" as well as historical losses, DD-OH experienced difficulties in obtaining inventory financing.  Their primary factor reduced their terms and would no longer finance further inventory expansions dollar for dollar.  Several other attempts to find financing also failed.

## III.    THE CHAPTER 11 CASE

This section of the Disclosure Statement describes important developments that have occurred in the Chapter 11 Case.

### A.    The First Day Motions and Related Matters

The Debtors filed various motions at the inception of the Chapter 11 Case, specifically, to avoid the potentially disruptive impact the commencement of  the Chapter 11 case would have on the Debtors' ability to continue operating, to facilitate the orderly transition into Chapter 11 and proceed with a going-out-of-business sale.  The Debtors requested that the Court consider, on an expedited basis, the following motions: (a) motion for joint administration of the debtors' bankruptcy cases; (b) motion for an Order authorizing the Debtors' use of cash collateral and scheduling a final hearing pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001; (c) motion for an Order authorizing the Debtors to satisfy, and directing payroll banks to honor, pre-petition gross salaries, commissions and related obligations to the Debtors' employees; (d) motion for an Order authorizing the Debtors to maintain existing bank accounts and continue using its existing business forms and cash management system and waiving deposit guidelines; (e) motion for an continuation of utility service and approval of adequate assurance of payment to utility companies under 11 U.S.C. § 366(b); (f) motion for an Order authorizing the Debtors to

honor certain pre-petition customer deposits; (g) motion for an Order extending the Debtors'

time to file schedules and statement of financial affairs; (h) motion for an Order establishing

procedures for interim compensation and reimbursement of expenses of Chapter 11 professionals

and Committee members; (i) motion for substantive consolidation and (j) motion for an Order

authorizing Debtors to assume pre-petition executory contract with Planned Furniture

Promotions, Inc. to conduct a going-out-of-business sale and approving lease rejection

procedures (collectively, the "First Day Motions").

The purposes of the First Day Motions included, among other things, to: (a) enable the

Debtors to continue operating as they pursued a going-out-of-business sale of its inventory in

order to facilitate Chapter 11 reorganization; and (b) preserve the value of the Debtors' estate.

Each of the First Day Motions was necessary to the Debtors' ability to remain open, proceed

with the going-out-of-business sale and reorganize in a manner that is in the best interest of the

Debtors' creditors.

### B.    The Debtors' Professionals

The Debtors retained, pursuant to Orders entered by the Bankruptcy Court, the following

professionals to assist them with the administration of the Chapter 11 Cases:

**Bankruptcy Counsel**
FOX ROTHSCHILD, LLP
997 Lenox Drive
Lawrenceville, NJ 08648
Attn:   Hal L. Baume, Esq.
          Joseph R. Zapata, Jr., Esq.

**Financial Consultants**
NACHMANHAYSBROWNSTEIN, INC.
919 N. Market Street, Suite 1410
Wilmington, DE 19801
Attn:   Edward T. Gavin, CPA

LV1 1151169v2 01/18/10

C.       **The Committee and its Professionals**

On October 2, 2008, the United States Trustee for the District of New Jersey appointed

the Committee to represent the interests of all the Debtors' unsecured creditors.  The Committee

is comprised of individuals representing the following Creditors:

> Sealy Mattress Co. Of NJ, Inc.
> 697 River Street
> Paterson, NJ 07524
>
> A.R.T. Furniture, Inc.
> 1165 Auto Center Drive
> Ontario, CA 91761
>
> Furniture Brands International
> 1 W. Brentwood Blvd.
> St. Louis, MO 63105
>
> Mail America
> 89 Bridge Street Plaza
> Wheeling, WV 26003
>
> Klausser Furniture Industries, Inc.
> P.O. Drawer 220
> Asheboro, NC 27205
>
> Furniture Values International
> d/b/a Aspen Furniture, LLC
> 2929 Grand Ave.
> Phoenix, AZ 85017

The Committee retained, pursuant to Orders entered by the Bankruptcy Court, the

following professionals:

> **Committee Counsel**
> BARTON, BARTON & PLOTKIN LLP
> 420 Lexington Avenue
> New York, New York 10170
> Attn:   Eric W. Sleeper, Esq.

19

**Financial Advisors**
AMPER, POLITZINER & MATTIA, LLP
2015 Lincoln Highway
Edison, New Jersey 08818
Attn:   Edward A. Phillips, CPA

Since its formation, the Committee has played a substantially active and involved role in all aspects of the Chapter 11 Case.

### D.      Operating Guidelines

Upon the Petition Date, the Debtors became bound by the Operating Guidelines and Reporting Requirements for Chapter 11 Cases (the "Operating Guidelines").  The Debtor has fulfilled and continues to fulfill its obligations under the Operating Guidelines.

### E.      Section 341(a) Meeting of Creditors

On November 20, 2008, the Debtors appeared at the section 341(a) meeting of creditors in the Chapter 11 Case conducted by the UST.

### F.      Schedules and Statements

The Debtors filed with the Bankruptcy Court its Schedules and Statement of Financial Affairs (the "Schedules").  According to the Debtors' Schedules, as of the Petition Date, the Debtors had secured liabilities in the approximate amount of $2,203,869.06, unsecured priority liabilities in the approximate amount of $1,193,709.19, and unsecured non-priority liabilities in the approximate amount of $13,402,089.33.[2]   According to the Debtors' Schedules, the book value of its assets exceeded $9,976,091.80.  The Schedules can be reviewed at the Bankruptcy Court during regular business hours.

---

[2] Due to potential co-debtor obligations, certain creditors may be listed for the same obligation on two or more of the Debtors' schedules.  The totals included in this paragraph have corrected for the duplication and have calculated the debt as one obligation.

LV1 1151169v2 01/18/10

### G.    <u>Bar Date</u>

The date by which Creditors were to file proofs of claim in the Chapter 11 Case is February 11, 2009 (the "Bar Date").  Any holder of a claim against the Debtors who was required to, but failed to file a proof of claim on or before the Bar Date will be forever barred from asserting such a claim against the Debtors' estate and the claim of any holder which filed a claim after the Bar Date will be challenged as untimely pursuant to the contemplated claims objection process and may be forever barred from asserting such a claim against the Debtors' estate.

In addition, on November 12, 2008,  the Debtors filed a motion with the Bankruptcy Court seeking the entry of an order fixing a deadline for creditors to file claims for administrative expense priority for 20 day extensions of credit for goods sold pursuant to 11 U.S.C. § 503(b)(9) ("20 Day Claims").  On December 10, 2008, the Bankruptcy Court entered an Order fixing February 11, 2009 as the deadline for creditors to file 20 Day Claims (the "20 Day Claim Bar Date").   Any holder of a 20 Day Claim against the Debtors who was required to, but failed to file a proof of claim on or before the 20 Day Claim Bar Date are forever barred and discharged against asserting a claim against the Debtors' estate by Order of the Bankruptcy Court.   In addition, any holder of a claim against the Debtors for rejection damages arising from the rejection of an executory contract of lease ("Rejection Damages Claim") who was required to, but failed to file a proof of claim on or before the deadline to file such claims are forever barred and discharged against asserting a claim against the Debtors' estate by Order of the Bankruptcy Court.

### H.    <u>Post-Petition Operations & the Going-Out-Of-Business Sale</u>

Prior to the Filing Date, the Debtors considered several options, including refinancing, new capital contributions, sale of some or all of their assets and/or liquidation of certain of their

21

stores and assets.  The Debtors met with representatives of various financial institutions,, sought

out new investors, other potential merger targets and discussed refinancing with Harleysville

National Bank.   The Debtors also considered closing under-performing stores and retrenching

with financially leaner operations.  None of these efforts were successful.

　　　In addition to attempts to obtain financing and/or sell their businesses, the Debtors

requested proposals from different liquidation companies.    After discussions with such

liquidation companies, the Debtors determined that the proposal from Planned Furniture

Promotions, Inc. ("PFP") was the highest and best proposal and would result in the greatest

return to the Debtors' estates and their creditors, both secured and unsecured.

　　　As a result of extensive negotiations, the Debtors and PFP entered into the September 19,

2008 Sale Promotion Consulting Agreement (the "Agreement") for the liquidation of the

Debtors' inventory (the "Company Inventory" and the "Other Inventory").   The Agreement

provided, in pertinent part, that the Debtors would receive the following amounts:  (i) eighty-five

percent (85%) of the Company Inventory Cost Value (the "Company Inventory Guaranteed

Amount"; (ii) thirty percent (30%) of the Other Inventory Cost Value (the "Other Inventory

Guaranteed Amount"); (iii) one hundred percent (100%) of the Accepted On-Order Merchandise

Cost Value and thirty percent (30%) of the Accepted On-Order Merchandise Cost Value if the

merchandise is odd, mismatched, damaged or distressed (the "Accepted On-Order Merchandise

Guaranteed Amount" and together with the Company Inventory Guaranteed Amount and the

Other Inventory Guaranteed Amount collectively, the "Guaranteed Amount"); and (iv) a

$500,000 augment fee.

　　　As part of the First Day Motions, the Debtors filed a motion for an Order authorizing

Debtors to assume the Agreement with PFP and to conduct a going-out-of-business sale (the

"GOB Sale").  On October 10, 2008, an Order was enter by the Bankruptcy Court approving the Agreement, authorizing the sale and establishing lease rejection notice procedures (the "GOB Order").  The GOB Order provided, *inter alia*, that the GOB Sale could be conducted at the Store Locations for up to one hundred seventy (170) days from the Petition Date.  In accordance with the GOB Order, the leases for each Store Location were rejected as such Store Location was no longer necessary for the GOB Sale.  Pursuant to the GOB Order, the GOB Sale was conducted and concluded on or before March 31, 2009.  The Debtors estates have received a gross sum of approximately $3,476,000 as a result of the GOB Sale.[3]

While the Debtors, as reorganized and reconstituted, intend to continue to operate out of the Ship Bottom and Southampton locations, the Debtors have ceased operations at all of the Store Locations pending confirmation of a Plan.

## I.    Creditors Committee Litigation

Under the Second Interim Cash Collateral Order, the Debtors and the Committee were provided 90 days from the entry of the Order to investigate Harleysville's liens, interests and claims, including as to the extent, validity and priority thereof.  To the extent that either the Debtors or the Committee determined to challenge the extent, validity and/or priority of Harleysville's liens, interests or claims, the adversary proceeding was to have been commenced on or within such 90-day period.  By agreement between the Debtors, the Committee and Harleysville, further interim cash collateral Orders were entered and the deadline to investigate and challenge such liens extended.

On March 20, 2009, the Committee commenced the adversary proceeding no. 09-01416 against Harleysville, FIFT, LP, Exit05, LLC, Ron Huber, Donald Huber and O. Robert Huber

---

[3] Approximately $1,950,000 in proceeds from the GOB Sale have either been used to pay secured creditors and/or are presently held in escrow for same.

LV1 1151169v2 01/18/10

seeking, among other things, to recover certain transfers of real property, for the avoidance of such transfers and for other causes of relief. A motion was further filed by the Committee for a temporary restraining order and for injunctive relief. Temporary restraining and injunctive orders were subsequently entered by the Court.

On July 17, 2009, Harleysville filed an answer and cross-claim against Ron Huber, Donald Huber and O. Robert Huber. On July 17, 2009, Harleysville further filed a third-party complaint against DD-OH Family Partners, LLC t/a DD Huber Furniture & Design and Oskar Huber Furniture & Design, David Garber, Jon Garber and Julie Sebastian.

In the proceeding, the Committee sought, among other things (i) to have Harleysville alleged lien on the Debtors' assets securing the OH Loans determined to be invalid and of no force and effect, (ii) to avoid the transfers by Oskar Huber, Inc. of the Southampton Property to FIFT and Ship Bottom Property to Exit05 and return same to the Debtors' estate, and (iii) equitably subordinate the mortgages held by Harleysville on the Southampton Property and Ship Bottom Property.

## J.       Proposed Settlement of Creditors Committee Litigation and the Plan

A tentative settlement was reached by the parties to resolve this litigation which served as the basis for that certain First Modified Plan of Reorganization filed on August 11, 2009 (the "Prior Plan"). One of the major components of the Prior Plan was the sale of the entire Southampton Property to a third party purchaser. The Southampton Property is a condominium and consists of three units (A, B and C). Said third party purchaser was going to lease Unit A of Southampton (where the Huber Entities had operated a furniture store) to Huber Newco (the new entity to be formed by the Hubers to operate two stores). The confirmation hearing on the Prior Plan was scheduled for September 8, 2009 and it was anticipated that the Prior Plan would be

24

confirmed, effective and consummated by September 30, 2009.  Unfortunately, shortly before

that hearing the third party purchaser notified the Hubers that it would not close on the sale.  The

Prior Plan could, therefore, not be confirmed and the confirmation hearing was adjourned from

time to time to give the Hubers the opportunity to find a replacement buyer or refinancing.

Unfortunately, a replacement buyer or refinancing for the entire Southampton Property, after

months of searching, could not be found.  The failure to confirm and consummate the Prior Plan

by September 30, 2009 resulted in other problems and impediments arising which would also

prevent confirming a plan similar to the Prior Plan (including, without limitation, the loss of the

Exit Financing required for the Prior Plan).   While searching for a replacement buyer or

refinancing, the  Debtors, Hubers, Committee and Harleysville commenced and conducted over

the past several months constant, difficult and time consuming negotiations to formulate a plan

which did not rely on the sale/refinancing of the entire Southampton Property and Exit Financing

from Harleysville, while still providing (i) unsecured creditors with the same recovery as

provided in the Prior Plan, (ii) Harleysville with what it would find an acceptable recovery on its

Claims, and (iii) sufficient funding to pay all requisite administrative and non-tax priority claims

as of the Effective Date.  Unfortunately, this process caused the case to continue several months

longer than anticipated during which time administration expenses continued to be incurred

which further complicated the negotiations on a suitable replacement plan.  While a replacement

purchaser for the entire Southampton Property could not be found, the Hubers were able to

obtain financing for their parents to purchase Units B&C of the Southampton Property and

despite the fact that same would provide substantially lower proceeds than a sale of the entire

Southampton Property would have, the parties ultimately overcame several hurdles to reach an

agreement which formed the basis for the Plan.

LV1 1151169v2 01/18/10

The terms of the settlement are fully set forth in the Plan.  A brief and general summary of the settlement is as follows:

In exchange for the following, the Committee will dismiss with prejudice the litigation and all parties will exchange releases.

Harleysville will retain all of its liens and mortgages but will accept the sum of $1,432,100 in full settlement and satisfaction of the OH Loans (Harleysville will waive all other claims under the loan documents including default interest, legal fees, any penalties, etc).  The Southampton Property consists of three condominium units (A, B and C).  The Debtors furniture store operated in Southampton Unit A while Southampton Units B&C were rented to third parties.  Southampton Units B&C will be sold after confirmation of the Plan on the Effective Date to the Hubers' parents and the net proceeds will be used to pay the outstanding principal balance of the FIFT Loan B&C (which is the loan related to and secured by Southampton Units B&C) and accrued interest, if any, at the regular contract rate, with anticipated excess proceeds of just under $223,000 being used to make other payments required to be made on the Effective Date.  FIFT Loan A (which is the loan related to and secured by Southampton Unit A) and Exit05 Loan (which is the loan related to and secured by the Ship Bottom Property) will be restructured and mature in two years from the Effective Date.

The Restructured Loans will be cross-defaulted, cross-guaranteed and cross-collateralized with the Post Confirmation Loans and will contain (in addition to the terms and conditions set forth in the Plan) such additional terms and conditions as are customary and/or reasonably required by a lender for credit facilities of these types and/or in comparable circumstances.  All documentation evidencing the Restructured Loans will be prepared by Harleysville's counsel.

LV1 1151169v2 01/18/10

In consideration of the foregoing, Harleysville will provide, subject to various conditions as set forth in the Plan, Post Confirmation Loans in the amount of $900,000, of which $750,000 will be used in part to help fund the payments required under this Plan, including, without limitation, payment of Administration Claims, Priority Non-Tax Claims and to pay $575,000 of the sum of $1,250,000 which will ultimately be paid into a fund for the benefit of the holders of Allowed General Unsecured Claims.  The balance of $150,000 will principally be used for Letters of Credit to be provided by Harleysville to the new business entity to be formed by the Hubers which will reopen two stores (in Southampton Unit A and Ship Bottom Property) referred to in the Plan as "Huber Newco".  The Post Confirmation Loans will be made to Huber Newco and  will be secured by mortgages on Southampton Unit A,  Ship Bottom Property and the assets of Huber Newco.  FIFT will retain ownership of Southampton Unit A and Exit05 will retain ownership of the Ship Bottom Property.  As the Southampton Unit A and Ship Bottom Property are sold or refinanced so that they may be paid off within two years (by their maturity) a portion of the proceeds thereof will be used pay the balance of  the sum of $1,250,000 which will ultimately be paid into a fund for the benefit of the holders of Allowed General Unsecured Claims as well as the unpaid balance of the deferred Professional Compensation Claims (which are also to be secured by mortgages on Southampton Unit A, Ship Bottom Property and the assets of Huber Newco).

The Post Confirmation Loans will be cross-defaulted, cross-guaranteed and cross-collateralized with the Restructured Loans and will contain (in addition to the terms and conditions set forth in the Plan) such additional terms and conditions as are customary and/or reasonably required by a lender for credit facilities of these types and/or in comparable

LV1 1151169v2 01/18/10

circumstances.  All documentation evidencing the Post Confirmation Loans will be prepared by Harleysville's counsel.

Huber Newco and Garber will each assume their respective portion of the allowed priority claims for sales taxes (in the approximate aggregate amount of $1,242,000) and pay those taxes over time in installment payment as permitted under the Bankruptcy Code or as otherwise agreed by the tax authorities.

There are various conditions to the Debtors' ability to proceed to confirmation of the Plan which include, without limitation, the following:

Harleysville's acceptance of its treatment under the Plan and its provision of the Post Confirmation Loans is expressly conditioned upon Harleysville's receipt of an appraisal of Southampton Unit A showing a fair market value of same of at least $4.4 million.

The confirmation of the Plan is conditioned upon the Professionals agreeing to accept payment of their unpaid Allowed Professional Compensation Claims (expected to aggregate $347,000 for all Professionals through the Effective Date) in deferred installment payments over time as set forth in section 6.4 of the Plan.  Under applicable bankruptcy law, all administration expenses, including Allowed Professional Compensation Claims, are to be paid in full in cash on the Effective Date (or as soon thereafter as allowed) unless the claimant agrees otherwise.  The Professionals have been asked to waive their rights to be paid on the Effective Date and accept deferred monthly installment payments from Huber Newco over a period of time pursuant to the terms of section 6.4 of the Plan, thereby, in effect, extending credit to Huber Newco.  Among the terms set forth in section 6.4 of the Plan, are terms requiring that these obligations be secured by mortgages on Southampton Unit A, Ship Bottom and the assets of Huber Newco (junior to the

mortgages and liens held by Harleysville). As of the time the Plan was filed, the Professionals have not yet agreed to this and, in accordance with the Plan, will notify counsel to Debtors, Hubers, Harleysville and the Committee, on or before the deadline for voting and filing objections to the Plan, whether or not they will agree to defer payment of their respective unpaid Allowed Professional Compensation Claims.

With respect to the foregoing contingencies all parties have reserved all rights.

### K.   Additional Post-Petition Matters

As part of the administration of the bankruptcy cases, the Debtors have filed numerous motions with the Bankruptcy Court and obtained orders for relief including: (a) motion for Order authorizing procedures for assumption and assignment or rejection of executory contracts; (b) motion(s) to reject certain executory contracts and unexpired leases; (c) application for final Order determining adequate assurance of payment for post-petition utility services; (d) motion(s) to extend exclusivity to file a plan and solicit acceptances thereto; (e) motion for authority to employ and compensate professionals to represent the Debtors in the ordinary course; (f) motion to extend time to assume or reject real property leases; and (g) motion for an Order authorizing COBRA premium payments.

### L.   Summary of Assets and Liabilities

#### 1.   Assets

As of January 15, 2010, the Debtors had cash on hand of approximately $1,443,000 (of which the sum of $1,432,100 is being held in escrow on account of Harleysville) thus leaving non-escrowed cash on hand of approximately $11,000. Other assets include furniture, fixtures, equipment remaining in the Southampton and Ship Bottom Properties and intangible assets such as certain receivables and trade names.

29

2.    **Liabilities and Expenses**

As of January 15, 2010, the Debtors had the following potential liabilities:

a.       Approximately $224,000 in unpaid allowed administrative expense claims (other than Professional Compensation Claims), including post petition stub rent claims of approximately $99,000 and 20 Day Claims of approximately $97,700.   Although, as indicated in the First Modified Disclosure Statement in support of the Prior Plan   ("Prior Disclosure Statement"),  claims in amounts substantially higher than the foregoing amounts were filed, the valid amount of such claims has now been fixed either by Bankruptcy Court determination or settlement resulting from various claim objections filed by the Debtors or the Committee.

b.       Approximately $81,400 in allowed priority claims for customer deposit claims.   These claims have now been resolved either by Court determination or settlement.   Although, as indicated in the Prior Disclosure Statement,  claims in amounts substantially higher than the foregoing amounts were filed, the valid amount of such claims has now been fixed either by Bankruptcy Court determination or settlement resulting from various claim objections filed by the Debtors or the Committee

c.       Approximately $15,011,584.44 in asserted general unsecured claims.[4]  The Debtors have not yet fully evaluated these claims to determine whether they are all valid but believes they will be materially reduced once the reconciliation process has concluded.

3.    **Additional Administrative Expenses to be Incurred Through Confirmation**

It is contemplated that through confirmation in March, 2010, the Debtors will incur additional and unpaid administrative expenses for professional fees of approximately $347,000.

LV1 1151169v2 01/18/10

4.    **Investigation of Chapter 5 Avoidance Actions**

The Debtors have not yet undertaken a detailed analysis of the nature and amount of any Chapter 5 Avoidance Actions and therefore do not have a specific list which includes all of the preserved Chapter 5 avoidance actions that may be brought by the Creditor Trustee on behalf of the estates and Creditor Trust for the benefit of all holders of Allowed General Unsecured Claims.

IV.    **SUMMARY OF THE PLAN**

The following is a brief summary of certain provisions of the Plan. This summary does not purport to be complete, and Creditors are urged to read the Plan in full. A copy of the Plan is annexed hereto as Exhibit A.

A.    **Introduction**

This is a reorganizing plan, whereby the Debtors seek to accomplish payments under the Plan by, among other things, continuing their furniture business operations in two separate, new entities. The Effective Date of the proposed Plan is estimated to be on or before March _____, 2010.

Pursuant to the Plan, the Hubers will create a new business entity which will assume certain restructured liabilities and make payments as provided in the Plan in addition to certain payments which will be made from certain funds in the Debtors' estates at the time of confirmation of the Plan and certain new financing to be provided to the new entity formed by the Hubers. Garber will assume and pay a portion of the sales tax liabilities as set forth in the Plan. The Plan further contemplates the settlement of certain litigation commenced in 2009 by

---

[4] The amount reflects the total of all claims filed against all of the Debtor entities.

LV1 1151169v2 01/18/10

the Committee in return for, among other things, payments totaling $1,250,000 for the benefit of

general unsecured creditors.

B.    **Voting Procedures and Requirements**

1.    **Ballots and Voting Deadlines**

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of

the Plan.  Your Claims may be classified in multiple classes.  When you vote and return your

Ballot, please indicate the Class or Classes in which your Claims are classified by marking the

appropriate space provided on your Ballot for such purpose.

**The Bankruptcy Court has directed that, to be counted for voting purposes,**

**Ballots for the acceptance or rejection of the Plan must be served upon Fox Rothschild,**

**LLP, 997 Lenox Drive, Building 3, Lawrenceville, New Jersey 08648, Attention:  Robin**

**Solomon, Paralegal, so as to be received by no later than 5:00 p.m. Eastern Standard Time**

**on _____, 2010 (the "Voting Deadline").**   Ballots not received by the Voting

Deadline may not be counted, and Ballots that do not indicate either an acceptance or rejection of

the Plan will be deemed to constitute an acceptance of the Plan.

If you have any questions regarding the procedure for voting, please contact:

| | | |
|---|---|---|
| Hal L. Baume, Esq. | | Eric W. Sleeper, Esq. |
| Joseph R. Zapata, Jr., Esq. | OR | BARTON, BARTON & PLOTKIN |
| FOX ROTHSCHILD LLP | | LLP |
| Princeton Pike Corporate Center | | 420 Lexington Avenue |
| 997 Lenox Drive, Building 3 | | New York, New York 10170 |
| Lawrenceville, New Jersey 08648 | | (212) 687-6262 |
| (609) 896-3600 | | (212) 687-3667 Fax. |
| (609) 896-1469 Fax. | | Email: esleeper@bartonesq.com |
| Email: hbaume@foxrothschild.com | | Counsel to the Committee |
|       jzapata@foxrothschild.com | | |
| Counsel to the Debtors | | |

LV1 1151169v2 01/18/10

It is important for all Creditors that are entitled to vote on the Plan to exercise

their right to vote to accept or reject the Plan.  Even if you do not vote to accept the Plan, you

may be bound by the Plan if it is accepted by the requisite holders of claims and confirmed by

the Bankruptcy Court.

### 2.        Parties in Interest Entitled to Vote

Any holder of a claim in Class 2 or 3 against the Debtors (i) whose claim has not been

disallowed previously by the Bankruptcy Court, (ii) whose claim has been scheduled by the

Debtors and is not scheduled as disputed, contingent or unliquidated, (iii) who has filed a proof

of claim before the Bar Date and no objection thereto has been filed, is entitled to vote to accept

or reject the Plan, or (iv) if any objection to such claim is to be settled, or any objection thereto is

to be withdrawn or dismissed, pursuant to the Plan.  Any claim to which an objection has been

filed is not entitled to vote unless the Bankruptcy Court, upon application of the holder to whose

claim an objection has been made, temporarily allows such claim in an amount that it deems

proper for the purpose of accepting or rejecting the Plan.  Any such application must be heard

and determined by the Bankruptcy Court on or before the Voting Deadline.  A vote may be

disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was

not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy

Code.

### 3.        Definition of Impairment

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or equity

interests is impaired under a plan of reorganization unless, with respect to each claim or equity

interest of such class, the plan:

a.        leaves unaltered the legal, equitable, and contractual rights of the

Holder of such claim or equity interest; or

LV1 1151169v2 01/18/10

b.    notwithstanding any contractual provision or applicable law that entitles the Holder of a claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default:

i)    cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

ii)    reinstates the maturity of such claim or interest as it existed before such default;

iii)    compensates the Holder of such claim or interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law;

iv)    if such claim or such interests arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the Holder of such claim or such interest (other than the debtor or an insider) for actual pecuniary loss incurred by such Holder as a result of such failure; and

v)    does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the Holder of such claim or interest.

## 4.    Classes Impaired under the Plan

The Claims in Class 2 (Secured Claims of Harleysville), are impaired and, entitled to vote to accept or reject the Plan.

The Claims in Class 3 (General Unsecured Claims) are impaired and are entitled to vote to accept or reject the Plan.

LV1 1151169v2 01/18/10

The Claim of Class 4, the Equity Interests, is impaired.  No distribution will be made or interest will be retained by this class, and thus, Class 4 is conclusively deemed to have rejected the Plan.

### C.    Confirmation Procedure

#### 1.    Confirmation Hearing

A hearing before the Honorable Judith H.Wizmur, United States Bankruptcy Judge, has been scheduled for _____, 2010, at _____.m., at the United States Bankruptcy Court, 401 Market Street, Camden, New Jersey 08101 to consider confirmation of the Plan.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

#### 2.    Procedure for Objections

Any objection to confirmation of the Plan must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served on counsel for the Debtors and the Committee and all parties who have filed a notice of appearance so as to be received by no later than 5:00 p.m. Eastern Standard Time on _____, 2010.  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court.

#### 3.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all the requirements of Section 1129 of the Bankruptcy Code.  Among the requirements for confirmation are that the Plan be:  (a) accepted by all impaired classes of claims and equity interests that are entitled to vote or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" against

LV1 1151169v2 01/18/10

and is "fair and equitable" with respect to such class; (b) feasible; and (c) in the "best interests" of creditors and stockholders impaired under the Plan.  The Bankruptcy Court also must find that:

       a.      The Plan has classified claims in a permissible manner;

       b.      The Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

       c.      The Plan has been proposed in good faith.

## 4.      Classification of Claims and Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a claim in a particular class only if such claim is substantially similar to the other claims in such class.  The Plan creates separate classes to deal respectively with secured claims and unsecured claims.  The Debtor and the Committee believe the Plan's classifications place substantially similar claims in the same class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

## 5.      Voting and Acceptance of the Plan

As a condition to confirmation of the Plan, the Bankruptcy Code requires each class of "impaired" claims entitled to vote on the Plan to vote to accept the Plan.  The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of two-thirds (2/3) in dollar amount and more than one-half (½) in number of those claims actually voting.  Acceptance of the plan by a class of equity interests is defined as acceptance by holders of two-thirds (2/3) of the number of shares actually voting.  Holders of claims who fail to vote will not be counted as either accepting or rejecting the Plan.  A vote, moreover, may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that it was not made or solicited in good faith.

LV1 1151169v2 01/18/10

Classes of claims that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Classes of claims that receive no distribution under a plan are conclusively presumed to have rejected the plan.

**6.      Best Interests Test**

The "best interests" of creditors test requires that each holder of a claim receive or retain under the Plan property of a value that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. To determine what members of each impaired class of claims would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that a liquidation of the Debtors' assets would generate in the context of a Chapter 7 liquidation sale. The amount available for satisfaction of claims would consist of the proceeds resulting from the sale, reduced by the claims of secured creditors, to the extent of the value of their collateral, and the costs and expenses of the liquidation.

Because the Plan is a Plan of Reorganization, each Class of Creditors will receive substantially more than they would receive if the Debtors' Assets were liquidated pursuant to Chapter 7 of the Bankruptcy Code. Among other things, sales tax claims of approximately $1,300,000 will be paid by new entities formed by the Hubers and Garber instead of being paid (ahead of allowed unsecured claims) out of the assets of Debtors' Estate. In addition the Estate will neither be taxed with the additional expenses and commissions of a trustee nor delayed by a trustee's appointment and need to become familiar with this complex matter. Annexed as Exhibit D is an analysis reflecting the actual and projected costs through confirmation of the Debtors' Plan, which projects that funds will be available to distribute to certain classes of claims. Accordingly, the Debtors believe the Plan satisfies the "best interests" of creditors test.

LV1 1151169v2 01/18/10

7. **The Feasibility Test**

The "feasibility" test requires the Bankruptcy Court to find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtors.

8. **The Fair and Equitable Test**

If any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan despite such non-acceptance. To obtain such confirmation, it must be shown, among other things, that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each impaired class of claims that has rejected the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a class if, among other things, the plan provides: (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims, that the holder of any claim that is junior to the claims of such class will not receive or retain on account of such junior claim any property at all unless the senior class is paid in full. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest.

9. **Other Requirements of Section 1129**

The Debtors believe that the Plan meets all the other technical requirements of section 1129 of the Bankruptcy Code, including that the Plan has been proposed in good faith.

LV1 1151169v2 01/18/10

**THE DEBTORS SHALL SEEK CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE AMOUNTS OF CLAIMS OR INTERESTS IN ANY ONE OR MORE CLASSES VOTE TO ACCEPT THE PLAN.**

### D.  Classification of Claims and Interests and Their Treatment Under the Plan

The Plan classifies claims into four (4) classes, and also provides for payment of allowed administrative expenses and allowed priority tax claims (which are not classified).  For each class, the Plan states whether the claims are impaired and whether holders of the claims will receive various types of distributions under the Plan.  The classes and payments to be made and treatment proposed to be accorded to allowed claims of each class under the Plan are summarized and described below.  After Confirmation and upon the occurrence of the Effective Date, the Plan binds the Debtors, any creditor whether or not such creditor has accepted the Plan, and the Debtors shall be discharged of liability for the payment of debts to the extent specified in 11 U.S.C. §1141.

### 1.  Unclassified Claims

Pursuant to section 1123(a)(1) of the Bankruptcy Code, claims of a kind specified in Bankruptcy Code sections 507(a)(2), which are Administrative Claims, or 507(a)(8), which are priority tax claims, are not to be designated in a class.  Thus, administrative claims and priority tax claims against the Debtors shall be treated separately as unclassified claims.

### 2.  Administrative Claims

Administrative expenses are claims for fees, costs or expenses of administering the Debtors' Chapter 11 Case which are allowed under section 507(a)(1) of the Bankruptcy Code, including all professional compensation requests pursuant to Sections 330 and 331 of the Bankruptcy Code and all claims pursuant to section 503(b)(9) of the Bankruptcy Code.  The Bankruptcy Code requires that all administrative expenses including fees payable to the

39

Bankruptcy Court and the Office of the United States Trustee which were incurred during the pendency of the case must be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

a.    Administrative Claims – General.  All trade and service debts and obligations incurred in the normal course of business by the Debtors during the Chapter 11 Case, to the extent allowed, excluding Court Orders awarding professional fees, shall to the extent not otherwise paid prior, receive cash in an amount equal to such allowed administrative claim on the Effective Date or as soon thereafter as is practicable.  To date, there have been no material requests for payment of an administrative claim, excluding professionals and Section 503(b)(9) claims.  The Debtors, the Committee and, upon confirmation, the Creditor Trustee reserve the right to object to all Administrative Claims.

b.    Administrative Claims - Professional Compensation Claims.  The Plan provides that any person seeking payment on account of a professional compensation and reimbursement claim shall file its respective final fee application no later than sixty (60) days after the Effective Date.  Failure to file a Final Fee Application shall result in the Professional Compensation Claim being forever barred and discharged.  Unlike the Prior Plan which required, in accordance with applicable law, that all Professional Compensation Claims, to the extent not previously paid, shall be paid in full: (a) seven (7) days after such claim becomes an Allowed Claim, or (b) on such other terms as may be mutually agreed upon between the holder of such claim and the Debtors, the Plan is conditioned upon the Professionals agreeing to receive payment of unpaid Allowed Professional Compensation Claims in monthly installments over time pursuant to section 6.4 of this Plan, provided that each of the Professionals agrees to same and notifies counsel for Debtors, Committee and Harleysville of same on or before the deadline

LV1 1151169v2 01/18/10

for voting on or filing objections to the confirmation of the Plan (since as of the date of the filing of this Plan each of the Professionals has not yet agreed to any deferred payment of Professional Compensation Claims). These unpaid claims are estimated to be approximately $347,000 through the Effective Date of the Plan in March, 2010.

   c. Administrative Claims – Reclamation Claims/20 Day Claims. Section 503(b)(9) affords an administrative claim to a seller of goods, where the goods were received by the debtor within twenty (20) days before the date of commencement of a case in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Claims under Section 503(b)(9) total approximately $97,700.

   In addition, 11 U.S.C. § 546(c) allows for seller of goods to reclaim goods that were delivered to the Debtors within forty-five (45) days before the date of the commencement of a case, provided that such seller can satisfy its burden of establishing: (i) that it has a statutory or common-law right to reclaim goods; (ii) that the goods were sold in the ordinary course of seller's business; (iii) that the debtor was insolvent when goods were received; (iv) that the seller made written demand for reclamation within the statutory time limit after the debtor received the goods; (v) that the claim is not subject to a prior security interest; and (vi) that the goods are traceable and remain in the debtor's possession (collectively, the "§546(c) Elements").  The Debtors received reclamation demands from several vendors asserting reclamation claims aggregating $4,764.41, of which $0.00 fell within the Section 503(b)(9) administrative claim described above.  With respect to the balance of the vendors serving reclamation demand letters, the Debtors intend to contest any requests for administrative claims relating thereto.  Among other things, no vendor has demonstrated entitlement to a reclamation claim or taken any action to enforce its reclamation claim and, in any event, the Liens

LV1 1151169v2 01/18/10

encumbering Debtors' inventory exceeded the value of such inventory so that any reclamation demand would have no value and be unenforceable.

### 3.    Classified Claims

The following describes the Plan's classification of those Claims against the Debtor required to be classified under the Bankruptcy Code:

a.    **Class 1**

Class 1 shall consist of non-tax priority claims. Class 1 is unimpaired.

b.    **Class 2**

Class 2 shall consist of Allowed Secured Claims of Harleysville. Class 2 is impaired.

c.    **Class 3**

Class 3 shall consist of Allowed General Unsecured Claims. The Allowed General Unsecured Claims are impaired and each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan. The amount of General Unsecured Claims scheduled by the Debtors was $9,976,091.80. The Claim's Register maintained by the Bankruptcy Court reflects general unsecured claims in the total amount of at least $15,011,584.44 It is anticipated that the amount of Allowed General Unsecured Claims will be materially reduced following the disallowance and/or reduction of duplicate claims, superseded claims, previously paid claims, the agreed subordination of any and all insider claims of any of the Huber Family, the Garber Family, or the like, claims not supported by the Debtors' books and records, and claims that are subject to other objections.

Each holder of an Allowed General Unsecured Claim shall receive its pro rata share of the proceeds of the Creditor Trust on the Distribution Date or as otherwise provided in the Plan. Class 3 is impaired.

42

d.    **Class 4**

Class 4 consists of Equity Interests.  Class 4 shall not receive any distribution under the Plan or retain any interest under the Plan.  Class 4 is impaired.

## V.    MEANS FOR EXECUTION OF THE PLAN

### A.    Funding

Funding of payments required to be made under the Plan, except for the payment of sales taxes, shall come from the following sources: (i) Cash in the Estate (after payment to Harleysville of $1,432,100), (ii) Post Confirmation Loans from Harleysville, (iii) sale of the Southampton Units B&C on the Effective Date, and (iv) sale and/or refinancing of Southampton Unit A and the Ship Bottom Property within two years of the Effective Date.

### B.    Establishment of Creditor Trust

On the Effective Date, the Creditor Trust will be established pursuant to the Creditor Trust Agreement, and the Creditor Trustee will begin his duties.

### C.    Transfer of Assets

On the Effective Date, in accordance with the Confirmation Order:

1.    The Creditor Trust Assets will be irrevocably transferred and assigned to the Creditor Trust, and will be held in trust for the benefit of all holders of Allowed General Unsecured Claims pursuant to the terms of the Plan and of the Creditor Trust Agreement.  The Estate's title to the Creditor Trust Assets will pass to the Creditor Trust on the Effective Date, free and clear of all claims, liens and interests of creditors and interests of equity security holders in accordance with Section 1141 of the Bankruptcy Code.  The Creditor Trustee will pay, or otherwise make distributions on account of, all Allowed General Unsecured Claims against the Debtors in accordance with the Plan.

2.    The Huber Assets will be irrevocably and indefeasibly transferred and

43

assigned to the Huber Newco.  Except as otherwise provided in the Plan, the Estates' title to the Huber Debtors Assets will pass to the Huber Newco on the Effective Date, free and clear of all claims, liens and interests of creditors and interests of equity security holders in accordance with Section 1141 of the Bankruptcy Code subject to the Liens and Claims of Harleysville granted or approved pursuant to the Plan.

D.    **Effect of Transfer.**

For federal and applicable state income tax purposes, the transfer of the Creditor Trust Assets to the Creditor Trust will be a disposition of the assets directly to and for the benefit of the beneficiaries of the Creditor Trust in partial satisfaction of their claims, immediately followed by a deemed contribution of the Creditor Trust Assets by the beneficiaries to the Creditor Trust.  The beneficiaries will be treated as the grantors and deemed owners of the Creditor Trust.

E.    **Harleysville Payments.**

As more fully set forth in the Plan, the OH Loans will be satisfied from $1,432,100 of the escrowed funds currently held in the estate, the FIFT Loan B&C related to and secured by Southampton Units B&C will be fully satisfied from the proceeds of the sale of the Southampton Units B&C.  The remaining FIFT Loan A (related to and secured by Southampton Unit A) and the Exit05 Loan will be restructured as set forth in the Plan and the Southampton Unit A and Ship Bottom Property shall serve as a portion of the collateral for the Post Confirmation Loans to be provided by Harleysville (as well as for the remaining payments due on account of the $1,250,000 Payment and deferred Professional Compensation Claims).

F.    **Sales Taxes.**

1.    Huber Newco will irrevocably assume and be solely responsible for the

obligation to pay the Allowed Priority Tax Claim for Huber Sales Taxes which shall be paid either (i) in regular installment payments in Cash of a total value, as of the Effective Date (calculated using the applicable statutory rate of interest), equal to the Huber Sales Taxes over a period commencing on the first day of the first month after the month in which the Effective Date occurs and ending on that date which is five years after the Petition Date, or (ii) in accordance with any other terms mutually agreed to by the Holder(s) of the Claim for the Huber Sales Taxes and Huber Newco.

2.      Garber will irrevocably assume and be solely responsible for the obligation to pay the Allowed Priority Tax Claim for Garber Sales Taxes which shall be paid either (i) in regular installment payments in Cash of a total value, as of the Effective Date (calculated using the applicable statutory rate of interest), equal to the Garber Sales Taxes over a period commencing on the first day of the first month after the month in which the Effective Date occurs and ending on that date which is five years after the Petition Date, or (ii) in accordance with any other terms mutually agreed to by the Holder(s) of the Claim for the Garber Sales Taxes and Garber.  Garber's obligation to pay the Garber Sales Taxes shall be evidenced by documentation in form and substance reasonably acceptable to Huber Newco and Harleysville.  Upon request of a party in interest and/or of the Bankruptcy Court, Garber shall provide evidence of his ability to pay the Garber Sales Taxes.

G.      **Establishment of Creditor Trust Expense Reserve**

The amount of the Creditor Trust Expense Reserve shall initially be in the amount set forth in the Plan.  Thereafter, it will be calculated based on the projected expenses necessary to accomplish the tasks by or on behalf of the Creditor Trustee under the Plan. A reserve for estimated amount of disputed claims will also be established.  That portion of the Reserve that

relates to the costs and expenses of prosecuting the Avoidance Actions and objections to claims, and payment of professional fees will be determined on the basis of budgets prepared by the professionals who will prosecute such matters or by the Creditor Trustee.

H.      **Settlement of Claims.**

The Creditor Trustee will be authorized to settle disputed claims and Avoidance Actions pursuant to and in accordance with the terms and provisions of the Creditor Trust Agreement, without first having to seek approval from the Bankruptcy Court.  The Creditor Trustee will be authorized and empowered to bind the Creditor Trust thereto.  Any settlement by the Creditor Trustee pursuant to the terms of the Creditor Trust Agreement shall be conclusively deemed to be in the best interests of the estates and the Creditor Trust

I.      **Professionals for the Creditor Trustee**

The Creditor Trustee shall employ professionals in his discretion subject to the terms and conditions of the Creditor Trust Agreement, to assist the Creditor Trustee in discharging the responsibilities described in the Creditor Trust Agreement.  The Creditor Trustee Professionals shall be compensated for their services on a monthly basis in accordance with the hourly fees customarily charged by the Creditor Trustee and the Creditor Trustee Professionals for professional services, or on such other terms as the Creditor Trustee and the Creditor Trustee professionals shall agree.

J.      **Recoveries**

The sum of $1,250,000 and recoveries from Avoidance Actions will be deposited into the Creditor Trust to be disbursed in accordance with the Plan.

K.      **Procedure for Determination of Claims**

1.      Objections to Claims

Except as to any claim that has been allowed before the Effective Date, the

46

Creditor Trustee may object to the allowance of any claim against the Debtors or seek estimation thereof on any grounds permitted by the Bankruptcy Code by filing an initial pleading in the Bankruptcy Court at any time prior to the first business day which is ninety (90) days after the Effective Date, or as otherwise extended by the Bankruptcy Court, or continuing the claims objection process initiated by the Debtors or the Committee pre-confirmation.

2.    Treatment of Disputed Claims.

No payments or other distributions will be made to holders of claims unless and until such claims are allowed claims pursuant to a final Order. If a claim is not an allowed claim on the Effective Date or when payment is otherwise due under the Plan, payment of the allowed claim will be made when the claim becomes an allowed claim after the Effective Date or as otherwise specifically provided in the Plan. At the time of any payments of other distributions to holders of allowed claims in any class, an amount sufficient to have paid each holder of a disputed claim in such class its pro rata share of such distribution, calculated as though such disputed claim were an allowed claim, shall be reserved for the potential benefit of the holder of the disputed claim, and thereafter distributed as set forth above.

3.    Treatment of Contingent Claims.

Until such time as a contingent claim or a contingent portion of an allowed claim becomes fixed or absolute or is disallowed, such claim will be treated as a disputed claim for all purposes related to distributions under the Plan. The holder of a contingent claim will only be entitled to a distribution under the Plan when and if such contingent claim becomes an allowed claim.

**L.    Post-Effective Date Professional Compensation Claims**

Any authorized, permitted or approved Professional Compensation Claims incurred by

any Creditor Trust Professionals after the Effective Date will be treated as part of the fees and expenses of administering the Creditor Trust and will be paid by the Creditor Trustee in accordance with the terms of the Plan.

**M.    Dissolution of Debtor/Termination of Service of Corporate Officers and Directors**

Sixty days after the Effective Date, the Debtors will be deemed dissolved pursuant to applicable state law and by authority of the Confirmation Order confirming the Plan.  Sixty days after the Effective Date, the existing officers, partners and directors of the Debtors shall cease to serve in their current capacities.  The Creditor Trustee shall succeed to the rights to act in such capacities as may be necessary to implement the Plan insofar as fulfilling his responsibilities under the Creditor Trust Agreement.

**N.    Appointment of the Creditor Trustee and Professionals Trustee**

In the Confirmation Order, the Creditor Trustee will be appointed and will be bound to perform as required by the Plan.  The appointment of the Creditor Trustee may be subject to the Creditor Trustee delivering, at the initial expense of the Creditor Trust, a bond as adequate to secure proper performance of the Creditor Trustee's duties under the Plan and the Creditor Trust Agreement.

In the Confirmation Order, the Professionals Trustee (whose duties will simply be to collect and distribute professional fee installment payments and enforce remedies in the event of default) will be appointed and will be bound to perform as required by the Plan.  The same person serving as the Creditor Trustee may also serve as the Professionals Trustee.

**O.    Duties of the Creditor Trustee**

On the Effective Date, the Creditor Trustee will be the representative of the Trust

LV1 1151169v2 01/18/10

Beneficiaries as that term is used in 11 U.S.C. § 1123(b)(3)(B) and will have the rights and powers provided for in the Bankruptcy Code in addition to any rights and powers granted herein and in the Creditor Trust Agreement.   In his capacity as the representative of the Trust Beneficiaries, the Creditor Trustee will be the successor-in-interest to the Debtors with respect to all claims, actions, and other interests constituting assets.   The Creditor Trustee will hold all rights, title, and interest in and to the assets of the Creditor Trust on behalf of the Beneficiaries, and will pay from the Creditor Trust all ordinary and necessary costs of protecting and preserving the assets.   The Creditor Trustee will administer the Creditor Trust, will dispute or otherwise agree to settle claims, will liquidate the Avoidance Actions and will make distributions from the Creditor Trust, all in accordance with the terms of the Plan and the Creditor Trust Agreement.   Unless otherwise excused or exempted from doing so by the Bankruptcy Code, the Creditor Trustee will abide by all laws, including tax laws and regulations, and will prepare or cause to be prepared all local, state, or federal tax returns, filings, and/or reports that are necessary or appropriate.   The Creditor Trustee subject to the terms and provisions of the Creditor Trust Agreement shall have sole and exclusive authority for the retention of Professionals to assist in any manner after the Effective Date.   In addition, the Creditor Trustee shall also serve as a disbursing agent under the Plan who will hold all funds to be disbursed (or escrowed for later disbursement) on the Effective Date of the Plan and will disburse those funds in accordance with the Plan.

### P.     Reporting Requirements/Effect of Failure to Object

Beginning with a date which is fifteen (15) days after the end of the first month within which falls the ninetieth (90th) day after the Effective Date, and continuing on the fifteenth (15th) day after the end of each succeeding quarter until the Final Distribution Date, the Creditor

Trustee will file written reports (the "Creditor Trustee Accounting Reports") with the Bankruptcy Court and will provide a copy to each of the members of the Creditor Trust Advisory Committee, if any. The Creditor Trustee Accounting Reports, subject to any confidentiality or attorney work product privilege, will provide information on collections and disbursements, administrative costs, cash on hand or deposit, and the Creditor Trustee's ongoing efforts to administer the Creditor Trust. Before making his final distribution, and after submitting a draft of the Final Creditor Trustee Accounting Report (hereinafter defined) to the Creditor Trust Advisory Committee, if any, for its approval, the Creditor Trustee will file a written report with the Bankruptcy Court (which report shall constitute the final accounting of the Creditor Trust) showing the assets administered, the distributions made by the Creditor Trustee, and the final distributions to be made by the Creditor Trustee (the "Final Creditor Trustee Accounting Report"). A draft of the Final Creditor Trustee Accounting Report shall be provided to the Creditor Trust Advisory Committee, if any, for its review and comment a minimum of seven (7) days before it is filed with the Court. The Creditor Trustee shall provide notice by regular, first-class mail to all Beneficiaries of the filing of the Final Creditor Trustee Accounting Report. Any Beneficiary who fails to file and serve on the Creditor Trustee a written objection to any Creditor Trustee Accounting Reports or to the Final Creditor Trustee Accounting Report within twenty (20) days after such report or account is filed shall be deemed to have assented thereto and approved the contents thereof. Any objection to any report or accounting shall be resolved by the Bankruptcy Court. If no objection is filed to the Final Creditor Trustee Accounting Report within the time frame set forth above, then, upon making the final distribution in the manner set forth in the final report, the Creditor Trustee and his Professionals will be: (a) fully discharged of their duties under the Plan and Creditor Trust Agreement; and (b) fully discharged and released

from all duties, liabilities and obligations of every kind and nature to the beneficiaries, except as is expressly set forth in the Plan or the Creditor Trust Agreement to the contrary; provided, however, that the foregoing shall not relieve the Creditor Trustee and his Professionals from liability for gross negligence, fraud, willful misconduct, self-dealing or breach of fiduciary duty.

### Q.    Powers of the Creditor Trustee

The Creditor Trustee shall have the power to take any and all actions which, in the business judgment of the Creditor Trustee subject to the terms and provisions of the Creditor Trust Agreement, are necessary or appropriate to fulfill his obligations under the Plan and Creditor Trust Agreement, including, but not limited to, each of the powers set forth in the Creditor Trust Agreement.

### R.    Tenure, Removal and Replacement of the Creditor Trustee

The authority of the Creditor Trustee will be effective as of the Effective Date, and will remain and continue in full force and effect until all of the assets are liquidated in accordance with the Plan, the funds in the Creditor Trust have been completely distributed in accordance with the Plan, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities and the Order closing the Bankruptcy Case is a final Order. The service of the Creditor Trustee under the Plan will be subject to the following:

1.    The Creditor Trustee will serve until resignation pursuant to subsection (b) below, removal pursuant to subsection (c) below, or the completion of his duties;

2.    The Creditor Trustee may resign at any time by filing a written notice of resignation to the Bankruptcy Court, the Creditor Trust Advisory Committee, if any, and the Office of the United States Trustee.  Such resignation will be effective the earlier of thirty (30) days after filing same with the Bankruptcy Court or when a successor is appointed as provided

LV1 1151169v2 01/18/10

herein;

3.  The Creditor Trustee may be removed for "cause" by the Creditor Trust Advisory Committee, if any, without further order of the Bankruptcy Court, <u>provided</u>, <u>however</u>, in any such case, such removal shall be in good faith and can be challenged by the Creditor Trustee by making an application to the Bankruptcy Court during which challenge period the Creditor Trustee shall remain with all rights and obligations under the Creditor Trust Agreement; and (ii) "cause" for removal of the Creditor Trustee shall include negligence, fraud, wrongful action or inaction in the performance of his duties, or failure to consult with the Creditor Trust Advisory Committee as required under the Creditor Trust Agreement; and

4.  in the event of a vacancy in the position of the Creditor Trustee (whether by removal, resignation, illness, incapacity, or death), the vacancy will be filled by the appointment of a successor Creditor Trustee by the Creditor Trust Advisory Committee, if any, or if none, then the Bankruptcy Court.

**S.    <u>No Right in Trust Assets</u>**

The Trust Assets will be held by the Creditor Trustee in trust for the benefit of the creditors that are beneficiaries of the Creditor Trust and that are paid from the Creditor Trust under the Plan.

**T.    <u>Limitation on Liability of the Creditor Trustee</u>**

Subject to applicable law, the Creditor Trustee will not be liable for any act he may do or omit to do as Creditor Trustee while acting in good faith and in the exercise of his reasonable business judgment; nor will the Creditor Trustee be liable in any event except for his own gross negligence or willful fraud or willful misconduct.  The foregoing limitation on liability also will apply to any Person (including any professional) employed by the Creditor Trustee and acting on

LV1 1151169v2 01/18/10

behalf of the Creditor Trustee in the fulfillment of the Creditor Trustee's duties under the Plan and the Creditor Trust Agreement.  The Creditor Trustee and all Creditor Trustee Professionals also will be entitled to indemnification out of the Assets of the Creditor Trust against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits or claims that the Creditor Trustee may incur or sustain by reason of being or having been a Creditor Trustee of the Creditor Trust, or for performing any functions incidental to such service; provided, however, that the Creditor Trustee and the Creditor Trustee Professionals will not be relieved of liability for bad faith, willful misfeasance, reckless disregard of duty, gross negligence, willful fraud, willful misconduct, self-dealing or breach of fiduciary duty.

### U.     Creditor Trust Advisory Committee

A Creditor Trust Advisory Committee may be created at the same time as the Creditor Trust is created.  The Creditor Trust Advisory Committee, if any, shall consist of no more than three (3) persons and shall be comprised of those members of the Committee who are willing to serve on the Creditor Trust Advisory Committee.  The Creditor Trust Advisory Committee shall have general advisory powers for the activities of the Creditor Trustee as well as those specific rights and powers set forth in the provisions of the Creditor Trust Agreement.  The Creditor Trust shall, from time to time but not less than quarterly (and more than that if requested by the Trust Advisory Committee), report to the Creditor Trust Advisory Committee, if any, on the affairs of the Creditor Trust.

## VI.     TREATMENT OF EXECUTORY CONTRACTS

### A.     Assumption of Executory Contracts

All Executory Contracts not otherwise assumed by the Debtors will be rejected as of the Confirmation Date.

LV1 1151169v2 01/18/10

B.     **Rejection Claims Bar Date**

Every Claim asserted by a Creditor arising from the rejection of an Executory Contract by the Plan must be filed with the Bankruptcy Court no later than the first Business Day which is thirty (30) days after the Effective Date; provided, however, that nothing contained herein or in the Plan shall be deemed or construed as an extension of the date by which creditors whose executory contracts were rejected by prior order of the Bankruptcy Court had to file proofs of claim stemming from the Debtors' rejection of those executory contracts. Every such claim that is timely filed will be treated under the Plan as a Class 3 General Unsecured Claim, except to the extent such creditor received a pre-petition security deposit whereby such creditor shall be required to apply said security towards its claim. However, nothing herein shall be construed as the Debtors' waiver or acquiescence to the allowance of such claim. The Debtors specifically preserves all of its rights and defenses to such claim as well as the application of any such security deposit. Every such claim that is not timely filed by the deadline stated above will be forever barred, unenforceable and discharged, and the creditor holding the claim will not receive or be entitled to any distribution under the Plan on account of such claim.

## VII.   **MODIFICATION, WITHDRAWAL OR NON-CONFIRMATION OF THE PLAN**

A.     The Plan may be modified by the Debtors from time to time in accordance with, and pursuant to, Bankruptcy Code Section 1127. The Debtors may alter, amend or modify the Plan at any time before Confirmation, provided that the Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code §§ 1122 and 1123, and the Debtors shall have complied with Bankruptcy Code § 1125. However, the Bankruptcy Court may require a new disclosure statement and/or revoting on the Plan if Debtors modify the plan before Confirmation.

B.     The Debtors may also seek to alter, amend or modify the Plan at any time after

54

Confirmation so long as (1) the Plan has not been substantially consummated, (2) as altered, amended or modified the Plan satisfies the conditions of Bankruptcy Code §§ 1122 and 1123, and (3) the Bankruptcy Court authorizes the proposed modification after notice and a hearing under Bankruptcy Code § 1129.

C.       A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.  Prior the Effective Date, the Debtors may make appropriate technical non-material modifications to the Plan or the Disclosure Statement without further order or approval of the Bankruptcy Court, provided that such technical modifications do not adversely affect the treatment of Holders of Claims or Equity Interest.

D.       The Debtors further reserve the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

E.       The Debtors reserve the right to withdraw the Plan at any time before the entry of the Confirmation Order, in which event (i) the Plan and this Disclosure Statement shall be deemed null and void and of no force and effect (as if the Plan, the Disclosure Statement or the settlement of the Committee's Adversary Proceeding set forth in the Plan had never been negotiated, drafted or filed), and (ii) without limiting the generality of the foregoing, none of the provisions or statements set forth in the Plan or Disclosure Statement shall be binding or constitute an admission by any of the Debtors, the Committee, Harleysville, the Hubers, the Garbers, the Huber Real Estate Entities, the Huber Family, the Garber Family, any other

Creditors, parties in interest or Persons for any purpose or in connection with any matters, including, without limitation, with respect to any issues, matters or litigation currently pending or which may hereafter arise in the Chapter 11 Case and the Committee's Adversary Proceeding.

F.      In the event that this Plan is not confirmed by the Court, the Confirmation Order does not become a Final Order, or the Effective Date does not occur, then (i) the Plan and the Disclosure Statement shall be deemed null and void and of no force and effect (as if the Plan, the Disclosure Statement or the settlement of the Committee's Adversary Proceeding set forth in the Plan had never been negotiated, drafted or filed), and (ii) without limiting the generality of the foregoing, none of the provisions or statements set forth in the Plan or Disclosure Statement shall be binding or constitute an admission by any of the Debtors, the Committee, Harleysville, the Hubers, the Garbers, the Huber Real Estate Entities, the Huber Family, the Garber Family, any other Creditors, parties in interest or Persons for any purpose or in connection with any matters, including, without limitation, with respect to any issues, matters or litigation currently pending or which may hereafter arise in the Chapter 11 Case and the Committee's Adversary Proceeding and each and every one of the Debtors, the Committee, Harleysville, the Hubers, the Garbers, the Huber Real Estate Entities, the Huber Family, the Garber Family, respectively, reserve any and all of their respective rights as against each other and any and all other Persons.

## VIII.  CONDITIONS TO EFFECTIVE DATE

### A.      Conditions to Occurrence of Effective Date

Each and all of the following are conditions to the Plan becoming effective, and must be satisfied fully or waived by the Debtor and the Committee:

1.      The Confirmation Order has been entered by the Bankruptcy Court and has become a final order;

LV1 1151169v2 01/18/10

2.      The Creditor Trustee has accepted, in writing, the terms of his service and compensation, and such terms and compensation shall have been approved by the Bankruptcy Court in the Confirmation Order;

3.      The Creditor Trustee has provided any required bond;

4.      the Creditor Trust has been established and received the sum of $575,000 (on account of the sum of $1,250,000) as well as the Creditor Trust Expense Reserve payment of $75,000;

5.      the Post Confirmation Loans, including Letters of Credit, have closed and the $750,000 portion thereof has been provided and funded and the Restructured Loans have closed;

6.      the Southampton Units B&C sale to the Southampton Purchaser has closed and the net proceeds thereof (of not less than $1,250,000) have been paid to Harleysville, the Creditors Trust and the Disbursing Agent pursuant to this Plan;

7.      The Harleysville Escrow Fund has been released and disbursed pursuant to this Plan as follows: the sum of $1,432,100 to Harleysville pursuant to section 5.2 of this Plan.

8.      The Disbursing Agent has also received all of the Confirmation Funds required for the Confirmation Fund Reserve in accordance with this Plan.

9.      The Professionals Loan Documents have been fully executed by all parties and all transactions related thereto under this Plan have been closed and consummated.

**B.      Waiver of Conditions**

The Debtors, in their sole discretion, may waive the final order condition in subpart (a) above at any time from and after the Confirmation Date.  In that event, the Debtor and the Committee will be entitled to render any or all of their performance under the Plan prior to what

otherwise would be the Effective Date if the above-referenced conditions were not waived, including, but not limited to, the right to perform under any circumstances which would moot any appeal, review, or other challenge of any kind to the Confirmation Order if the Confirmation Order is not stayed pending such appeal, review, or other challenge.

## IX.     **RETENTION OF JURISDICTION**

Notwithstanding Confirmation of the Plan and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction for the following purposes:

### A.     **In General**

The Bankruptcy Court will retain jurisdiction to determine the type, allowance and payment of any claims upon any objections thereto (or other appropriate proceedings) by the Creditor Trustee, Huber Newco, Garber or any other party-in-interest entitled to proceed in that manner.  As part of such retained jurisdiction, the Bankruptcy Court will continue to determine the allowance of administrative claims and any request for payment thereof, including professional compensation and reimbursement claims.

### B.     **Plan Disputes and Enforcement**

The Bankruptcy Court will retain jurisdiction to determine any dispute which may arise regarding the interpretation of any provisions of the Plan.  The Bankruptcy Court also will retain jurisdiction to enforce any provisions of the Plan and any and all documents relating to the Plan. The Bankruptcy Court also will retain jurisdiction over any matter relating to the implementation and/or consummation of the Plan.

### C.     **Creditor Trust and Professionals Trust.**

Without limiting the generality of the foregoing section entitled "Plan Disputes and Enforcement" and notwithstanding the Effective Date and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over each of the Creditor Trust and the

trust created with respect to the Professional Compensation Claims Financing ("Professionals Trust") and the Professional Compensation Claims Obligations after the Effective Date, including, without limitation, jurisdiction to resolve any and all controversies, suits and issues that may arise in connection therewith, including, without limitation, the Creditor Trust Agreement, the Professionals Trust Agreement, or any entity's obligations incurred in connection herewith, including without limitation, any action against the Creditor Trustee, the Professionals Trustee or any or all of the Creditor Trustee Professionals, the Creditor Trust, the Professionals Trustee professionals and the Professional Compensation Claims Trust.

### D.      Further Orders

The Bankruptcy Court will retain jurisdiction to facilitate the performance of the Plan by entering, consistent with the provisions of the Plan, any further necessary or appropriate order regarding enforcement of the Plan and any provision thereof.  In addition, the Bankruptcy Court will retain jurisdiction to facilitate or implement the allowance, disallowance, treatment, or satisfaction of any claim, or any portion thereof, pursuant to the Plan.

### E.      Sales of Assets

The Bankruptcy Court will retain jurisdiction to authorize and approve any sales of the Debtors' assets free and clear of all liens, claims, interests, or encumbrances in accordance with the terms of the Plan.

### F.      Governmental Units or Regulatory Agencies

The Bankruptcy Court will retain jurisdiction to adjudicate any dispute or to hear and determine any action taken, proposed, or threatened by any state, federal, or local governmental regulatory agency or unit having or asserting jurisdiction or power over the conduct of the business of the Debtors and/or the Creditor Trust.

### G. Final Decree

The Bankruptcy Court will retain jurisdiction to enter an appropriate final decree in the Chapter 11 Case.

### H. Appeals

In the event of an appeal of the Confirmation Order or any other kind of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof as may be necessary to consummate the Plan.

### I. Executory Contracts

The Bankruptcy Court will retain jurisdiction to determine any and all motions regarding assumption or rejection of executory contracts and any and all claims arising therefrom.

### J. Claims and Causes of Action

The Bankruptcy Court will retain jurisdiction: (a) to hear and determine any claim or cause of action arising in or related to the Chapter 11 Case; and (b) to adjudicate any causes of action or other proceedings currently pending or which may be commenced by the Creditor Trustee, Huber Newco or Garber after the Effective Date or otherwise referenced here or elsewhere in the Plan, including, but not limited to, the adjudication of the Avoidance Actions and Other Actions and any and all "core proceedings" under 28 U.S.C. section 157(b), which are or may be pertinent to the Chapter 11 Case and which the Creditor Trustee, Huber Newco or Garber may deem appropriate to commence and prosecute in support of implementation of the Plan.

LV1 1151169v2 01/18/10

## X.   GENERAL PROVISIONS

### A.   Extension of Payment Dates

If any payment date falls due on any day which is not a business day, then such due date will be extended to the next business day.

### B.   Notices

Any notice required or permitted to be provided under the Plan will be in writing and served by regular postage prepaid first class mail, hand-delivery, facsimile or e-mail.

### C.   Closing of the Case

At such time as the Creditor Trust has been fully administered (i.e., when all things requiring action by the Creditor Trustee have been done, and the Plan has been substantially consummated) and in all events within sixty (60) days after the Final Distribution Date, the Creditor Trustee will file an application for a final order upon notice to the Office of the United States Trustee, after which an order approving the Creditor Trustee's final report may be entered. None of the filings contemplated in this paragraph, however, will in any way delay the Creditor Trustee's ability to request entry of the final decree by the Bankruptcy Court.

### D.   Interest

Whenever interest is to be computed under the Plan, interest will be simple interest and not compounded.  Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on claims, and no holder of a claim will be entitled to interest accruing on or after the Petition Date on any claim.

### E.   Confirmation By Non-Acceptance Method

The Debtors will request, if necessary, confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any impaired class of claims which does not vote to accept the Plan.

61

### F.      Vesting

As of the Effective Date, (i) the Creditor Trust will be vested with all the Creditor Trust Assets and Huber Newco will be vested with all Huber Assets, free and clear of all Claims, Liens, security interests, assignments, encumbrances, charges and other interests of Creditors and other parties in interest, except as otherwise provided in the Plan.

### G.      Severability

If the Bankruptcy Court determines, before the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such claims as to which the provision is determined to be invalid, void or unenforceable.   The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of the Plan.

### H.      Governing Law

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey, without giving effect to the principles of conflicts of law of thereof.

### I.      No Admissions or Waivers by Debtors

Notwithstanding anything herein to the contrary, nothing contained in the Plan or in this Disclosure Statement shall be deemed an admission by any entity with respect to any matter set forth herein.  If the Plan is not confirmed (or, if confirmed, does not become effective), no statement contained herein or in the Plan may be used or relied on in any manner in any suit, action, proceeding or controversy within or outside of the Chapter 11 Case against the Debtors.

LV1 1151169v2 01/18/10

The Debtors reserve any and all of their rights as against all Persons in the event the Plan is not confirmed.

**J.**     **Exculpation**

To the extent allowed by Section 1125(e) of the Bankruptcy Code, and without prejudice to the rights of the Creditor Trustee to the extent set forth in this section, neither the Debtors, their officers, directors or trustees, the Committee and its members (solely in their capacity as members of the Committee) nor any of the Chapter 11 Professionals ("Released Persons") shall have or incur any liability to any holder of a claim or interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, affiliates or any of their successors or assigns, for any act or omission occurring after the Petition Date and in connection with, relating to, or arising out of the Chapter 11 Case, formulation, negotiation or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, confirmation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for their bad faith, willful malfeasance, reckless disregard of duty, gross negligence, willful fraud, willful misconduct, self-dealing or breach of fiduciary duty.  In all respects, the Debtors, Committee, Creditor Trustee and each of their respective members, officers, directors, trustees, employees, advisors and agents shall be entitled to rely upon advice of counsel with respect to their duties and responsibilities under the Plan.

**K.**     **Successors and Assigns**

The rights and obligations of any creditor referred to in the Plan will be binding upon, and will inure to the benefit of, the successors, assigns, heirs, devisees, executors and personal representatives of such creditor.

LV1 1151169v2 01/18/10

**L.**      **Fractional Dollars**

Notwithstanding any other provision of the Plan, no payments or distributions under the Plan of or on account of fractions of dollars will be made.  When any payment or distribution of, or on account of, a fraction of a dollar to any Holder of an Allowed Claim would otherwise be required, the actual payment or distribution made will reflect a rounding up or down of such fraction to the nearest whole number.

**M.**      **Minimum Distribution**

As set forth in the Plan and the Creditor Trust Agreement, if the amount of cash to be distributed to the holder of an Allowed Claim is less than $50 on a particular Distribution Date, the Creditor Trustee may hold the cash distributions to be made to such holder until the aggregate amount of cash to be distributed to such holder is in an amount equal to or greater than $50.  Notwithstanding the preceding sentence, if the amount of cash distribution to any holder of an Allowed Claim never aggregates more than $50, then the Creditor Trustee shall not be required to distribute cash to any such holder.

**N.**      **Payment of Statutory Fees and Filing of Quarterly Reports**

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at or in conjunction with the Confirmation Hearing, will be paid on or before the Effective Date and, thereafter, pending entry of a final decree.  All quarterly reports of disbursements required to be filed by applicable bankruptcy law will be filed in accordance with applicable bankruptcy law.  The Office of the United States Trustee will continue to be paid in accordance with the terms of the Plan.

**O.**      **Consolidation of the Debtors' Cases and Estates**

On or about March 1, 2008, OH, OHFF, and J.D Garber Furniture, LP ("JD Garber")

LV1 1151169v2 01/18/10

merged into DD-OH  although whether or not such Merger was effective may be a matter of dispute  (the "Merger"), including in the Committee's Adversary Proceeding.  To accomplish such Merger, the Debtors sought to (and believed that they did) transfer the assets, liabilities and business functions of OH, OHFF, and JD Garber (collectively the "Merged Debtors") into DD-OH.  Since the Merger, it is the Debtors' position that DD-OH has held itself out to all creditors as the principal business entity for the Merged Debtors' former operations.  This position may be a matter of dispute.  Although the US Trustee appointed one Committee to represent the interests of all of the Debtors' General Unsecured Creditors, Claims were scheduled by and filed against each of the Debtors.  Therefore regardless of whether or not the Merger was effective, the Committee negotiated the treatment under this Plan for all Class 3 Creditors while understanding that such treatment would benefit of each of the Debtors' General Unsecured Creditors and that the Claims scheduled by and filed against each Debtor would need to be considered and addressed.

By virtue of the Merger, and for the purposes of this Plan, the assets and liabilities of all of the Debtors will be treated as substantively consolidated as of the Effective Date solely for purposes of all actions associated with confirmation and effectuation of this Plan including, voting and distribution.  All Creditors holding Allowed General Unsecured Claims shall share, pro rata, in the Creditor Proceeds to be distributed from the Creditor Trust.

The deemed consolidation shall not (other than for purposes of effectuating the terms of this Plan) affect the legal and corporate structures of the Debtors nor shall it expand the rights of any creditor that asserts a Claim against any of the Debtors or Lien in or against any Collateral.

If the Bankruptcy Court authorizes the Debtors to consolidate for voting and distribution purposes fewer than all of the Classes of Claims or unclassified Claims sought to be consolidated

LV1 1151169v2 01/18/10

for these purposes, then pursuant to section 1122 of the Bankruptcy Code, the Debtors may proceed with separate classifications for any such non consolidated Classes or unclassified Claims.  If the Debtors elect to proceed with separate classifications or treatment of Classes of Claims or unclassified Claims, such Classes of Claims or unclassified Claims will be treated as against each individual non-consolidated Debtor for voting and distribution purposes.  In such event, each Class of Claims or unclassified Claims shall be divided into subclasses; one for each of the Debtors.  In some situations a particular Debtor may not have any claims asserted against it in a particular class or otherwise.

Without limiting any similar provisions in this Plan, to the extent this Plan is not confirmed, nothing stated herein shall be construed as an admission by any party in interest or other Person.

Upon the Effective Date, the bankruptcy cases of Oskar Huber Fine Furniture Incorporated (Case No. 08-28136), Oskar Huber, Inc. (Case No. 08-28138), JD Garber Furniture, LP (Case No. 08-28143), JDG of DE, LP (Case No. 08-28144) and JDG of PA, LP (Case No. 08-28145) shall be immediately closed and the bankruptcy estates of each of the foregoing debtors shall be substantively consolidated into that of  DD-OH Family Partners, LLC (Case No. 08-28140) which shall remain open until further Order of the Court.

## XI.    CERTAIN TAX CONSEQUENCES OF THE PLAN

SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX ISSUES DISCUSSED BELOW.   THEREFORE, EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN.   NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF

LV1 1151169v2 01/18/10

THE TAX ASPECTS OF THE PLAN.  ALL CREDITORS ARE URGED TO CAREFULLY REVIEW THE TAX DISCLOSURE PROVIDED HEREIN.

The Creditor Trust Agreement will conform to the guidelines set forth by the IRS regarding grantor trusts.  The Creditor Trust should be treated as a grantor trust if it is operated in accordance with the Creditor Trust Agreement.  A grantor trust generally is disregarded for federal and state income tax purposes.  Claimants having an interest in a grantor trust are treated as directly owning the assets of the trust and are required to report their proportionate share of its gain, loss, income, and deduction (without regard to the timing of distributions from the trust).

It is uncertain how the grantor trust rules would apply to the extent it is unknown which claimants ultimately will receive distributions from the Creditor Trust.

Because the Creditor Trust should be recognized as a grantor/creditor trust and the beneficiaries are its grantors, the beneficiaries will be taxed on the Creditor Trust's income under the grantor trust rules.  Assets held by the Creditor Trust will be treated as if they had been disbursed to the beneficiaries in satisfaction of their claims under the Plan and immediately thereafter transferred by the beneficiaries to the Creditor Trust.  The beneficiaries will be treated as owning the assets held by the Creditor Trustee in order to accomplish the Reorganization of the Assets.  The beneficiaries will be taxed currently on any income realized by the Creditor Trust without regard to whether the beneficiaries actually receive a distribution from the Creditor Trust.  The Creditor Trustee will file a tax return reporting the income and will give each of the beneficiaries, as beneficiaries, an appropriate tax statement indicating the beneficiary's share of the income of the Creditor Trust.  The IRS will then collect taxes on the post-Effective Date income, if any, of the assets held by the Creditor Trust from the beneficiaries.

It is possible that the IRS may treat the Creditor Trust as one or more complex trusts

LV1 1151169v2 01/18/10

taxable under IRC Section 641, in which event the tax features of the Creditor Trust would be different from those stated above including, among other things, potentially a tax on the Creditor Trust itself as well as a tax on the beneficiaries.

THE FOREGOING IS A SUMMARY ONLY AND IS <u>NOT</u> A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE TAX CONSEQUENCES OF THE PLAN COULD BE COMPLEX AND, IN MANY AREAS, UNCERTAIN. THEREFORE, EACH HOLDER OF A CLAIM IS STRONGLY URGED NOT TO RELY ON THE FOREGOING AND TO CONSULT HIS OR HER OWN TAX ADVISOR REGARDING SUCH CONSEQUENCES.

## XII.    <u>RECOMMENDATION AND CONCLUSION</u>

The Debtors believe the Plan provides the best available alternative for maximizing the recoveries that creditors may receive from the estate. Therefore, the Debtors recommend that all creditors that are entitled to vote on the Plan vote to accept the Plan.

[SIGNATURES TO FOLLOW ON NEXT PAGE]

LV1 1151169v2 01/18/10

OSKAR HUBER FINE FURNITURE
INCORPORATED, Debtors and Debtors in
Possession

By: ___/s/ Ronald Huber_____

DATED: January 18, 2010                Ronald Huber, President


OSKAR HUBER, INC., Debtors and
Debtors in Possession

By: ___/s/ Ronald Huber_____
DATED: January 18, 2010                Ronald Huber, President


DD-OH FAMILY PARTNERS LLC,
Debtor and Debtor in Possession

By: ___/s/ David Garber_____
DATED: January 18, 2010                David Garber, Chief Executive
Officer


DD-OH FAMILY PARTNERS LLC,
Debtor and Debtor in Possession

By: ___/s/ Ronald Huber_____
DATED: January 18, 2010                Ronald Huber, President


J.D. GARBER FURNITURE, L.P., Debtors
and Debtors in Possession

By: _____/s/ David Garber_____
DATED: January 18, 2010                David Garber, General Partner


JDG of DE, L.P., Debtors and Debtors in
Possession

LV1 1151169v2 01/18/10

By: _____*/s/ David Garber*_____

David Garber, General Partner

DATED: January 18, 2010

JDG of PA, L.P., Debtors and Debtors in Possession

By: __*/s/ David Garber*_____

David Garber, General Partner

DATED: January 18, 2010

LV1 1151169v2 01/18/10